**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FCC Holdings, Inc., *et al.*,[1] | Case No. 14-11987 (CSS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF SEAN HARDING IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

SEAN HARDING hereby declares, under penalty of perjury, as follows:

1.      I am the interim Chief Executive Officer and Chief Restructuring Officer of debtors and debtors-in-possession FCC Holdings, Inc. (**"FCC"**); Education Training Corporation (**"ETC"**); Edutech Acquisition Corporation (**"EduTech"**); High-Tech Institute Holdings, Inc. (**"High-Tech Holdings"**); and High-Tech Institute, Inc. (**"High-Tech"** and, together with FCC, ETC, EduTech, and High-Tech Holdings, the **"Debtors"** or the **"Company"**). I perform my duties out of the Debtors' headquarters located at 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334. I submit this declaration (the **"Declaration"**) in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the **"First Day Motions"**).

2.      I am a Senior Managing Director in the Corporate Finance practice of FTI Consulting, Inc. (**"FTI"**), based in Atlanta, Georgia. The Company originally engaged FTI as a financial advisor on April 4, 2014. On April 10, 2014, I was appointed Chief Restructuring Officer, and on April 29, 2014, I was appointed interim Chief Executive Officer. I have more

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FCC Holdings, Inc., a Delaware corporation (2598); Education Training Corporation, a Florida corporation (1478); High-Tech Institute Holdings, Inc., an Arizona corporation (4629); EduTech Acquisition Corporation, a Florida corporation (8490); and High-Tech Institute, Inc., an Arizona corporation (3099). The Debtors' business address is 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL  33334.

than seventeen years of experience working with distressed companies and advising secured creditors in out-of-court restructurings and in formal bankruptcy proceedings, in a number of different industries. My experience has included renegotiation of financing arrangements and covenant compliance, development and review of detailed financial and operational business turnaround plans, development and review of detailed 13-week cash flow projections, product profitability analyses and cost reduction initiatives, including SG&A rationalization.

3.      I am also a member of FTI's interim management practice, and have served as an officer in numerous restructuring engagements, including serving as Senior Vice President of Restructuring to Zacky Farms and serving as Senior Vice President of restructuring to Cagle's Inc. In this latter capacity I also oversaw the day-to-day operations of the company, including managing liquidity, correspondence with vendors, customers and lenders. During my career, I have also served as Senior Vice President of Restructuring to Allen Family Foods, financial advisor to a $1.1 billion revenue poultry processor, restructuring advisor to the 3rd largest hog producer in the country, financial advisor to a $1.4 billion revenue turkey processing company, secured lender advisor to Pilgrim's Pride, restructuring advisor to FPL Foods; restructuring advisor to Burger King Corporation and  numerous franchisees; and restructuring advisor to numerous Pizza Hut franchisees.

4.      Prior to joining FTI, I was a manager with the U.S. division of PricewaterhouseCoopers' Business Recovery Services practice. I hold a B.S. in Commerce with a concentration of Finance from the University of Virginia.

5.      As the Interim Chief Executive Officer of the Debtors, I am authorized to submit this Declaration on behalf of the Debtors. Except as indicated otherwise, all statements in this Declaration are based upon my personal knowledge or my review of the Debtors' books and

records, other relevant documents and information prepared or collected by the Debtors' employees. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein. In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

6.    Part I of this Declaration provides a brief overview of the Debtors and a summary of these Chapter 11 Cases (as defined below). Part II of this Declaration describes in more detail the Debtors' business, the developments that led to the Debtors' chapter 11 filings, and their goals in these Chapter 11 Cases. Part III sets forth the relevant details of the various First Day Motions.

## I.    INTRODUCTION

7.    Before the Petition Date (defined below), the Debtors provided educational opportunities to approximately 10,000 active students in the proprietary post-secondary education space. The Debtors provided these services on 41 campuses and employed approximately 2,000 people.

8.    Proprietary post-secondary education plays an important role in making education accessible to a variety of students that might otherwise not have the opportunity to obtain a quality education, including low-income students who cannot afford traditional college, students who are academically unprepared for traditional college, working students, and students who are single or stay-at-home parents. Proprietary post-secondary schools generally offer flexible schedules, online course offerings, and qualified faculty that are paid to teach courses rather than to conduct research. Throughout their history, the Debtors have been successful in providing education to many students and particularly to these non-traditional students.

9.    The Debtors operate in a highly-regulated industry, subject to oversight by the U.S. Department of Education (**"DOE"**) as well as state regulatory agencies and national

3

accrediting bodies. As proprietary post-secondary institutions, the Debtors rely on funding from the DOE pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq. (**"Title IV"**). Title IV funds accounted for nearly 90% of the Debtors' revenue prior to the Petition Date.

10.     On or shortly after the Petition Date, the Debtors are filing their *Motion of the Debtors for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the **"Sale Motion"**) in order to seek approval of and implement a somewhat unusual transaction which, given the regulatory issues discussed below, is the only alternative the Debtors have to keep 28 campuses up and running (subject, in the case of 9 campuses, to further approval of the DOE), approximately 8,150 students educated, and approximately 1,500 people employed. In order to conclude the implementation of the transaction described in the Sale Motion, the Debtors commenced the chapter 11 cases (the **"Chapter 11 Cases"**) on the date hereof (the "**Petition Date**") by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

11.     Although the transaction described in the Sale Motion will not result in any significant cash proceeds for the Debtors' estates, for the reasons discussed in more detail below, approval of the transaction described in the Sale Motion is nevertheless in the best interests of the Debtors' estates and in the public interest, as it is the best (and only) alternative available for

4

the Debtors. If the transaction described in the Sale Motion is not approved, campuses will be shut down, students will have to find other schools to complete their education, people will be out of jobs, certain obligations to the DOE will not be assumed and satisfied, and vendors and suppliers will lose business opportunities. As a result, although the consideration for the transaction described in the Sale Motion is well less than the approximately $49,000,000 in secured debt owed by the Debtors, the Debtors secured lenders have consented to the transaction (the **"Secured Lenders Consent"**) and the DOE has approved the Step 1 Transactions (as defined below). The Debtors have sought – but not yet received – approval from the DOE of the Step 2 Transactions (as defined below).

12.    The transaction consists of two components: (1) the sale of certain campuses that, due to regulatory issues, was substantially consummated pre-petition, although certain aspects of the sale (such as assumption and assignment of leases), are contemplated to be concluded post-petition (the **"Step 1 Transactions"**), and (2) a post-petition private sale of certain other campuses (the **"Step 2 Transactions,"** and together with the Step 1 Transactions, the **"Transaction"**). The consideration for the Transaction is $1,000,000 in cash, a $1,000,000 lender consent fee, the assumption of certain leases, contracts and other liabilities and the funding of certain expenses that will enable the Debtors to (a) keep certain parts of their businesses running (and therefore students educated) through the conclusion of the Transaction and (b) have the opportunity to conclude and implement "Teach-Out" arrangements (discussed below) that will allow many of the students attending campuses that are not being sold to conclude their education. Due to the regulatory and other issues discussed below, the Debtors will therefore be asking the Bankruptcy Court in these Chapter 11 Cases to approve the

Transaction in its entirety, including the Step 1 Transactions, and for authority to close Step 2 Transactions in these Chapter 11 Cases.

13.      As discussed in detail below, among the regulatory issues that dictated the structure of the Transaction as partially consummated outside of chapter 11 are prohibitions on the use of Office of Postsecondary Education Identification (**"OPEID"**) numbers (which allow educational institutions to receive funding under Title IV) after an institution has filed a chapter 11 case. Because of the permanent prohibition on Title IV eligibility if an institution has filed for chapter 11, a traditional 363 sale is not a practical alternative for institutions dependent on Title IV revenues. In addition, certain change in control requirements severely limit the universe of likely potential purchasers to those already in the proprietary post-secondary education industry.

14.      Because the Debtors intend to operate a portion of their businesses during the pendency of these Chapter 11 Cases, and in order to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business, the Debtors request various forms of relief in the First Day Motions. The First Day Motions are described in greater detail in Part III below, but generally seek, among other things, the Bankruptcy Court's authority to: (a) continue certain of the Debtors' remaining operations with as little disruption as possible through the conclusion of the Transaction; (b) compensate their employees through this process;[2] (c) implement "Teach-Out" programs and wind-down those operations that are not being sold through the Transaction; (d) obtain authority to consensually use cash collateral; (e) comply with applicable state and federal statutes and regulations; (f) implement the Step 2 Transactions under the Amended and Restated Asset Purchase Agreement by and between the Debtors and IEC Corporation or its Designee (the **"Purchase Agreement"**), (g) complete the Step 1 Transactions

---

[2] The Debtors may also receive services from one or two former employees – who are now acting as consultants for certain of the Debtors' equity holders – at no cost to the Debtors, for a short period of time during these Chapter 11 Cases.

including the conclusion of certain post-petition aspects of the Step 1 Transactions in the Chapter 11 Cases (e.g., assignment and assumption of certain leases); (g) assume the Transition Services Agreement (the **"TSA"**); and (h) retain appropriate professionals. Maintaining the support of the Debtors' key constituencies, as well as operating the Debtors' day-to-day business with minimal disruption and erosion, is crucial to the success of the Debtors' efforts to maximize the value of the Debtors' estates and to ensure an expeditious resolution of these Chapter 11 Cases.

## II.    BACKGROUND

### A.    <u>Overview of the Debtors</u>

15.    Prior to the Petition Date, the Company, which currently operates under the name "Anthem Education," had three sets of schools – the 14 Florida Career College schools listed on **Exhibit A** (the **"FCC Schools"**); the 22 Anthem Education schools listed on **Exhibit B** (**"Anthem Schools"** and collectively "**Anthem Education**"); and the 5 US Colleges schools listed on **Exhibit C** (the **"US Colleges"**)[3] – on over 40 campuses, as well as "Anthem Online," its online course offerings. In order to preserve the OPEID number of the FCC Schools and allow for the assumption of the related DOE liabilities, the FCC Schools were transferred to IEC Corporation (**"IEC"**) prior to the Petition Date in partial implementation of the Step 1 Transactions.[4] The US Colleges are to be transferred to IEC as part of the Step 2 Transactions. In addition, and subject to DOE approval, certain of the Anthem Schools (identified as such on Exhibit B) may be transferred to IEC as part of the Step 2 Transactions if DOE approval can be obtained on a timely basis (the "**Step 2 Anthem Schools**"). If the DOE does not timely approve

---

[3] The US Colleges are the only campuses not deriving revenue under Title IV.

[4] The Debtors intend to complete the remainder of the Step 1 Transactions, including the assignment and assumption of certain leases, in these Chapter 11 Cases.

the acquisition of the Step 2 Anthem Schools, then the Debtors anticipate those campuses will be shut down.

16.     Prior to the Petition Date, three of the Anthem Schools (identified as such on Exhibit B) were sold to Premier Education Group, L.P. (**"Premier"**). With respect to the remaining ten Anthem Schools that were not sold pre-petition and are not part of the Transaction, the Debtors have negotiated (or are in the process of negotiating) "Teach-Out" arrangements for the students at these campuses, to ensure that those students can continue their educations with as little disruption as possible.

17.     FCC owns 100% of the stock of ETC. ETC owned and operated the FCC Schools, and owns 100% of the stock of both EduTech and High-Tech Holdings. EduTech owns and operates the US Colleges campuses. High-Tech Holdings owns 100% of the stock of High-Tech, which owns and operates (or owned and operated) the Anthem Schools. An organizational chart for the Debtors is attached hereto as **Exhibit D**.

18.     Headquartered in Ft. Lauderdale, Florida, the Company provided quality post-secondary education in fourteen states. The Company's programs provided career-focused degrees and diplomas that provided graduates with the ability to seek or improve their employment opportunities in the healthcare, technology, trades, business and legal industries, by teaching students specific skills that are sought by employers. As a result, students were prepared for the workplace right out of school or gained additional expertise to help them progress in their current occupations. The programs offered by the Company included the following: dental assistant; healthcare management; medical assistant technician; medical billing and coding; pharmacy technician; nursing; surgical technology; accounting; business management; healthcare management; masters of business administration; cosmetology; skin and nail care

specialist; criminal justice; paralegal; computer & network technician; information technology; massage therapy; heating ventilation & air conditioning (**"HVAC"**); and veterinary technology.

19.    The Company's mission was to provide high-quality post-secondary career education and training to its students and well-prepared graduates to employers. The Company supported its students along every step of their academic journey – from the initial contact and the application process to achieving their career goals and beyond. "Career Center" advisors meet students regularly to help them develop professional resumes, practice interviewing skills and learn effective job-search strategies. Some campuses hosted job fairs and invited local employers – many of whom engaged for student externships – to participate and sometimes act as guest speakers. Each campus employed knowledgeable financial aid advisors who helped qualifying students find the right scholarships, grants and loans to fund their education. Most campuses participated in the "Federal Work-Study" program as well.

20.    The Company's philosophy was that students found success when they were well-supported by faculty and staff. Classes were taught by instructors who were successful career professionals and who provided individualized education and interaction. Students had the opportunity to develop and practice their skills in modern labs, on the same kind of equipment used in the field. They regularly met with academic advisors who worked with them on taking the right classes at the right time, and had access to dedicated student services staff to get outside services they needed to help them remain in school.

21.    Experienced career center professionals at each campus – including the online college – assisted students with job placement. Career Center staff members identified job openings, hosted career fairs and maintained ties with local and national employers. Financial aid under Title IV was available to students who qualified. The Company also worked closely with

veterans and military personnel to help them identify and apply for military-specific financial aid packages, and with students who qualified for financial aid under various non-DOE governmental or Native American financial assistance programs.

22.    The Company's campuses provided training and education that lead to diplomas, associate degrees or bachelor's degrees (depending upon the accreditation and state approvals applicable to each location). Likewise, Anthem College Online allowed students to earn diplomas, associate and bachelor's degrees. One of the Anthem Schools – Morrison University, located in Reno, Nevada – offers an MBA, as well as associate and bachelor's degrees in accounting, management and computer science.

**B.    History of FCC**

23.    The FCC Schools, which were owned by ETC, were started by David Knobel in 1994 in Fort Lauderdale, Florida, and sold to a private equity fund in 2004. Upon the sale, Mr. Knobel stayed on to run the FCC Schools. In 2007, the FCC Schools were then sold to their current equity holders, Greenhill Capital Partners II, L.P., Greenhill Capital Partners (Cayman) II, L.P., Greenhill Capital Partners (Executives) II, L.P., Greenhill Capital Partners (Employees) II, L.P. (the **"Greenhill Capital Partners Entities"**), GCP Anthem, LLC (**"GCP Anthem"**), 105 Evergreen, LLC (together with GCP Anthem and the Greenhill Capital Partners Entities, the **"Greenhill Entities"**), Abrams Capital Partners I, LP, Abrams Capital Partners II, LP, Whitecrest Partners, LP, Great Hollow International, L.P., Riva Capital Partners, LP (collectively, the **"Abrams Entities"**), David Knobel, and J&N MCD TX FAM LTD (collectively with the Greenhill Entities and the Abrams Entities, the **"Equity Holders"**). The Equity Holders invested approximately $132 million to purchase the FCC Schools. The FCC Schools provided programs in several disciplines, including various healthcare, IT business,

nursing and HVAC programs. The FCC Schools operated under OPEID number 023058 and derived most of their revenues from Title IV funding.

**C.**    **History of Anthem Education**

24.    Anthem Education dates to 1965, with the establishment of the High-Tech Electronics Institute of Arizona in Phoenix, Arizona. In the 1980s, new management focused on expanding the school's offerings to provide training in other careers to meet the changing needs of the expanding Phoenix population. This included acquiring Anthem College – Bryman School, a healthcare training school originally founded in 1964.

25.    Over the years, Anthem Education acquired or launched additional schools and colleges to provide focused training and education for students interested in entering or advancing their positions in healthcare, technology, criminal justice, business or paralegal careers. New campuses included schools in New Jersey, New York and Pennsylvania; a pair of healthcare training schools in the St. Louis, Missouri region; and Morrison University, a business school founded in 1902.

26.    As more institutions joined the Anthem group, they were rebranded with the Anthem name, including Anthem College, Anthem Institute, and Anthem Career College. Anthem College Online was launched in 2003 for students interested in earning associate and bachelor degrees, including degree completion programs. Anthem Education's institutions operated under OPEID numbers 022631, 030764, 022932, 008441, and 010851. As noted above and discussed in more detail below, these OPEID numbers allowed the Anthem Schools to receive Title IV funding.

**D.**    **ETC's Acquisition of Anthem**

27.    In early 2012, ETC, which at the time owned and operated 11 FCC Schools (all located in Florida), acquired Anthem Education for a net purchase price (after post-closing

adjustments) of approximately $16.3 million (the entirety of which was funded by the Equity Holders). As a result of the acquisition, the Company had a national footprint, with 34 ground campuses in fourteen states. The Anthem Education acquisition brought additional programs such as nursing and HVAC technician training to the list of available programs under Anthem Education, and brought new programs such as dental technician, pharmacy technician and surgical technology, to the FCC Schools.

E.    **ETC's Acquisition of the US Colleges**

28.    After the acquisition of Anthem Education, in August 2013 ETC, through its subsidiary EduTech, acquired the assets of Medtech Educational Services, d/b/a US Colleges of Health and Human Services, which operated five campuses in California known as "US Colleges." The US Colleges' locations do not have OPEID numbers and do not receive Title IV funding. Rather, US Colleges operates programs that are shorter in duration than those offered by the other schools, like phlebotomy technician, for which students either pay out-of-pocket, or whose tuition is funded by employers or other (non-DOE) government agencies. Part of the reason for acquiring US Colleges was to provide an additional source of non-Title IV funding in order for the Company to remain compliant with DOE regulations.

F.    **Debtors' Business Model**

29.    The Debtors' business model was based on earning revenue from tuition paid by students for their educational programs, and relying on advertising and referrals to introduce new students to the Company. The Debtors' expenses generally consisted of employee salaries, costs of instruction, advertising costs, facility costs, capital expenditures, and general overhead and administrative costs.

### G.    Prepetition Capital Structure

30.    Prior to the Petition Date, FCC, as borrower (the **"Borrower"**), ETC, EduTech, High-Tech Holdings, and High-Tech, as guarantors (collectively, the **"Guarantors"**), Bank of Montreal, as administrative Agent (the **"Agent"**) and the other lenders party thereto from time to time (the **"Lenders"**) were party to that certain Credit Agreement, dated as of November 2, 2012, as amended by that First Amendment to Credit Agreement, dated as of January 31, 2012, that certain Second Amendment to Credit Agreement, dated as of June 14, 2013, that certain Third Amendment to Credit Agreement, dated as of April 4, 2013, and as amended and restated by that certain Amended and Restated Credit Agreement dated as of April 29, 2014 (the **"Amended and Restated Credit Agreement,"** and, together with the other Loan Documents as defined therein, the **"Pre-Petition Loan Documents"**).

31.    As of the Petition Date, the Debtors' outstanding obligations under the Pre-Petition Loan Documents and other loan documents were approximately $49,000,000, plus interest and fees, including the following principal amounts:

| | |
|---|---|
| Tranche A Loans: | $18,578,846 |
| Tranche B Loans: | $29,056,430 |
| Existing Letters of Credit: | $ 1,390,122 |

32.    Pursuant to the Pre-Petition Loan Documents, and as security for the payment and performance of the Debtors' obligations thereunder and under all other loan documents, the Debtors granted the Agent, for the benefit of the Lenders, a first priority security interest in substantially all assets of the Debtors and the proceeds thereof.

33.    The Tranche A lenders are the Abrams Entities, GCP Anthem, and Education Lender, LLC (**"Education Lender"** and, together with the Abrams Entities and GCP Anthem, the **"Tranche A Lenders"**). The Tranche B lenders are Bank of Montreal, Synovus Bank, BancAlliance Inc., Community & Southern Bank, C1 Bank, and Congressional Bank

(collectively, the **"Tranche B Lenders"**). Under the waterfall established pursuant to the Pre-Petition Loan Documents, the first $10 million in loan proceeds would go to repay the Tranche A loans, the second $15 million would go to repay the Tranche B loans, the third $5 million would go to repay the Tranche A loans, the remainder would go to repay the Tranche B loans, and the remainder after that would go to repay the Tranche A loans.

34.     The Debtors also have unsecured debt in the approximate amount of $15,000,000, consisting largely of advertisers, landlords, book vendors, supplies venders, and information technology service vendors.

**H.      Regulatory Overview**

35.     As indicated above, the Debtors' business operated in a highly regulated industry, subject to the requirements of Title IV, and oversight by the DOE, state regulatory agencies and accrediting bodies (ACICS, ACCSC and ABHES). Nearly 90% of the Debtors' revenue came from Title IV funding from the DOE. The remainder of the Debtors' revenues came primarily from cash payments by students, payments by employers, loans from private sources and loans and grants from other government agencies (such as the Department of Defense). The Company's revenues from US Colleges accounted for a portion of the Company's non-Title IV funding. The regulatory scheme described below materially impacts the Company's restructuring options and is therefore important to understanding the Company's goals in these Chapter 11 Cases.

**1.      The Higher Education Act and FSA Programs.**

36.     The federal government provides financial support for students attending post-secondary educational institutions in the United States through the federal student aid programs administered by the DOE under the Higher Education Act (**"HEA"**), 20 U.S.C. §§ 1001 *et seq.* (**"FSA Programs"**). The DOE promulgates regulations under the HEA and enforces the

regulatory and statutory provisions governing the administration of FSA funds to students through post-secondary institutions. Post-secondary institutions must apply to and receive approval from the DOE in order to be eligible to participate in the FSA Programs. Once an institution has been approved, or "certified," by the DOE to participate in the FSA Programs, it is given an OPEID number and through that OPEID number may disburse FSA funds to eligible students attending an approved program at the main campus or any approved additional location of that main campus. Many students rely heavily on these funds to finance their education. A single OPEID number covers the main campus and each of its additional locations. These campuses are collectively referred to as the "institution."

### 2.    Sale and Bankruptcy Issues.

37.    It is my understanding that, in the event of a bankruptcy filing, an institution's eligibility to participate in the FSA programs is immediately and irrevocably terminated by operation of law, notwithstanding the automatic stay provisions of federal bankruptcy law. It is also my understanding that an institution that becomes ineligible because of bankruptcy must immediately stop awarding FSA funds to students. I also understand that the loss of eligibility is effective as of the date of the bankruptcy filing and is permanent – the institution's eligibility under its OPEID number cannot be reinstated. For this reason, the OPEID number of an entity that has sought bankruptcy protection is no longer valid and the institution as a whole cannot be sold as an FSA Program participating institution. The result is that a traditional chapter 11 filing is difficult for companies funded primarily under Title IV because it results in a virtually immediate cessation of substantial revenue and eliminates much, if not all, of the value of the institution to a buyer.

38.    The requirements associated with an OPEID number also impact the ability to sell an FSA participating institution outside of a bankruptcy proceeding.  As a general rule, if a buyer

of an institution wants to acquire the OPEID number under which an institution operates, the buyer must assume known and unknown liabilities associated with the OPEID number (which may cover more than one campus) in order for that location to continue to be eligible to participate in the FSA Programs.[5] Potential exposure for a buyer includes liabilities for improperly expended or unspent FSA funds by the closed institution and unpaid refunds of FSA funds to students. As a result, it is difficult to identify buyers without their own OPEID number that will purchase campuses that are in financial difficulty because assumption of the OPEID number may bring un-quantified risk and a distressed seller cannot provide meaningful indemnity. Further, most existing industry operators were also unlikely to be buyers, not only because they would have to assume certain known and known DOE liabilities, but also because most existing industry operators were having their own operational or financial issues, and had limited cash and limited ability to raise capital given current industry conditions.

### 3. Change in Control Provisions.

39.     I understand that in order to receive Title IV funding, a school must be properly and continuously accredited and licensed, and satisfy the DOE's change-in-control provisions. If an acquiring company is not able to provide the DOE with two years of audited financial statements, then the DOE will require a letter of credit from that company, in an amount determined by the DOE in its discretion. I understand that it is customary for the DOE to require a letter of credit in the amount of 25% of company's Title IV funding for its most recent fiscal year. Here, the Company's Title IV funding was approximately $180 million. Thus, any entity seeking to acquire the Company that was not already in the proprietary post-secondary education

---

[5] There is a statutory and regulatory exception under which a buyer would not be required to assume the liabilities or student loan default rates of a closed institution. The DOE has said in recent communications that any buyer of the Debtors' campuses will be required to assume all known liabilities and certain unknown liabilities, student loan default rates, and any FSA Program revenues transferred to the acquiring institution as part of the acquisition.

business with two years of audited financial statements would have to provide a letter of credit to the DOE in the amount of approximately $45 million. This requirement essentially eliminated the prospects of any financial buyers not already in the proprietary post-secondary education business acquiring the Company.

### 4.   Regulatory Oversight and Accreditation.

40.     Proprietary post-secondary education providers, like the Company, have been subject to increased regulatory scrutiny and litigation in recent years from a variety of sources, including the DOE, the Consumer Financial Protection Bureau, State Attorneys General, members of Congress and its committees, and private litigants. The DOE conducts periodic reviews to determine whether to renew the eligibility and certification of every institution participating in the FSA Programs. Generally, such reviews occur every six years. Post-secondary schools are also subject to audits and program compliance reviews by various external agencies, including the DOE, its Office of Inspector General and state and accrediting agencies. The HEA and its implementing regulations also require that an institution's administration of FSA program funds be audited annually by an independent accounting firm.

41.     To participate in the FSA Programs, an institution must be (1) legally authorized by a state to provide postsecondary education programs in that state and (2) accredited by an accrediting agency recognized by DOE as a reliable authority on institutional quality and integrity. As a result, institutions are subject to extensive regulation and review by these agencies, which cover virtually all phases of the institution's operations.

42.     Under the HEA and its implementing regulations, each institution must be authorized to offer education programs and grant degrees or diplomas by the state in which the campus is physically located. State approval to operate a post-secondary institution is also generally required under state law. The level of regulatory oversight varies substantially from

state to state. In some states, the schools are subject to licensure by the state education agency and also by a separate higher education agency. Some states assert jurisdiction over online educational institutions that offer educational services to residents in the state or that advertise or recruit in the state, notwithstanding the lack of a physical location in the state. State laws may establish standards for instruction, qualifications of faculty, location and nature of facilities, financial policies, marketing and recruiting activities and other operational matters. Certain states also prescribe standards of financial responsibility and other operating standards that are different from, and in addition to, those prescribed by the DOE. In addition, a vast majority of states impose notification and/or approval requirements governing changes in ownership, which both a buyer and seller must meet for state licensure to continue uninterrupted. If a school does not meet its state requirements, its state licensing could be limited, modified, suspended or terminated. Failure to maintain licensure makes a school ineligible to participate in the FSA Programs.

43.    Pursuant to provisions of the HEA, the DOE relies on accrediting agencies to determine whether the academic quality of an institution's educational programs is sufficient to qualify the institution to participate in the FSA Programs. Accrediting agencies primarily examine an institution's stated mission, its ability to meet that mission, and the academic quality of its instructional programs. A grant of accreditation is generally viewed as reliable authority that an institution satisfies its mission and that its educational programs meet established academic standards. Accrediting agencies also review the administrative and financial operations of the institutions they accredit to ensure that each institution has the resources to perform its educational mission. Accrediting agencies monitor institutions through annual self-reporting and through the conduct of periodic site visits by representatives of the accrediting agency and

qualified persons from peer institutions. Accrediting agencies also conduct a substantive review and approval process of any institution undergoing a change in ownership. In the event an accrediting agency determines that a school's performance in one or more areas falls below certain parameters, the accrediting agency may require the school to "show cause" why its accreditation should not be revoked. Failure to maintain institutional accreditation makes a school ineligible to participate in the FSA Programs.

44.     Thus, the extensive regulatory environment in which the Debtors operated effectively limit the universe of potential buyers for the Debtors to strategic buyers (those already in the proprietary post-secondary education business), as opposed to any financial buyers. In addition, the universe of buyers is further limited by the interlocking accreditation requirements and the requirements of the state regulatory agencies.

**5.     Title IV Reconciliation.**

45.     As a participant in Title IV financial assistance programs, the Company's institutions were allowed to disburse funds on behalf of students, subject to reconciliation requirements for the receipt and return of Title IV funds. The Title IV administration process involves two separate government systems. One, called "COD," is for the processing and posting of financial aid awards, which enabled the Company to draw down on Title IV funding on behalf of students. The second one, called "G5," is for actually drawing down on the funding. There are various funding "statuses" available to institutions, dependent in part on their ability to demonstrate to the DOE adequate administrative oversight of their financial aid programs. Prior to April 2014, the Company operated under the "advance funding method," whereby the G5 system essentially operated as a line of credit for the Company to draw down on, based on the amount of funding an institution is eligible for based on what it inputs into the "COD" system. In order to insure that an institution does not draw down more funding than it should, institutions

are required to reconcile their draws on the G5 system with their student records on the COD system.

I.    **Events Leading to the Chapter 11 Filing**

46.    The Debtors' financial problems began upon ETC's acquisition of Anthem Education in April 2012. At the time of the acquisition, Anthem Education had been a distressed company that was losing approximately $800,000 of cash per month; however, ETC believed that through cost-saving synergies and the launching of new programs across a now-national platform, the newly combined company would be profitable.

1.    **Reconciliation Issues.**

47.    Integration of the Anthem Education student information software systems and the FCC Schools' student information and financial aid management software systems proved to be a major challenge for the Company, and resulted in significant difficulties in processing and reconciling Title IV funding. Prior to the acquisition, the FCC Schools reconciled their Title IV funding on a regular basis, using a proprietary student information software system integrated with a third-party financial aid management software system that worked well for FCC and its then-11 campuses (all located within the state of Florida). Anthem Education, on the other hand, operated under a different, third-party, integrated student information and financial aid management software system to manage its Title IV funding programs for its nationwide network of schools.

48.    When the Company attempted to integrate the Anthem Education system into the FCC systems (which also included implementation of a new third-party financial aid management system) in early 2013, the software files did not process correctly, which corrupted student records transmitted to COD, creating an imbalance between the G5 and COD systems. This imbalance resulted from the Company drawing down permissible funds from the G5

system, but upon reconciliation, determining that that student's information was never properly entered into the COD system.

49.    Because of the software issues, the Company had to reconcile approximately 10,000 student records that were corrupted, and began having to manually process its Title IV funding. Manually processing and reconciling the Title IV funding for a company now triple its original size, however, proved to be extremely difficult and costly. By June 2013, though, the Company had reconciled the corrupted student records and believed that it had reconciled the imbalance that existed between the G5 system and COD.

50.    To further exacerbate the problem, if this reconciliation was not done before the end of the applicable funding period, the Company would forever lose the ability to put that student into the COD system for that funding period, and would have to repay the funds. Likewise, in circumstances where the Company should have been able to draw Title IV funds, but failed to do so because student data was not transmitted timely to COD, the Company could not later draw those funds if the error in transmitting the data to COD was identified after the expiration of the funding period.

51.    Due to continuing systems issues and inefficiencies inherent in processing financial aid manually for 10,000 students, the Company's G5 and COD balances began to diverge once again in the Fall of 2013. In early March of 2014, management was notified that the DOE contacted the financial aid team and notified the Company that the out-of-balance condition must be reconciled by March 31, 2014, [6] in order for the Company to continue to draw Title IV funding. At that time, the out-of-balance condition between COD and G5 had grown to approximately $12 million.

---

[6] Generally the DOE requires out-of-balance companies to balance their G5 and COD balances June 30 of each year, but because of the magnitude by which the Company was out of balance, the DOE required an accelerated schedule from the Company.

52.   In order to get back in balance that quickly, the Company had to completely stop drawing down on its Title IV funding. As a result, in early to mid-April of 2014, the Company was liquidity constrained and required additional cash to make payroll and pay its operating expenses. In order to fund this shortfall, the Abrams Lenders and GCP Anthem contributed $2 million, in exchange for an unsecured subordinated note, to keep the Company running.

**2.    The April 2014 Recapitalization.**

53.   In late April, 2014, the Abrams Lender and GCP Anthem, along with new lender Education Lender, agreed to loan an additional $13 million to the Company. As part of that transaction, the Company's original bank lenders – who are now the Tranche B lenders – agreed to subordinate their existing debt to this new loan, and the $2 million subordinated note in favor of the Abrams Lenders and GCP Anthem was canceled, with the $2 million deemed to have been contributed as part of the new facility. At closing, $6 million of the $15 million was funded, for a total initial infusion of $8 million in April 2014, with the intention to fund an additional $7 million over the ensuing weeks and months. While Education Lender funded its initial contribution toward the original $6 million, Education Lender defaulted on its obligation to fund an additional $421,153.85 to the Company.

54.   After this loan was made, the Company was able to satisfy its DOE obligations, which were anticipated to total $9 million upon a final reconciliation in the Spring of 2014. However, the financial strain on the Company that resulted from being behind with many of its vendors during the period that it could not draw down Title IV funds, combined with an erosion in new student enrollments and a higher-than-expected student drop rate, required the Company to raise additional funds to run the Company. As a result, in July of 2014, the Abrams Entities

and GCP Anthem contributed an additional $4 million in Tranche A Loans pursuant to an amended and restated note.

### 3. Other Operational Challenges.

55.    In addition to the reconciliation issues, there were other operational challenges associated with the Anthem Education acquisition. FCC had its corporate offices and all of its campuses located in the state of Florida. Anthem Education, on the other hand, had campuses all over the country, with its corporate headquarters located in Phoenix, Arizona. At the time of the acquisition, Anthem Education was losing approximately $800,000 per month. Further, the marketing plans for the FCC Schools – which focused largely in student referrals – differed from that of Anthem Education, which focused largely on acquiring leads through internet marketing programs. Thus, while the FCC Schools had been operating well and profitably prior to the acquisition of Anthem Education, the FCC Schools suffered as well after the acquisition due to management having to turn its attention to Anthem Education.

### 4. Liquidity Issues.

56.    Without the ability in the Spring of 2014 to drawn down on its Title IV funding – which accounted for nearly 90% of the Company's revenues – the Company suffered from serious liquidity issues. The Company was also still catching up with its vendors from its difficulties the prior year, and the Company had previously committed to approximately $12 million in capital expenditures in the Fall of 2013, which spending could not be halted by the Spring of 2014. Thus, the Company had to conserve available cash and many vendors began requiring cash-on-delivery payment and/or payment of all past due invoices before providing any new critical goods or services. As a result, the Company's liquidity was further strained.

### 5. Defaults under Pre-Petition Loan Documents.

57.    As a result of all of the foregoing issues, on or about July 1, 2014, the Debtors defaulted under their Pre-Petition Loan Documents.

### J. Efforts to Restructure

58.    The Debtors retained FTI as consultants in April 2014 and restructured their debt and brought in additional capital that same month. They also made a number of changes in their management team, with Chief Operating Officer Neal Yawn resigning on April 4, 2014, CEO David Knobel being removed by the Company's Board of Directors on April 29, 2014, and Mark Young, Senior Vice President of Student Operations, resigning in early June, 2014. Upon the removal of Mr. Knobel, I was installed as interim Chief Executive Officer.

59.    Ultimately, the Company reconciled its Title IV funding and repaid the DOE approximately $17 million, as of June 2014, which was significantly higher than the originally estimated $9 million deficiency at the time of the April 2014 recapitalization. Further, the amount of cash needed to resolve the Debtor's financial problems, combined with a continuing decline in the student population, drained the Debtors' resources such that they no longer believed they had a viable long-term business model without significant investment that was not available.

### K. The Transaction

### 1. Efforts to Identify Transaction Options.

60.    Once the Debtors realized that their long-term business model was not sustainable without significant additional capital, the Debtors moved quickly to identify transaction options that would allow the students to continue their educational opportunities, protect employee jobs, address DOE liabilities, and provide on-going business opportunities for vendors and suppliers. The timing of these efforts were driven by my determination that the Company's liquidity would

be fully used up in late August 2014 even with certain additional funds the Equity Holders had agreed to invest to allow for pursuit of a transaction.

61.     The Debtors considered a number of options including a sale of the entire business; a sale of portions of the business; and Teach-Out arrangements. A **"Teach-Out"** arrangement is one where another school either selects students that they will accept to transfer to the new school, or where a new school agrees to take all of the students for a particular program. With respect to those campuses for which the Debtors have been unable to procure a purchaser, the Debtors have sought Teach-Out arrangements for its students, so that they could continue their education with as little disruption as possible. As of the Petition Date, the Debtors have executed approximately 15-20 Teach-Out agreements – covering approximately 1,100 students – in order to provide their students with a convenient option for completing their education.

62.     Given the regulatory overlay described above – most particularly the DOE's onerous change-in-control provisions that would require an entity not already in the education business to post a letter of credit in the amount of 25% of the Title IV funding – the universe of possible purchasers was extremely limited, and restricted to only to others already in the industry. Against the backdrop of those restrictions, in the early Summer of 2014, the Debtors began marketing their business to others in the industry, based largely on the contacts of the Debtors' equity holders (who have extensive experience and contacts in the proprietary post-secondary education industry), as well as contacts provided by the leading investment bank in the industry. As a result of those efforts, the Debtors spoke with approximately 7-10 potential purchasers, signed approximately 5-7 confidentiality agreements, and had approximately 30 unique visitors to its data room.

63.     Ultimately, these efforts resulted in the Purchase Agreement with IEC.[7] As noted above, the Transaction has two steps. The Step 1 Transactions involved the pre-petition sale of 14 FCC Schools to IEC with the post-petition assumption of certain contracts and leases. The Step 2 Transactions will involve the sale of 5 US Colleges campuses to IEC, and subject to obtaining the required regulatory approvals, the sale of 9 Anthem Education campuses to IEC. The consideration for the Transaction is $1,000,000 in cash, a $1,000,000 lender consent fee, and the assumption of certain liabilities and funding of certain expenses that will enable the Debtors to (a) keep certain parts of their businesses running (and therefore students educated) through the conclusion of the Transaction and (b) have the opportunity to conclude and implement "Teach-Out" arrangements that will allow students in campuses that are not being sold to conclude their education.

### 2.     The Step 1 Transactions and the Step 2 Transactions.

64.     Given the regulatory framework under which the Debtors operate, including the requirement that an institution will lose forever its OPEID number and ability to receive Title IV funding if it files for bankruptcy, the Debtors constructed a two-step transaction in order to maximize value, keep its campuses open and it students educated.

65.     The Step 1 Transactions involved the pre-petition sale of the FCC Schools (OPEID #023058) to IEC pursuant to the Purchase Agreement. This first step had to be completed prior to bankruptcy, because IEC did not have an OPEID number with compatible

---

[7] The Greenhill Capital Partners Entities, whose equity interests in the Debtors are less than 25% of the Debtors' total equity, also hold less than 20% "first-out preference" membership interests in an indirect parent entity of IEC. The Greenhill Capital Partners Entities have recused themselves from the Debtors' Board of Directors' discussions regarding the IEC Transaction. I am also informed that the Greenhill Capital Partners Entities have not played any part in IEC's decision to acquire the campuses from the Debtors, and that the Greenhill Capital Partners Entities have represented to the DOE that they have agreed not to share in any financial benefit from IEC's acquisition of the Debtors' campuses.

accreditation through which it could draw down Title IV funding for these campuses.[8] Thus, in order to keep the existing OPEID numbers for these campuses, and therefore preserve the ability to obtain Title IV funding, these campuses had to be sold pre-petition. That sale closed on August 21, 2014. The Step 1 Transactions were partially completed prior to the Petition Date solely because of the requirement that the FCC Schools would have forever lost their OPEID numbers (and therefore ability to receive Title IV funding) if the FCC Schools had filed for bankruptcy. Nevertheless, the Transaction is collectively one Transaction under the Purchase Agreement, and pursuant to the Sale Motion, the Debtors will be seeking this Court's approval of the entire Transaction.

66.     The Step 2 Transactions – involving campuses where IEC does not need to acquire the existing OPEID numbers (both Anthem Education and the US Colleges) – are intended to be fully implemented through these Chapter 11 Cases. The purchase of the Step 2 Anthem Schools is, however, subject to applicable educational approvals, including that of the DOE. The parties are continuing to seek DOE approval, however, as of the Petition Date, approval has not yet been obtained. If the Debtors do not receive a response from the DOE within the next week, however, then IEC's obligation under the Purchase Agreement to fund the operating expenses associated with the Step 2 Anthem Schools campuses will end, and the Debtors will have to close down those 9 campuses, putting approximately 3700 students out of school, and approximately 450 people out of work.

---

[8] IEC does have Title IV participating schools with OPEID numbers, but those schools are accredited by accrediting agencies different from FCC's accrediting agencies. Because of the differing accrediting agencies, the FCC Schools could not be merged with the IEC's institutions under any of IEC's OPEID numbers. Thus, because accreditation is a requirement of Title IV eligibility, in order to acquire the FCC Schools and ensure the ability to receive Title IV funding, IEC had to acquire the FCC Schools' OPEID number.

### 3.    The Approvals.

67.    By and large, the state regulatory agencies have been cooperative in granting the necessary approvals for the Transaction, as have the accreditors, whose primary concern is what is in the students' best interests. Likewise, the Debtors have obtained the Secured Lenders Consent as well as consent the Equity Holders. The Equity Holders are not receiving any consideration in the Transaction.  The Lenders are receiving the $1,000,000 lender consent fee (plus IEC's agreement to cash collateralize at 105% three letters of credit, totaling $1.13 million, securing three FCC Schools' lease obligations, that had been provided by the Tranche B Lenders).

68.    While the Transaction is not expected to result in any net cash to the estate, as a matter of public policy, the Transaction ought to be approved, for several reasons. First, the secured creditors, who are owed over $49 million, have consented to the Transaction. Second, over 8,150 students will continue to receive their educations, resulting in degrees and other certifications that contribute to society. Third, over 1,500 employees will keep their jobs. Fourth, vendors and suppliers to the Debtors will have a continuing opportunity to do business with IEC. And fifth, certain DOE liabilities have been assumed (and subject to approval of Step 2, certain other DOE liabilities may be assumed).

### 4.    The Premier Transaction.

69.    Separate and apart from the Transaction with IEC, the Debtors consummated another prepetition transaction with Premier, for the sale of three campuses located in New Jersey (OPEID #010851). That sale closed on August 22, 2014. As with the Step 1 Transaction, the sale to Premier also involved the sale of an OPEID number, such that applicable federal law prohibited this sale from being conducted in a bankruptcy case. Upon closing of that sale,

approximately 700 students were able to continue their educations and the majority of the faculty and staff will receive employment.

70.    The Lenders consented to the sale to the Premier transaction as well, in exchange for a $150,000 consent fee. Premier also assumed High-Tech Institute's liabilities under OPEID number 010851, as well as any bulk sales law and WARN act obligations that High-Tech Institute may have had. The Debtors are not seeking post-petition relief with regard to the sale to Premier at this time.

### 5.    The Arizona Receivership.

71.    Finally, High-Tech owns a parcel of real property located in Phoenix, Arizona (the **"Arizona Real Property"**), as to which the Agent has sought to exercise its remedies with respect to its collateral, including appointment of a receiver and foreclosure. On August 22, 2014, the Superior Court for the State of Arizona, in and for the County of Maricopa, in the case styled *Bank of Montreal v. High-Tech Institute, Inc., et al.*, Case No. CV 2014-010731, entered an order appointing a receiver for the Arizona Real Property. The Debtors intend to consent to stay relief with respect to this action, and to seek to leave the receiver in place.

### 6.    Reasons to Approve the Transaction in its Entirety.

72.    To be clear, this is not a case where any material recovery is expected for creditors. After consummation of the Transaction, the secured creditors will be left with approximately $48 million in unpaid debt. Unsecured creditors may have claims satisfied in connection with the assumption of contracts and leases and will have the opportunity in some cases to do business with IEC going forward. The Equity Holders have invested approximately $170 million in the Debtors, and will receive no recovery whatsoever. The DOE is having certain liabilities assumed, but not all of them. If the Transaction is approved, the Debtors do not

anticipate filing a plan of reorganization – rather, they intend on either converting the cases to Chapter 7 or seeking a structured dismissal of the Chapter 11 Cases.

73.     Despite all of that, most of the critical constituents – including the secured lenders, the administrative agent, the DOE (subject to its approval of the Step 2 Transactions), and the Debtors' Equity Holders, have worked together to get the Transaction done because it was the *only* option that allowed for the majority of the students to continue to be educated and employees to retain jobs and provided the best available option for the Debtors.

### III.     FIRST DAY MOTIONS[9]

74.     Concurrently with the filing of the voluntary petitions to commence these cases, the Debtors will be filing a number of First Day Motions. The Debtors anticipate that the Bankruptcy Court will conduct a hearing within a business day or two after the commencement of the cases (the **"First Day Hearing"**), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

75.     Generally, the First Day Motions have been designed to meet the immediate goals of (a) establishing procedures for the efficient administration of these Chapter 11 Cases; (b) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtors' key constituencies. I have reviewed each of the First Day Motions, including the exhibits, attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Chapter 11 Cases.

---

[9] Capitalized terms used in Part III and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

76.     The First Day Motions are summarized below:

**A.     Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only**

77.     By this motion, the Debtors request the joint administration of the Debtors' related Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Debtors' cases under the FCC case and also request that the caption of their cases be modified to reflect the joint administration of the cases.

78.     ETC, EduTech, High-Tech Holdings, and High-Tech (collectively, the **"Subsidiaries"**) are direct or indirect wholly owned subsidiaries of FCC, such that the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2). Joint administration of these cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases.

79.     Joint administration will permit the Clerk to use a single general docket for the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

80.     I understand that if the Court approves joint administration of the Debtors' cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to these cases and obviate the need for duplicative notices, motions, applications and orders, and thereby save time and expense for the Debtors and their estates.

81.     Based on the foregoing, the Debtors believe that joint administration of the cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B.      Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**

82.     By this motion, the Debtors seek emergency interim authorization to use Cash Collateral subject the terms of the Proposed Interim Order for the purpose of avoiding immediate and irreparable harm to the Debtors' respective bankruptcy estates pending a final hearing, and further authorization pursuant to a final order on the Motion. In consideration for use of Cash Collateral and in accordance with the Consent Agreement, the Debtors seek authority from the Court to provide the Lenders adequate protection and a determination that such adequate protection is adequate under the circumstances of these cases. Further, the Debtors request that the Court schedule a final hearing on the use of Cash Collateral and, following such a hearing, enter a final order authorizing use of Cash Collateral.

83.     The Debtors do not have sufficient available sources of working capital and financing to effect the transaction contemplated in the Purchase Agreement and the TSA or to preserve and maintain the value of the Debtors' remaining assets without the use of the Cash Collateral. The Debtors ability to operate their remaining business and preserve the value of their remaining assets, as well as pursue and effect the transactions contemplated in the Purchase Agreement or the sale or disposition of the Debtors' remaining business and assets is critical to preserving the value of the Debtors' estates. In addition, the Debtors need for use of Cash Collateral is critical and immediate. In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and the Debtors would not be able to

consummate the transaction provided in the Purchase Agreement or preserve the value of the remaining business and assets. Accordingly, the Debtors and their estates would suffer immediate and irreparable harm unless the Debtors are authorized to use Cash Collateral on the terms and conditions set forth herein and in accordance with the Initial Budget.

84.    Given the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors have been unable to obtain financing from sources on terms more favorable than those provided for in motion and the Proposed Interim Order. The Debtors likewise have been unable to obtain unsecured credit allowable under Section 364(b)(1) of the Bankruptcy Code as an administrative expense.

85.    The Lenders assert an entitlement to adequate protection of the security interests in their prepetition collateral within the meaning of sections 361 and 363 of the Bankruptcy Code. The Debtors do not dispute those interests. The Agent, on behalf of the Consenting Lenders, is willing to consent to the Debtors' use of Cash Collateral as set forth herein upon the terms set forth in the Proposed Interim Order.

86.    Based on the foregoing, the Debtors believe that the Court should authorize the use of Cash Collateral on an interim and, following a final hearing, final basis.

**C.    Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Waiving Certain Investment and Deposit Guidelines**

87.    By this motion, the Debtors seek an order: (a) authorizing the maintenance of Bank Accounts and continued use of existing Business Forms; (b) authorizing but not directing continued use of the existing Cash Management System; (c) waiving certain of the deposit Guidelines set forth by the Office of the United States Trustee; and (d) providing any additional relief required in order to effectuate the foregoing. The relief requested herein will help ensure

the Debtors' smooth transition into chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these cases.

88.      The Debtors' Cash Management System constitutes a customary and essential business practice that was created and implemented by the management of the Debtors in the exercise of their business judgment. Moreover, the Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

89.      Indeed, the Cash Management System is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. All of these benefits will assist the Debtors in their efforts to maintain the operation of their remaining businesses and preserve asset value during the pendency of these Chapter 11 Cases, which will increase the likelihood of a sale of their remaining assets. Accordingly, the relief requested herein appropriate under section 105(a) of the Bankruptcy Code.

90.      Based on the foregoing, the Debtors believe that the Court should authorize the Debtors to continue to use their existing Cash Management System, maintain their existing Bank Accounts, and waive certain of the deposit Guidelines set forth by the Office of the United States Trustee, including those Guidelines requiring that debtors (a) close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts; (b) establish and maintain separate debtor-in-possession accounts for the payment of taxes and

separate debtor-in-possession accounts for cash collateral; and (c) obtain and utilize new checks for all debtor-in-possession accounts which bear the designation "Debtor-in-Possession" and contain certain other information related to the chapter 11 case.

91.     The Debtors also request that the Court authorize them to use all correspondence and Business Forms existing immediately before the Petition Date without reference to the Debtors' status as "debtors-in-possession." As of the Petition Date, the Debtors had a large stock of Business Forms that they used in the ordinary course of business. Reprinting their Business Forms to indicate that the Debtors are "Debtors-in-Possession" would impose an unnecessary burden and expense on the Debtors. There is little doubt that the parties with whom the Debtors do business shortly will become aware that they are chapter 11 debtors-in-possession.

92.     In addition, the Debtors pool their cash into certain bank accounts and distribute funds to individual schools to purchase supplies and fund operations. These Intercompany Transactions allow the Debtors' Cash Management System to function efficiently in a cost-effective manner through the centralization of key administrative functions. If these Intercompany Transactions are discontinued, the Debtors' cash management process would be disrupted causing irreparable harm to the Debtors.  Accordingly, the Debtors believe that the continuation of Intercompany Transactions in the ordinary course of the Debtors' business is in the best interest of the Debtors' estates and their creditors.  The Debtors maintain records of substantially all Intercompany Transactions and can ascertain, trace and account for the Intercompany Transactions at all times. The Debtors will continue to maintain such records postpetition.

93.     Based on the foregoing, the Debtors believe that the relief requested in this motion is necessary for the maximization of the value of their remaining assets and should be granted.

**D.    Motion of the Debtors for Entry of an Order (A) Authorizing Debtors to Pay (I) All Prepetition Employee Obligations, and (II) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Transfers**

94.     By this motion, the Debtors seek authority to pay and honor, as the case may be, (a) all prepetition claims of Employees, including, but not limited to, claims for Wages and Salaries, PTO, and certain costs and disbursements related to the foregoing, up to the statutory cap of $12,475 per Employee, (b) any claims or payments pursuant to the Employee Benefit Programs, and (c) all Payroll Taxes. The Debtors further request that the Court enter an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

95.     As discussed herein, the Debtors have an obligation under the Purchase Agreement to pay certain of the Employee Obligations of Employees that were transferred to IEC pursuant to the closing of the sale of the FCC Acquired Assets. Accordingly, failure to do so would have a severe negative impact on the Debtors' estates. Moreover, as mentioned previously, payment of the remaining Employee Obligations is essential in order to effect the transactions contemplated by the Purchase Agreement. Finally, the Lenders under the Pre-Petition Credit Agreement have consented to the payment of the Employee Obligations pursuant to the Secured Lenders Consent. Accordingly, the Debtors believe that the relief requested herein is in the best interests of their estates.

96.     Based on the foregoing, the Debtors believe that the relief requested in this motion is necessary for the maximization of the value of their remaining assets and should be granted.

**E.      Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy code (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate <u>Assurance of Payment</u>**

97.     In connection with the operation of their remaining businesses and management of their estates, the Debtors obtain electricity, gas, water, sewer services, waste services, internet services, alarm services, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**"). The Debtors' aggregate average monthly cost for Utility Services is approximately $99,714.

98.     Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to operate their remaining businesses and preserve the value of their assets would be severely and irreparably harmed. Specifically, the Debtors' campuses cannot operate without continued Utility Services. Accordingly, uninterrupted Utility Services are essential to preserve the viability of the potential sale of many of the Debtors' assets, as contemplated by the Purchase Agreement and to complete Teach-Out programs in place at their other campuses. It is therefore critical that the Utility Services continue uninterrupted.

99.     Based on the foregoing, the Debtors believe that the relief requested in this motion is necessary for the maximization of the value of their remaining assets and should be granted.

**F.     Motion of the Debtors for Entry of an Order Authorizing (i) the Debtors to Pay Prepetition Sales and Use Taxes, and (ii) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

100.     In connection with the normal operation of their businesses, the Debtors pay sales and use taxes (the "**Taxes**") to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**"). Approximately $33,000 of Taxes were accrued and unpaid as of the Petition Date. By this motion, the Debtors are seeking the authority to pay those prepetition Taxes that are owed to the Taxing Authorities.

101.     The Taxes which the Debtors seek authority to pay herein apply both to the assets sold to IEC pursuant to the Purchase Agreement and to the Debtors' remaining assets. Under the Purchase Agreement, the Debtors have the obligation to pay the outstanding sales and use taxes that relate to those assets sold pursuant to the Purchase Agreement. Accordingly, the Debtors seek authority to pay these Taxes in order to comply with their obligations under the Purchase Agreement. Payment of this portion of the Taxes may be partially funded by IEC in accordance with the Purchase Agreement.

102.     Additionally, with respect to the remaining Taxes, the Debtors seek authority to pay these Taxes in order to avoid the adverse consequences that could result from nonpayment. Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, which could include filing liens, interfering with or withdrawing concessions, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could significantly disrupt the Debtors' ability to operate their remaining businesses and preserve the value of their assets. It is critical that the Debtors continue to operate their remaining businesses and preserve the value of their assets in order to maintain the viability of the Transaction.

103.    Based on the foregoing, the Debtors believe that the Court should authorize the Debtors to pay the prepetition Taxes that are owed to the Taxing Authorities.

**G.    Motion of the Debtors for Entry of an Order Authorizing Debtors to (i) Maintain Existing Insurance Policies and Pay all Policy Premiums and Brokers' Fees Arising Thereunder, and (ii) Continue Insurance Premium Financing Programs and Pay Insurance Premium Financing Obligations Arising in Connection Therewith**

104.    In the ordinary course of the Debtors' businesses, the Debtors maintain numerous insurance policies with various insurance carriers (the "**Insurance Carriers**"), providing coverage for, *inter alia,* commercial general liability, automobiles, commercial property, excess liability, medical professional, glass, commercial crime, fiduciary liability, security/privacy and workers compensation (collectively, the "**Policies**"). As of the Petition Date, prepetition amounts due and owing pursuant to the Policies are approximately $35,000. By this motion, the Debtors request authorization to pay these prepetition amounts.

105.    The Policies are essential to continue to operate the Debtors' remaining businesses and preserve the value of the Debtors' estates. In addition, pursuant to the terms of the Purchase Agreement, the Debtors are required to maintain the Policies, which cover the assets purchased by IEC pursuant to the Purchase Agreement. IEC has agreed to provide a portion of the funds necessary to maintain the Policies. Moreover, the U.S. Trustee Operating Guidelines require the Debtors to maintain insurance coverage through the pendency of their Chapter 11 Cases. Even a temporary suspension of the Debtors' ability to pay these Policies would create a significant risk of the Debtors losing their insurance coverage. Accordingly, the Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under their current insurance contracts (including related brokers' fees).

106.    Additionally, the Debtors finance the premiums on certain of the Policies pursuant to a premium financing agreement (the "**PFA**") with AFCO Premium Credit LLC ("**AFCO**"), a

third-party lender. The PFA requires monthly installment payments of $49,587.91 due on the first day of each month beginning August 1, 2014 and continuing for a period of 7 months. The PFA bears a total finance charge of $3,985.59 on the total financed amount of $526,049.78. The annual interest rate under the PFA is 3.487%. The Debtors do not have any prepetition amounts owed under the PFA. By this motion, the Debtors seek to pay the installments under the PFA as they come due. The next installment payment is due on September 1, 2014. If the Debtors are unable to continue making their installment payments under the PFA, AFCO may be permitted to terminate certain of the Policies to recoup their losses. As mentioned previously, pursuant to the terms of the Purchase Agreement, the Debtors are required to maintain the Policies, which cover the FCC Acquired Assets. Moreover, maintenance of the Policies is crucial in order to protect and preserve the value of the Debtors' remaining assets, and thereby effect the transactions contemplated by the Purchase Agreement.

107.     Based on the foregoing, the Debtors believe that the relief requested in this motion is necessary for the maximization of the value of their remaining assets and should be granted.

**H.     Motion of the Debtors for an Order, Pursuant to Section 105(a) and 365(a) of the Bankruptcy Code, Authorizing the Assumption of the Transition Services Agreement**

108.     By this motion, the Debtors seek the entry of an order authorizing the Debtors to assume the TSA.

109.     Pursuant to the TSA, IEC agrees to provide, or cause certain third-parties to provide, the Debtors with certain services that are necessary for (a) the Debtors to operate their remaining business pending transition to IEC, (b) the administration of the Chapter 11 Cases, (c) compliance with certain regulatory requirements, (d) the completion of the Debtors' Teach-Out obligations, (e) establishment of a record custodian function, and (f) winding down of the

40

Debtors' remaining liabilities.

110.    The Debtors' decision to assume the TSA is an exercise of their sound business judgment. First, the terms of the TSA are the result of extensive, arms'-length negotiations between the Parties. Second, the assumption of the TSA and the payment of the Agreed Expenses affords the Debtors the opportunity to operate their business long enough to complete the Step 1 Transactions and to pursue the closing of the Step 2 Transactions, thereby mitigating liabilities by satisfying certain claims asserted against the Debtors' estates. Third, the TSA will allow the Debtors to comply with certain regulatory requirements, complete their teach-out obligations, and establish a record custodian function. Finally, the TSA imposes certain requirements on IEC which will facilitate the wind down of the Debtors' business.

111.    Moreover, the assumption of the TSA will not impose any financial requirements on the Debtors; instead, pursuant to the TSA and the Purchase Agreement, IEC is required to provide services vital to the operation of the Debtors' business as well as fund certain costs and expenses related to the operation of the Debtors' business.

112.    Based on the foregoing, the Debtors believe that the relief requested in this motion is necessary for the maximization of the value of their remaining assets and should be granted.

**I.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases *Nunc Pro Tunc* as of the Petition Date**

113.    By this motion, the Debtors request entry of an order authorizing and approving the Debtors' rejection of certain unexpired leases of real property (the "**Rejected Leases**"), all *nunc pro tunc* to the Petition Date.

114.    The Debtors have surrendered the premises subject to the Rejected Leases, have no ongoing or anticipated need for the premises, and have therefore determined it is in their best interests to reject these leases

115.    In view of the foregoing, the Debtors' determination to reject the Rejected Leases is the result of sound business judgment and the Debtors believe that the relief requested in this motion should be approved by the Court.

**J.      Motion of the Debtors for Entry of an Order (i) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business; (ii) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (iii) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; (iv) Approving Bid Protections and (v) Granting Related Relief**

116.    By this motion, the Debtors seek entry of an order (i) authorizing and approving the form of Purchase Agreement, (ii) authorizing the sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Purchase Agreement, (iii) authorizing the assumption and assignment of the Assumed Contracts, (iv) approving certain bid protections and expense reimbursement and (v) granting related relief.

117.    The Debtors, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with the their professionals, determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to enter into Purchase Agreement, commence these Chapter 11 Cases and seek approval of the Transaction. The Debtors believe that the Purchase Agreement maximizes the value of the Debtors' assets for all of the Debtors' constituents.

118.    Accordingly, the Debtors submit that sound business justification exists to consummate the transactions set forth in the Purchase Agreement. The Transaction detailed in

the Purchase Agreement, both the prepetition transfer of certain of the FCC Schools and the proposed sale of the Anthem Schools and US Colleges, represents the only transaction available to the Debtors which allows twenty-eight schools to remain open, over 8,150 students to continue their education and maintains over 1,500 jobs.[10] While the Transaction provided for in the Purchase Agreement will not result in any significant tangible proceeds to the Debtors' estates, approval of the Transaction is in the public interest and, due to the regulatory issues affecting the Debtors' business, is the best (and only) transaction available to the Debtors. If the transactions provided in the Purchase Agreement are not approved or are unwound, the twenty-eight schools will be shuttered and over 8,150 students' education will be irrevocably damaged.

119.    Further, the Debtor's secured lenders have consented to the transaction provided by the Purchase Agreement, and the DOE, which is the government agency with regulatory oversight of the Debtors' business, has approved the first, pre-petition component of the transaction, while the Debtors have sought, but not yet received, approval from the DOE for the second component of the Transaction.

120.    Based on the foregoing, the Debtors believe that the relief sought in this motion is not only reasonable, but necessary, to protect the interests of the Debtors' students and employees, and effect a relatively seamless transition of the Debtors' businesses.

---

[10] In the event the Debtors are unsuccessful in obtaining the required consents and approvals for the sale of the Anthem Schools, the Debtors hereby request Bankruptcy Court approval of the sale as it relates to the US Colleges.

**K.**     **Motion of the Debtors for Entry of an Order (i) Lifting the Automatic Stay to Allow Bank of Montreal, as Administrative Agent, to Exercise its Remedies Under Applicable Non-Bankruptcy Law Against Certain Real Property of High-Tech Institute, Inc. Located in Maricopa County, Arizona Pursuant to 11 U.S.C. § 362(d); and (ii) Allowing the Receiver to Remain in Place With Respect to the Deed of Trust Collateral**

121.     By this motion, the Debtors request that this Court enter an order allowing the Agent for itself and the other Lenders, to exercise its rights and remedies under applicable non-bankruptcy law against the Arizona Real Property, and (ii) allowing the Receiver to remain in place with respect to the Deed of Trust Collateral with full power and authority over the Deed of Trust Collateral, including such power and authority as set forth in the Receivership Order, pursuant to the terms of that certain *Stipulation Regarding Relief From Stay* between the Debtors and Agent.

122.     By virtue of the Stipulation, the Debtors are consenting to lift the automatic stay. The Debtors are in default under the terms of the Pre-Petition Credit Agreement and other Loan Documents. The Debtors have no equity in the Deed of Trust Collateral and have no need for use of the Deed of Trust Collateral in any reasonably likely reorganization.

123.     The claims of the Agent and Lenders under the Pre-Petition Credit Agreement and other Loan Documents exceed the value of the Deed of Trust Collateral. Further, the rights and interests of the Agent and Lenders in the Deed of Trust Collateral are not adequately protected under 11 U.S.C. § 361. Accordingly, the Debtors believe that lifting the automatic stay as requested herein is warranted under the circumstances.

124.     Based on the foregoing, the Debtors believe that the relief sought in this motion should be granted.

**L.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to
Credit Certain Excess Funds To Students' Accounts**

125.    By this motion, seek entry of an order authorizing, but not directing, the Debtors,
in their sole discretion, and in accordance with applicable law, to honor outstanding Title IV
Refunds which were outstanding as of the Petition Date and to continue to process and credit the
Title IV Refunds to students and the government, as applicable.

126.    Prior to the Petition Date in the ordinary course of business the Debtors incurred
and processed Title IV Refunds to the students enrolled in their programs and the government
when required. As of the Petition Date, checks for approximately $638,000 in Title IV Refunds
had been issued to students; however, those checks had not yet cleared the Debtors accounts. In
addition, the Debtors will continue to incur liability for Title IV Refunds from and after the
Petition Date.

127.    It is beyond question that pursuant to applicable law the Debtors are obligated to
pay the Title IV Refunds. The Debtors' failure to pay the Title IV Refunds could have a severe
impact on the Debtors as the failure to comply with applicable law could adversely impact the
Debtors' ability to receive funding pursuant to Title IV or could result in penalties or fines being
asserted against the Debtors.

128.    Based on the foregoing, the Debtors believe that the relief sought in this motion
should be granted.

**M.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to Enter
Into Teach-Out Agreements For Certain Campuses**

129.    By this motion, the Debtors seek entry of an order authorizing, but not directing,
the Debtors, in their sole discretion, to enter into Teach-Out Agreements, in materially the same
form as that attached as Exhibit B to the motion, in the event that the Step 2 Transactions do not
close.

130.    Institutions that decide to close an educational program, site, branch campus or the entire institution are required, typically by the applicable state regulatory agencies (the **"Regulatory Authorities"**) and the institution(s)' accrediting agencies (the **"Accreditors"**), to submit a teach-out plan. A teach-out plan is a written plan developed by an institution that provides for the equitable treatment of students and a reasonable opportunity for the students to complete their program of study if an institution, or an institutional location, ceases to operate before all students have completed their program of study.  A Teach-Out Agreement is a written agreement between institutions that provides for the equitable treatment of students and a reasonable opportunity for students to complete their program of study if an institution, or an institutional location, ceases to operate before all enrolled students have completed their program of study.

131.    With respect to those campuses for which the Debtors have been unable to procure a purchaser, prior to the Petition Date the Debtors executed a number of Teach-Out Agreements, and sought approval from the Regulatory Authorities and Accreditors, to allow their students to continue their education with as little disruption as possible.  As of the Petition Date, the Debtors had executed approximately 15-20 Teach-Out agreements – covering approximately 1,100 students – in order to provide their students with a convenient option for completing their education.

132.    In the event the Debtors are unsuccessful in obtaining the requisite approvals to effect the sale of the Step 2 Anthem Schools, and IEC's obligations to fund operating expenses associated with the Step 2 Anthem Schools terminates, the Debtors will be forced to close nine campuses, effectively terminating the educations of over 3,700 students. However, if the Debtors are permitted to execute Teach-Out Agreements with institutions interested in assisting the

Debtors with a teach-out plan, the Debtors will be able to ensure that these students are able to complete their education. The Teach-Out Agreements will require approval from the Regulatory Authorities and the Accreditors; however, the Debtors remain in constant communication with the Regulatory Authorities and Accreditors regarding the potential need to teach-out the students at the Step 2 Anthem Schools. The failure to comply with regulatory guidelines and pursue Teach-Out Agreements in the event the Step 2 Anthem Schools are not sold to IEC may result in penalties being imposed by the applicable regulatory authorities. Therefore, the Debtors believe that executing Teach-Out Agreements for the Step 2 Anthem Schools, in the event that the sale of the Step 2 Anthem Schools is not consummated, is in the best interests of the Debtors, their estates, and their students, and that the relief sought in this motion should be granted.

## IV.    CONCLUSION

133.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

[Signature on next page]

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2014.

/s/ Sean Harding
Sean Harding