## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FCC Holdings, Inc., *et al.*,[1] | Case No. 14-11987-CSS |
| Debtors. | (Joint Administration Requested) |
| | **Hearing Date: To be determined.** |
| | **Objection Deadline: To be determined.** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING
ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF
CERTAIN ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE
OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS;
(III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV)
APPROVING BID PROTECTIONS; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") hereby move the Court (the "**Motion**"), for an order, substantially in the form attached hereto as <u>Exhibit A</u>, under sections 105(a), 363(b), (f), and (m), 365 and 503 of title 11 of the United States Code, §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking entry of an order (i) authorizing and approving the Amended and Restated Asset Purchase Agreement  dated August 21, 2014 (as further amended or modified, the "**Purchase Agreement**") by and between the Debtors and IEC Corporation ("**IEC**" or the "**Buyer**") and attached hereto as <u>Exhibit B</u>, (ii) authorizing the sale free and clear

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FCC Holdings, Inc., a Delaware corporation (2598); Education Training Corporation, a Florida corporation (1478); High-Tech Institute Holdings, Inc., an Arizona corporation (4629); EduTech Acquisition Corporation, a Florida corporation (8490); and High-Tech Institute, Inc., an Arizona corporation (3099). The Debtors' business address is 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL  33334.

of liens, claims, encumbrances and interests pursuant to the Purchase Agreement, (iii) authorizing the assumption and assignment of certain assumed contracts and unexpired leases, (iv) approving the bid protections as set forth in the Purchase Agreement, and (v) granting related relief. In support of the Motion, the Debtors respectfully represent as follows:

<u>**Status of the Case and Jurisdiction**</u>

1.      On August 25, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these chapter 11 cases.

4.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief sought herein are sections 105, 363(b), (f), and (m), 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rules 2002-1 and 6004-1.

<u>**Background**</u>

6.      Prior to the Petition Date, the Company, which currently operates under the name "Anthem Education," operated three sets of schools – 14 Florida Career College schools (the "**FCC Schools**"); 22 Anthem Education schools ("**Anthem Schools**"); and 5 US Colleges (the

"US Colleges")[2] – on over 40 campuses, as well as "Anthem Online," its online course offerings. Headquartered in Ft. Lauderdale, Florida, the Company provided quality post-secondary education in fourteen states.

7.      As more fully set forth in the First Day Declaration, proprietary post-secondary education plays an important role in making education accessible to a variety of students who might otherwise not have the opportunity to obtain a quality education. Proprietary post-secondary schools generally offer flexible schedules, online course offerings that are designed to address the needs of these non-traditional students, and qualified faculty that are paid to teach courses rather than to conduct research. Throughout their history, the Debtors have been successful in providing education to many of these non-traditional students.

8.      The Debtors' business model was based on earning revenue from tuition paid by students for their educational programs and relying on advertising and referrals to introduce new students to the Company. The Debtors' expenses generally consisted of employee salaries, costs of instruction, advertising costs, facility costs, capital expenditures, and general overhead and administrative costs.

**Regulatory Overview**

9.      The Debtors operate in a highly-regulated industry, subject to oversight by the U.S. Department of Education (**"DOE"**) as well as state regulatory agencies and national accrediting bodies. As proprietary post-secondary institutions, the Debtors rely on funding from the DOE pursuant to Title IV (**"Title IV"**) of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.

---

[2] The US Colleges are the only campuses not deriving revenue under Title IV.

10.     As set forth in in the First Day Declaration, the federal government provides financial support for students attending post-secondary educational institutions in the United States through the federal student aid programs administered by the DOE under HEA, 20 U.S.C. §§ 1001 *et seq.* (**"FSA Programs"**). The DOE promulgates regulations under the HEA and enforces the regulatory and statutory provisions governing the administration of FSA funds to students through post-secondary institutions. Post-secondary institutions must apply to and receive certification from the DOE to be eligible to participate in the FSA Programs. Once an institution has been approved, or "certified," by the DOE to participate in the FSA Programs, it is given an identification number known as an OPEID (**"OPEID"**) and may disburse FSA funds to eligible students enrolled in and attending an approved program at the institution, whether at the main campus or any approved additional location of that main campus. Many students rely heavily on these funds to finance their education. A single OPEID number covers the main campus and each of its additional locations. These campuses are collectively referred to as the "institution."

11.     Nearly 90% of the Debtors' revenue came from Title IV funding from the DOE. The remainder of the Debtors' revenues came primarily from cash payments by students, payments by employers, loans from private sources and loans and grants from other federal agencies (such as the Department of Defense and Veterans Affairs).

**Impact of Regulatory Scheme on Sale of Debtors or Assets**

12.     As set forth in detail in the First Day Declaration, the Debtors' dependence on Title IV revenues limited the options the Debtors had to find additional investment and/or transaction partners when the Debtors experienced financial distress. This is primarily due to the fact that the filing of a chapter 11 proceeding immediately, and permanently, terminates an

institution's eligibility to participate in the FSA programs.  As a result, the Debtors could not pursue a traditional 363 sale or reorganization within the context of chapter 11.

13.     In addition, the universe of potential buyers for a distressed post-secondary education business is extremely limited.  If a buyer is interested in purchasing an institution and also wants to acquire the associated OPEID number, the buyer must assume known and unknown liabilities associated with the OPEID number (which may cover more than one campus) in order for that location to continue to be eligible to participate in the FSA Programs.  As a result, the universe of buyers without their own OPEID number willing to purchase campuses that are in financial difficulty is extremely limited, as assumption of the OPEID number may bring un-quantified risk and a distressed seller cannot provide meaningful indemnity.  Even strategic buyers, those with their own OPEID number, find distressed purchases difficult in this industry because the post performance of the acquired institution(s) may be ascribed to the buyer's existing business.

14.     Selling a distressed post-secondary education provider is further complicated by the fact that the industry has been subject to increased regulatory scrutiny and litigation in recent years from a variety of sources, including the DOE, the Consumer Financial Protection Bureau, State Attorneys General, members of Congress and its committees, and private litigants.  To participate in the FSA Programs, an institution must be (1) legally authorized by a state to provide post-secondary education programs in that state and (2) accredited by an accrediting agency recognized by DOE as a reliable authority on institutional quality and integrity. As a result, institutions are subject to extensive regulation and review by these agencies, which cover virtually all phases of the institution's operations.

15.    In addition to various approvals by the DOE, states and each school's accreditation body, an entity operating a proprietary post-secondary education business interested in acquiring the Debtors' business would have been required to furnish two years of audited financial statements to the DOE.  This further limits the universe of buyers as potentially interested parties not already operating a proprietary post-secondary education business with two years of audited financial statements must provide the DOE with a letter of credit in an amount determined by the DOE in its sole discretion. It is customary for the DOE to require a letter of credit in the amount of twenty-five percent (25%) of the company's Title IV funding for the most recently completed fiscal year. Therefore, any potentially interested party not already operating a proprietary post-secondary education business with two years of audited financial statements would have been required to provide the DOE with a letter of credit in the amount of approximately $45 million, given that the Debtors received approximately $180 million in Title IV funding in their most recently completed fiscal year.

16.    The extensive regulatory environment in which the Debtors operate, detailed more fully in the First Day Declaration, effectively limits the universe of potential buyers for the Debtors' business to strategic buyers willing to take on the risk of certain liabilities to their existing business or financial buyers already comfortable with the proprietary post-secondary education business. Due to the regulatory requirements and unmitigated risks related to the acquisition of an existing OPEID number, many buyers are either disinterested or unable to efficiently and effectively propose and execute any transaction to acquire the a distressed post-secondary education business.

**Events Leading to the Chapter 11 Filing**

17.     As discussed in more detail in the First Day Declaration, the Debtors experienced a number of issues which precipitated these Chapter 11 Cases, including:

- financial problems related to the Debtors' acquisition of Anthem Education in 2012;

- difficulties related to the integration of the Anthem Education software systems and the FCC software systems which required significant expenditures of both time and money to address;

- difficulties in reconciling the Debtors' Title IV funding with the DOE, which ultimately caused the Debtors to stop drawing Title IV funding for a period of time;

- severely constrained liquidity due primarily to the Debtors' inability to draw Title IV funding;

- an unexpected erosion in new student enrollments and a higher-than-expected student drop-out rate; and

- financial strain due to many of the Debtors' vendors requiring cash-on-delivery payment and/or payment of all outstanding invoices.

18.     Faced with a multitude of liquidity and regulatory issues, the Debtors attempted to address their operating and regulatory issues, restructure their debt and secure additional investment.  The Debtors also restructured their management team during that same period.  As a result of the foregoing issues, however, the Debtors defaulted under their loan documents on or around July 1, 2014.

**The Debtors' Sale Efforts**

19.     In April 2014, the Debtors began to investigate the interest of parties in consummating a transaction with the Debtors.  As previously discussed, the regulatory environment limited the pool of potentially interested parties to a relatively small universe.

20.     The Debtors considered a number of options including a sale of the entire business; a sale of portions of the business; and teach-out arrangements. The Debtors reached out to between seven (7) and ten (10) parties to evaluate their interest in acquiring the Debtors' assets. At least five (5) of those interested parties executed confidentiality agreements. In order to facilitate these potentially interested parties' interest in acquiring the Debtors' business, the Debtors established a dataroom which was visited by over thirty (30) unique individuals.

21.     Ultimately, the Debtors received several proposals from interested parties. The Purchase Agreement represents the sole proposal for the assets being sold in the Purchase Agreement. While the Debtors received several other proposals, only one other term sheet, for a small subset of schools, received the requisite regulatory approvals, and thus represented a viable transaction. The Debtors were able to successfully close this secondary transaction prior to the Petition Date. In addition, as of the Petition Date, the Debtors had executed approximately 15-20 teach-out agreements, which provide educational opportunities for approximately 1,100 students. The other proposals received by the Debtors did not receive the requisite approvals from the DOE, were abandoned by the interested party, or did not result in sufficient value to the Debtors' estates to make the transactions executable.

**The Two-Step Transaction**

22.     Given the regulatory framework in which the Debtors operate, including the reality that an institution will no longer be FSA eligible if it files for bankruptcy, the Debtors constructed a two-step transaction in order to keep its schools open and it students educated. Ultimately, these efforts resulted in the Purchase Agreement.

23.     Pursuant to the Purchase Agreement, the Debtors, *inter alia*, structured a two-step transaction with IEC. In the first step (**"Step 1"**), the Debtors sold, transferred and assigned to

IEC certain assets and liabilities of fourteen (14) Florida Career College schools (OPEID #023058) (the "**FCC Assets and Liabilities**").  Due to regulatory issues and following the receipt of certain Educational Approvals, the sale of the FCC Assets and Liabilities was consummated prior to the Petition Date other than with respect to certain contracts related to the FCC Business for which consent to assignment was not obtained prior to the Petition Date (the **"FCC Second Closing Assumed Contracts"**).  This transfer of the FCC Assets and Liabilities had to be completed prior to bankruptcy, because IEC did not have an OPEID number that could be used for these campuses.  Thus, in order to transition the existing OPEID number related to the FCC Schools, and therefore preserve IEC's ability to obtain Title IV funding for the FCC Schools, the FCC Schools had to be sold pre-petition.

24.     With respect to the second step (**"Step 2,"** and together with Step 1, the **"Transaction"**), the Purchase Agreement provides that (subject to certain terms and conditions including obtaining the required Educational Approvals (as defined in the Purchase Agreement) and Bankruptcy Court approval) the Debtors will sell, transfer and assign to IEC certain other assets and liabilities identified in the Purchase Agreement including (i) nine (9) "Other Acquired Campuses," (the "**Step 2 Anthem Schools**"), (ii) five (5) "CA Campuses," (the "**US Colleges**") and (iii) the FCC Second Closing Assumed Contracts (together, the "**Other Acquired Assets and Liabilities**").  IEC does not need to acquire the existing OPEID numbers in connection with the acquisition of the Anthem Schools and US Colleges. However, aspects of Step 2 remain subject to applicable Educational Approvals, including the approval of the DOE (as to the Step 2 Anthem Schools).  While the Parties continue to seek DOE approval, as of the Petition Date, such consent has not yet been obtained.

25.     The consideration for the Transaction is $1,000,000 in cash, a $1,000,000 lender consent fee (plus IEC's agreement to cash collateralize at 105% three letters of credit, totaling $1.13 million, securing three FCC Schools' lease obligations, that had been provided by certain Secured Lenders (as defined below)), the assumption of certain leases, contracts and other liabilities and the funding of certain expenses that will enable the Debtors to (a) keep certain parts of their businesses running (and therefore students educated) through the conclusion of the Transaction and (b) have the opportunity to conclude and implement teach-out arrangements that will allow many of the students attending campuses that are not being sold to conclude their education.

26.     In the event the Debtors do not receive a response from the DOE by August 29, 2014, IEC's obligation under the Purchase Agreement to fund the Step 2 Anthem Schools will terminate, and the Debtors will have to close down the Step 2 Anthem Schools, thereby potentially preventing approximately 3,700 students from finishing their education. If the applicable Educational Approvals are obtained and an order is entered approving the Transaction, then IEC will acquire the Other Acquired Assets and Liabilities and the FCC Second Closing Assumed Contracts.  If the Debtors are unsuccessful in obtaining the requisite Education Approvals for the sale of the Step 2 Anthem Schools, in accordance with this Motion, the Debtors will still seek approval of the balance of Step 2, which is primarily the sale of the US Colleges and the FCC Second Closing Assumed Contracts pursuant to the Purchase Agreement.

27.     The Debtors have worked diligently to obtain consent from their lenders and the regulatory agencies to the Transaction.  By and large, the state regulatory agencies have been cooperative in granting the necessary approvals for the Transaction, as have the accreditors, whose primary concern is what is in the students' best interests.  Likewise, the Debtors have

obtained the consent of their secured lenders (collectively, the "**Secured Lenders**") as well as the consent of the Equity Holders.

28.    While the Transaction is not expected to result in any net cash to the estate, it does maximize value and as a matter of public policy, the Transaction ought to be approved, for several reasons. First, the secured creditors, who are owed over $49 million, have consented to the Transaction. Second, over 8,150 students will continue to receive their educations, resulting in degrees and other certifications that contribute to society. Third, over 1,500 employees will keep their jobs. Fourth, vendors and suppliers to the Debtors will have a continuing opportunity to do business with IEC. And fifth, certain DOE liabilities have been assumed (and subject to approval of Step 2, certain other DOE liabilities may be assumed).

## Relief Requested

29.    Pursuant to sections 105(a), 363(b), (f), and (m), 365 and 503 of the Bankruptcy Code, the Debtors seek entry of an order authorizing and approving:  (a) the consummation of the Transaction; (b) the sale of the FCC Assets and Liabilities that was consummated prior to the Petition Date and the sale of the Other Acquired Assets and Liabilities following the Petition Date free and clear of all liens, claims, encumbrances (together, the **"Acquired Assets"**); (c) the assumption and assignment of the Assumed Contracts, the FCC Second Closing Assumed Contracts and the payment of the Cure Amounts with respect thereto; (d) in the event of an Alternative Transaction, (i)   the payment of the Break Up Fee; and (ii) the payment of the Expense Reimbursement; and (e) related relief.

30.    As described above, the Debtors, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with the their professionals, determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to enter

into Purchase Agreement, commence these Chapter 11 Cases and seek approval of the Transaction. The Debtors believe that the Purchase Agreement maximizes the value of the Debtors' assets for all of the Debtors' constituents, protects the interests of over 8,150 students by allowing the students to receive their educations, allows over 1,500 employees to maintain their employment, provides the vendors and suppliers to the Debtors a continuing opportunity to do business with IEC and provides for the assumption of certain DOE liabilities.

## Basis for Relief Requested

**The Purchase Agreement is an Exercise of the
Debtors' Sound Business Judgment and Should be Approved**

31.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

32.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of

business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtors have obtained a fair and reasonable price; and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). The Debtors submit that the decision to proceed with the Sale is based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

33.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105

sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

34.    The Debtors submit that sound business justification exists to consummate the Transaction as set forth in the Purchase Agreement. The Transaction detailed in the Purchase Agreement, both the prepetition transfer of certain of the FCC Schools and the proposed sale of the Anthem Schools and US Colleges, represents the only transaction available to the Debtors which allows twenty-eight (28) schools to remain open, over 8,150 students to continue their education and maintains over 1,500 jobs.[3] While the Transaction provided for in the Purchase Agreement will not result in any significant tangible cash proceeds to the Debtors' estates, the Transaction maximizes value and is in the public interest.  Due to the regulatory issues affecting the Debtors' business, the Transaction is the best (and only) transaction available to the Debtors. If the Transaction provided in the Purchase Agreement are not approved or are unwound, the twenty-eight (28) schools will be shuttered and over 8,150 students' education will be irrevocably damaged.[4]

35.    Further, the Secured Lenders have consented to the Transaction, and the DOE, which is a key government agency with regulatory oversight of the Debtors' business, approved

---

[3] In the event the Debtors are unsuccessful in obtaining the required consents and Educational Approvals for the sale of the Step 2 Anthem Schools, the Debtors hereby request Bankruptcy Court approval of the sale as it relates to the US Colleges and the FCC Second Closing Assumed Contracts.

[4] Failure to obtain approval of the Purchase Agreement will result in the immediate liquidation of the Debtors' business.

Step 1 of the Transaction, while the Debtors have sought, but not yet received, an indication of approval from the DOE for Step 2 of the Transaction with regard to the Step 2 Anthem Schools.

36.    Thus, the relief sought herein is not only reasonable, but necessary, to protect the interests of the Debtors' students and effect a relatively seamless transition of the Debtors' businesses.

**The Transaction Provided in the Purchase Agreement
are Appropriately Consummated by Private Sale**

37.    In accordance with Bankruptcy Rule 6004(f)(1), asset sales outside of the ordinary course of business may be by private or public sale. Fed. R. Bankr. P. 6004(f)(1). A debtor has broad discretion in determining the manner in which its assets are sold. *Berg v. Scanlon (In re Alisa P 'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . ."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property") (internal quotations and citations omitted). As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment. *See In re Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). Accordingly, if a debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interest of the estate, the debtor should be permitted to do so. *See Penn Mut. Life Ins. Co. v. Woodscape Ltd P 'ship (In re Woodscape Ltd P 'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "Where is no

prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

38.     As previously discussed, the Debtors' industry is highly regulated and the Debtors are subject to stringent restrictions as to their ability to seek the protection afforded a debtor pursuant to the Bankruptcy Code.  As discussed above, an institution (including any affiliate of the institution) that files for bankruptcy, is no longer considered an institution for purposes of Title IV funding eligibility.  *See* 20 U.S.C. 1002(a)(4)(A).  Further, a change-of-control requires various approvals by the DOE and the States, as well as the accrediting body overseeing each campus.  Specifically, an institution of higher education that has a change in ownership resulting in a change of control does not qualify for participation in the Title IV funding programs unless, *inter alia*, it established that it meets the definition of an institution described in 20 U.S.C. 1002(a)(4)(A).  Relatively few cases address the impact of Title IV program eligibility upon an institution commencing a bankruptcy proceeding.  However, of those, one, *In re Betty Owen Schools, Inc.*, discusses the impact of a sale pursuant to section 363 of the Bankruptcy Code, and the purchaser's eligibility for participation in Title IV programs.  195 B.R. 23 (Bankr. S.D.N.Y. 1996).  In that case, the DOE denied the subsequent purchaser's application for recertification. Despite the debtors and purchaser's efforts to enforce the sale order, the bankruptcy court explained that the sale order merely provided the purchaser was acting in good faith and that the risk of recertification was a risk the purchaser undertook when it purchased the debtors' assets. Due to these regulatory issues, the Debtors submit it would be impossible to conduct a standard public sale in the context of a bankruptcy proceeding.

39.     As previously discussed and explained in more detail in the First Day Declaration, due to the severe liquidity crises affecting the Debtors' business, the Debtors were unable to

continue to operate outside of bankruptcy without additional financing. Despite the Debtors' best efforts, the Debtors were unsuccessful in obtaining funding or financing to allow for continued operation of their business other than in connection with the consummation of Step 1.

40.     Consummating Step 1 of the Transaction provided the Debtors additional funding for these Chapter 11 Cases. However, as a result of the commencement of these Chapter 11 Cases, the Debtors are no longer eligible to receive Title IV funding, which accounted for approximately 90% of the Debtors' revenue prior to the Petition Date. As a result, a post-petition marketing process and pursuit of a public sale process would be impractical. As discussed herein, the universe of parties potentially interested in consummating a transaction with the Debtors is extremely limited. The Debtors, through their management and equity holders, marketed their business to others in the industry as well as to contacts provided by the leading investment bank in this industry. A post-petition sale process is unnecessary as the Debtors aggressively marketed their business, and as a result of these efforts the Debtors executed the Purchase Agreement. Further, Secured Lenders, who are owed in excess of $49 million have consented to the Transaction despite a very limited recovery on their claims.

41.     Therefore, the Purchase Agreement, and the private sale of the Debtors' assets through Step 1 and Step 2 should be approved as it maximizes value for the Debtors' constituents and protects the interests of over 8,150 students.

**The Sale of the Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

42.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for

the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

43.    The Debtors have already satisfied the second requirement of section 363(f) of the Bankruptcy Code.  While the Transaction does not provide a significant recovery to the Secured Creditors, the Secured Creditors expressly consented to the Transaction.    In fact, upon consummation of the Transaction, the Secured Lenders will be left with a secured claim in the amount of approximately $47 million.

44.    Further, the Debtors expect that they will satisfy the fifth of the requirements of section 363(f) of the Bankruptcy Code, as well.  Therefore, approving the Transaction, and the sale of the Acquired Assets, free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

45.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any "interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV,* 209 F.3d 252, 257 (3d

Cir. 2000). In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 *Collier on Bankruptcy* 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, *supra*, the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute" *Folger*, 209 F.3d at 258.

46.     The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the successful bidder arising from the debtor's pre-sale conduct. Under section 363(f) the Buyer is entitled to know that the Acquired Assets are not infected with latent claims that will be asserted against the Buyer after the transaction is complete. Accordingly, the Debtors request that any order approving this Motion contain a provision that the Buyer is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Acquired Assets.

**The Sale is Proposed in "Good Faith" Pursuant to**
**Section 363(m) of the Bankruptcy Code**

47.     The "good faith" prong of the *Abbotts Dairies* standard is also satisfied as discussed further below. The Debtors request that the Court find that IEC is entitled to the

benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Transaction provided in the Asset Purchase Agreement.

48.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

49.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.

50.     Moreover, the Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. *See In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").

51.     The Debtors submit that the Purchase Agreement is the result of a negotiated, arm's-length transaction, in which the Debtors and IEC at all times acted in good faith. Each party was represented by competent counsel and advised of their rights and obligations regarding the negotiation and execution of the Transaction. Further, the Debtors' decision to execute the Purchase Agreement was approved by independent and disinterested members of the board of directors.

52.     The Transaction, including the prepetition sale of the FCC Schools are the product of good faith negotiations and should be entitled to protection pursuant to section 363(m) of the Bankruptcy Code.  The Third Circuit has recognized that transactions integral to a sale deserve section 363(m) protection whether they themselves are properly referred to as sales under section 363(b) of the Bankruptcy Code.  *See Boeing Co. v. Kaiser Aircraft Indus. (In re Ala. Aircraft Indus.).* 2012 U.S. Dist. LEXIS 5279 (D. Del. Jan. 17, 2012) (finding that "transactions integral to a sale" deserve section 363(m) protection as the sale of assets is conditioned upon the vesting of the estates' causes of action in a trust and debtors' beneficial interest therein); *Cinicola v. Scharffenberger*, 248 F.3d 110, 125-26 (3d Cir. 2001) (providing the assumption and assignment of employment contracts section 363(m) protection because they were "inextricably intertwined" with the Debtor's sale of assets); *Official Comm. of Unsecured Creditors v. Chase Manhattan Bank (In re Charter Behavior Health Sys., LLC)*, 45 Fed. Appx. 150, 151 n.2 (3d Cir. 2002) (affording section 363(m) protection to the assignment of Medicare provider agreements because they were "inextricably intertwined" to the sales of the Debtors' hospitals).  Step 1 of the Transaction, including the prepetition sale of the FCC Schools, is a transaction that is integral to the Transaction and is inextricably intertwined with Step 2 of the Transaction; therefore, the Debtors request that the Court find that the Transaction provided in the Purchase Agreement was conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**Assumption and Assignment of**
**Executory Contracts and Unexpired Leases**

53.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

54.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

55.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

56.    Additionally, as set forth above, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11, provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986)

(noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

57.    The Debtors respectfully submit that the assumption, assignment and cure provisions contained in the Purchase Agreement are appropriate and reasonably tailored to provide non-Debtor parties to any assumed contracts with adequate notice in the form of the cure amounts (if any), of the proposed assumption and/or assignment of their applicable contract. Such non-Debtor parties to contracts to be assumed will then be given an opportunity to object to such notice. The Purchase Agreement further provides that, in the event an objection is not resolved, the Bankruptcy Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed assumption and assignment provisions and proposed cure procedures are appropriate in these Chapter 11 Cases.

**The Breakup Fee and Expense Reimbursement and**
**IEC Cash Reimbursement are Reasonable and, If Necessary, Appropriate**

58.    Although the Debtors do not anticipate any other offers for their assets, in the event of an Alternative Transaction, the Debtors seek approval to pay IEC a breakup fee (the **"Break Up Fee"**) of $150,000, as well as to reimburse IEC for its actual and necessary costs in an amount not to exceed $150,000 (the "**Expense Reimbursement**").

59.    The Break Up Fee and the Expense Reimbursement (together the "**Alternative Transaction Expenses**") will only be payable in the unlikely event that the Debtors consummate an Alternative Transaction with respect to the Step 2 Anthem Schools and the US Colleges. Moreover, the Debtors believe that the Alternative Transaction Expenses are fair and reasonable,

especially given the benefits to the estates of the Purchase Agreement and the unlikelihood that an alternative buyer is willing to close on the Step 2 Anthem Schools and the US Colleges.

60.     Approval of the Alternative Transaction Expenses is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535. Here, the Breakup Fee should be approved because it will provide a benefit to the Debtors' estates. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a breakup fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

61.     The Debtors' payment of the Alternative Transaction Expenses under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of

the efforts and the significant due diligence costs and expenses that have been and will be expended by IEC. Thus, the Debtors request that this Court approve and authorize payment of the Breakup Fee pursuant to the terms of the Purchase Agreement.

**Relief Under Bankruptcy Rule 6004(h)**

62.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

63.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

64.     Since a prompt closing of the Sale is of critical importance to the continued stability of the Debtors' business, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**Notice**

65.     Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the Agent, IEC, and all parties requesting notices pursuant to Bankruptcy Rule 2002 by mail. The Debtors submit that no other or further notice need be provided.

**No Prior Request**

66.     No previous request for the relief sought herein has been made to this or any other court.

**Conclusion**

67.     WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto, granting the relief requested herein and granting the Debtors such other and further relief as is just and proper.

Dated: August 27, 2014                    GREENBERG TRAURIG, LLP

                                          /s/ Dennis A. Meloro
                                          Dennis A. Meloro (DE Bar No. 4435)
                                          The Nemours Building
                                          1007 North Orange Street, Suite 1200
                                          Wilmington, Delaware 19801
                                          Telephone:  (302) 661-7000
                                          Facsimile:  (302) 661-7360
                                          Email: melorod@gtlaw.com

                                          -and-

Nancy A. Mitchell (*pro hac vice pending*)
Maria J. DiConza (*pro hac vice pending*)
Matthew L. Hinker (DE Bar No. 5348)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: 212-801-9200
Facsimile:  212-801-6400
Email: mitchelln@gtlaw.com
         diconza@gtlaw.com
         hinkerm@gtlaw.com

*Proposed Counsel for the Debtors and
the Debtors-in-Possession*