# EXHIBIT B

_____

AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT

_____

By and between

FCC HOLDINGS, INC.,

EDUCATION TRAINING CORPORATION,

EDUTECH ACQUISITION CORPORATION,

HIGH-TECH INSTITUTE HOLDINGS, INC.,

HIGH-TECH INSTITUTE, INC.,

and

IEC CORPORATION OR ITS DESIGNEE

Dated as of August 21, 2014

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS...................................................................................2

    1.1    Certain Terms Defined.............................................................2
    1.2    Interpretation........................................................................2

ARTICLE 2 PURCHASE AND SALE OF THE ACQUIRED ASSETS ......................3

    2.1    Purchase and Sale of FCC Acquired Assets .............................3
    2.2    Purchase and Sale of Other Acquired Assets............................4
    2.3    Excluded Assets.....................................................................6
    2.4    Assumption of Liabilities at the First Closing ..........................7
    2.5    Assumption of Liabilities at the Second Closing........................8
    2.6    Excluded Liabilities ...............................................................9
    2.7    Assignment and Assumption of Contracts and Leased Real Property .................11

ARTICLE 3 CONSIDERATION ..........................................................................12

    3.1    Purchase Price .....................................................................12
    3.2    Allocation of Purchase Price..................................................12

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS.................13

    4.1    Organization........................................................................13
    4.2    Authorization of Agreement .................................................13
    4.3    Conflicts; Consents of Third Parties.......................................14
    4.4    Title to and Use of FCC Acquired Assets.................................15
    4.5    Title to and Use of Other Acquired Assets ..............................15
    4.6    FCC Contracts.....................................................................15
    4.7    Other Contracts ...................................................................15
    4.8    Real Property .......................................................................15
    4.9    Intellectual Property.............................................................16
    4.10   Permits...............................................................................16
    4.11   Employee Benefit Plans ........................................................16
    4.12   Labor Matters......................................................................16
    4.13   Environmental Matters..........................................................16
    4.14   Insurance ............................................................................17
    4.15   Good Faith Buyer.................................................................17
    4.16   No Material Misstatements or Omissions.................................17
    4.17   No Brokers or Finders...........................................................17
    4.18   Litigation; Proceedings .........................................................17
    4.19   Board Approval and Recommendations ...................................18
    4.20   Compliance with Laws .........................................................18
    4.21   Educational Law and Educational Approvals............................18
    4.22   Affiliate Transactions...........................................................21
    4.23   Warranties Are Exclusive ......................................................21

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ...................................21

    5.1      Corporate Organization...............................................................21
    5.2      Authorization and Validity ...........................................................21
    5.3      Conflicts; Consents of Third Parties .............................................22
    5.4      Financing...................................................................................23
    5.5      No Brokers or Finders .................................................................23
    5.6      Litigation...................................................................................23
    5.7      Certain Compliance with Educational Law Matters ........................23
    5.8      No Other Representations and Warranties.....................................23

ARTICLE 6 COVENANTS AND OTHER AGREEMENTS.......................................24

    6.1      Pre-Closing Covenants of Sellers .................................................24
    6.2      Pre-Closing Covenants of Buyer ..................................................26
    6.3      Other Covenants of Sellers and Buyer...........................................27
    6.4      Employment Covenants and Other Undertakings.............................29
    6.5      Approvals ..................................................................................30

ARTICLE 7 TAXES .....................................................................................31

    7.1      Taxes Related to Purchase of Acquired Assets................................31
    7.2      Waiver of Bulk Sales Laws...........................................................32

ARTICLE 8 BANKRUPTCY COURT MATTERS ................................................32

    8.1      Certain Bankruptcy Matters .........................................................32
    8.2      Contracts ...................................................................................33
    8.3      Consultation with Buyer ..............................................................33

ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES............33

    9.1      Conditions Precedent to Performance by Sellers.............................33
    9.2      Conditions Precedent to the Performance by Buyer .........................34

ARTICLE 10 CLOSING AND DELIVERIES.......................................................35

    10.1     Closing .....................................................................................35
    10.2     Sellers' Deliveries ......................................................................36
    10.3     Buyer's Deliveries ......................................................................37

ARTICLE 11 TERMINATION ........................................................................38

    11.1     Termination...............................................................................38
    11.2     Effect of Termination..................................................................39
    11.3     Damages upon Termination. ........................................................39

ARTICLE 12 MISCELLANEOUS ...................................................................40

    12.1     Survival ....................................................................................40
    12.2     Further Assurances.....................................................................40
    12.3     Successors and Assigns...............................................................41

12.4    Governing Law; Jurisdiction............................................................41
12.5    Expenses ..............................................................................41
12.6    Severability ..........................................................................41
12.7    Notices ...............................................................................41
12.8    Amendments; Waivers ..................................................................43
12.9    Sellers Disclosures ...................................................................43
12.10   Entire Agreement .....................................................................43
12.11   Headings .............................................................................44
12.12   Counterparts .........................................................................44
12.13   Name Change ..........................................................................44
12.14   Payments and Revenues ................................................................44
12.15   Specific Performance .................................................................44
12.16   Waiver of Jury Trial .................................................................44
12.17   No Third Party Beneficiaries .........................................................45

**Appendix A - Defined Terms**

**Schedules**

**Schedule A - First Day Motions**
**Schedule 1 - Post-Secondary Institution Campus Locations**
**Schedule 2 - Bankruptcy Budget**
**Schedule 2.1(g) - FCC Transferred Leased Real Property**
**Schedule 2.2(g) - Other Transferred Leased Real Property**
**Schedule 2.3(d) - Excluded Assets**
**Schedule 2.3(h) - Excluded Contracts**
**Schedule 2.4(b) - FCC Assumed Payables**
**Schedule 2.4(d) - Assumed Liabilities and Obligations of Seller (First Closing)**
**Schedule 2.5(b) - Other Assumed Payables**
**Schedule 2.5(d) - Assumed Liabilities and Obligations of Seller (Second Closing)**
**Schedule 2.7(a) - FCC Assumed Contracts**
**Schedule 2.7(b) - Other Assumed Contracts and FCC Assumed Contracts Second Closing**
**Sellers Disclosure Schedules**
**Schedule 5.3(b) - Buyer Regulatory Approvals**
**Schedule 6.1(c) - Conduct of Business**
**Schedule 6.4(a) - Transferred Employees**

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of August 21, 2014 (the "**Execution Date**"), is made by and between FCC Holdings, Inc., a Delaware corporation ("**FCC Holdings**"), Education Training Corporation, a Florida corporation ("**ETC**"), EduTech Acquisition Corporation, a Florida corporation ("**Edutech**"), High-Tech Institute Holdings, Inc., an Arizona corporation ("**High-Tech Holdings**"), High-Tech Institute, Inc., an Arizona corporation ("**High-Tech**" and, together with FCC Holdings, ETC, Edutech, and High-Tech Holdings, "**Sellers**"), and IEC Corporation, a Delaware corporation and its designee ("**Buyer**").

## RECITALS

WHEREAS, Sellers are currently engaged in the business of owning and operating the for-profit post-secondary institutions at the campus locations identified as "Florida Career College Campuses" set forth on **Schedule 1** attached hereto (the "**FCC Acquired Campuses**" and the business in connection therewith, the "**FCC Business**") and at the campus locations identified as "Other Acquired Campuses" set forth on **Schedule 1** attached hereto (the "**Other Acquired Campuses**" and the business in connection therewith, the "**Other Acquired Business**");

WHEREAS, Buyer and Sellers entered into that certain Asset Purchase Agreement, dated as of August 7, 2014 (the "**Original Purchase Agreement**"), pursuant to which, among other things, Buyer agreed to acquire and assume from Sellers certain assets and liabilities of Sellers.

WHEREAS, Buyer and Sellers have agreed to amend the Original Purchase Agreement on the terms set forth herein.

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers the FCC Acquired Assets and the FCC Assumed Liabilities (each as defined herein) as more specifically provided herein;

WHEREAS, subject to the Educational Approvals (as defined herein), Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers the Other Acquired Assets and the Other Assumed Liabilities (each as defined herein) as more specifically provided herein; and

WHEREAS, if the Sellers and Buyer determine that it is advisable to consummate the Second Closing Transactions provided for herein pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, the Sellers will file their Bankruptcy Cases and will seek the entry of an order by the United States Bankruptcy Court in such jurisdiction as is agreed to by Sellers and Buyer (the "**Bankruptcy Court**") approving this Agreement, the Transition Services Agreement and authorizing the Sellers to consummate the Second Closing Transaction pursuant to the Sale Order.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Buyer hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Terms Defined.    Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in **Appendix A** attached hereto and as set forth elsewhere herein.

1.2    Interpretation.

(a)    When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(d)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.   Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any party to this Agreement or any other agreement or document shall include such party's permitted successors and assigns.

(f)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)    Any reference in this Agreement to $ shall mean U.S. dollars.

(h)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no

presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1     Purchase and Sale of FCC Acquired Assets.  Upon the terms and subject to the conditions set forth in this Agreement, and, at the First Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' right, title and interest in, to and under all of Sellers' tangible and intangible assets, properties, rights and claims as of the First Closing Date, of whatever kind or nature and wherever situated or located, which relate to the FCC Business or are used or held for use in, or were acquired in connection with, the operation of the FCC Business, other than the Excluded Assets, free and clear of all Claims or Encumbrances (other than Permitted Encumbrances).  All of such assets, properties and rights (other than the Excluded Assets) are collectively referred to in this Agreement as the "**FCC Acquired Assets**." Without limitation of the foregoing, the FCC Acquired Assets shall include Seller's right, title and interest in and to the following assets and properties as of the First Closing Date, except to the extent that any of the following are enumerated in Section 2.3 as Excluded Assets or are Second Closing FCC Assets:

(a)     all accounts receivable (including tuition receivables associated with deferred income and deferred registration fees), notes receivable, negotiable instruments, chattel paper (including without limitation, completed work which has not yet been billed) and other receivables (including, without limitation, in respect of students, products sold, licenses granted, services rendered or otherwise associated with the FCC Business and all amounts that may be returned or returnable with respect to letters of credit drawn down prior to the First Closing) from third parties, together with any unpaid financing charges accrued thereon (collectively "**FCC Accounts Receivable**");

(b)     all Intellectual Property related to the FCC Business, including the STARS software system;

(c)     all PP&E related to the FCC Business;

(d)     all Inventories related to the FCC Business;

(e)     all deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds (to the extent such vendor rebates and refunds relate to FCC Assumed Contracts), claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, FCC Accounts Receivable payments and other communications of Sellers related to the FCC Business;

(f)     Intentionally Omitted;

3

(g)    all FCC Transferred Leased Real Property listed on **Schedule 2.1(g)**, in each case together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(h)    all FCC Assumed Contracts;

(i)    all Documents related to the FCC Business;

(j)    all Permits and Educational Approvals related to the FCC Business to the extent transferable or renewable following the First Closing Date, including, without limitation, the Acquired OPEID Number;

(k)    except to the extent that such insurance policy is an Excluded Asset under Section 2.3(f) and Section 2.3(g) below, all rights under or arising out of all insurance recoveries to the extent such recoveries relate to the FCC Acquired Assets or FCC Assumed Liabilities (including all recoveries received by Sellers after the First Closing related to the FCC Acquired Assets and FCC Assumed Liabilities);

(l)    the goodwill of Sellers relating to the FCC Business;

(m)    all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties related to the FCC Business;

(n)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any FCC Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(o)    all sales and promotional materials, catalogues and advertising literature related to the FCC Business;

(p)    the Records of Sellers as they pertain to the FCC Acquired Assets or FCC Assumed Liabilities; provided that Sellers will have the right to retain copies at Seller's expense of any portion of such retained files, documents, instruments, papers, books, reports and records; and

(q)    the FCC Federal Funds Accounts (to the extent such accounts are assignable).

2.2    <u>Purchase and Sale of Other Acquired Assets</u>.  Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, upon the terms and subject to the conditions set forth in this Agreement  and subject to the receipt of the Educational Approvals as they related to the transfer of the Other Acquired Campuses, at the Second Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' right, title and interest in, to and under (i) all of Sellers' tangible and intangible assets, properties, rights and claims as of the Second Closing Date, of whatever kind or nature and

wherever situated or located, which relate to the Other Acquired Business or are used or held for use in, or were acquired in connection with, the operation of the Other Acquired Business and (ii) the Second Closing FCC Assets, in each case, other than the Excluded Assets and free and clear of all Claims or Encumbrances (other than Permitted Encumbrances). All of such assets, properties and rights related to the Other Acquired Campuses (other than the Excluded Assets) are collectively referred to in this Agreement as the "**Other Acquired Assets**." Without limitation of the foregoing, the Other Acquired Assets shall include Seller's right, title and interest in and to the following assets and properties as of the Second Closing Date, except to the extent that any of the following are enumerated in Section 2.3 as Excluded Assets:

(a)    all accounts receivable (including tuition receivables associated with deferred income and deferred registration fees), notes receivable, negotiable instruments, chattel paper (including without limitation, completed work which has not yet been billed) and other receivables (including, without limitation, in respect of students, products sold, licenses granted, services rendered or otherwise associated with the Other Acquired Business and all amounts that may be returned or returnable with respect to letters of credit drawn down prior to the Second Closing) from third parties, together with any unpaid financing charges accrued thereon (collectively the "**Other Acquired Accounts Receivable**" and together with the FCC Accounts Receivable, the "**Accounts Receivable**");

(b)    all Intellectual Property related to the Other Acquired Business;

(c)    all PP&E related to the Other Acquired Business;

(d)    all Inventories related to the Other Acquired Business;

(e)    all deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise) except any utility deposits required to be maintained by Order of the Bankruptcy Court, advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds (to the extent such vendor rebates and refunds relate to Other Assumed Contracts), claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, Other Acquired Accounts Receivable payments and other communications of Sellers related to the Other Acquired Assets;

(f)    Intentionally Omitted;

(g)    All Other Transferred Leased Real Property listed on **Schedule 2.2(g)**, in each case together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(h)    all Other Assumed Contracts;

(i)    all Documents related to the Other Acquired Business;

(j)      all Permits and Educational Approvals related to the Other Acquired Business to the extent transferable in order to permit Buyer to operate the Other Acquired Campuses as additional locations or branches of the FCC Acquired Campuses;

(k)      except to the extent that such insurance policy is an Excluded Asset under Section 2.3(f) and Section 2.3(g) below, all rights under or arising out of all insurance recoveries to the extent such recoveries relate to the Other Acquired Assets and Other Assumed Liabilities (including all recoveries received by Sellers after the Second Closing related to the other Acquired Assets and Other Assumed Liabilities);

(l)      the goodwill of Sellers relating to the Other Acquired Business;

(m)      all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties related to the Other Acquired Business;

(n)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Other Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(o)      all sales and promotional materials, catalogues and advertising literature related to the Other Acquired Business;

(p)      the Second Closing FCC Assets; and

(q)      the Records of Sellers as they pertain to the Other Acquired Assets or Other Assumed Liabilities; provided that Sellers will have the right to make copies at Seller's expense of any portion of such retained files, documents, instruments, papers, books, reports and records.

2.3    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed an agreement to sell, transfer, assign or convey any of the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets.    For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1 or 2.2) as of any Closing:

(a)      the Records of Sellers as they pertain to the Excluded Assets or Excluded Liabilities and/or ownership, organization, qualification to do business, tax obligations or existence of Sellers;

(b)      the rights of Sellers under this Agreement and the Ancillary Agreements and all Cash and non-Cash consideration payable or deliverable to Sellers under this Agreement;

(c)     Permits that are not transferable;

(d)     the assets listed on **Schedule 2.3(d)**;

(e)     all shares of capital stock or other equity interests in any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in Seller;

(f)     (i) all Sellers' rights under or arising out of insurance recoveries to the extent such rights relate to Excluded Assets or Excluded Liabilities, (ii) all insurance proceeds received in connection with such rights and (iii) all business interruption insurance proceeds;

(g)     all current and prior director and officer insurance policies of Sellers and all rights of Sellers of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h)     subject to Section 2.7, all Contracts that are not Assumed Contracts, including, without limitation, (i) any vendor rebates and other refunds relating to such Contracts that are not Assumed Contracts and (ii) the Contracts set forth on **Schedule 2.3(h)**;

(i)     all Cash;

(j)     all Prepaid Tuition Payments;

(k)     all bank accounts (other than the FCC Federal Funds Accounts, to the extent such accounts are assignable), checkbooks and cancelled checks of Sellers;

(l)     any Claim, right or interest in and to all Tax refunds, rebates, abatements, credits and similar items of Sellers relating to any period, or portion of any period, on or prior to the First Closing Date as to the FCC Acquired Assets or on or prior to the Second Closing Date as to the Other Acquired Assets or any Tax Return;

(m)     all rights in or to assets leased by Sellers (as lessee) except to the extent the liabilities and obligations under the associated lease are assumed by Sellers and such lease is assigned to Buyer;

(n)     in the event the Educational Approvals are not received to allow for the Second Closing, all Other Acquired Assets except the Second Closing FCC Assets acquired by the Buyer pursuant to the Sale Order; and

(o)     the Phoenix Owned Real Property, together with all improvements thereon, all fixtures and appurtenances thereto and rights and entitlements associated therewith.

2.4     <u>Assumption of Liabilities at the First Closing</u>.  Upon the terms and subject to the conditions of this Agreement, Buyer shall, effective at the time of the First Closing, assume and

agree to discharge and perform when due, the Liabilities of Sellers (and only those Liabilities of Sellers) which are enumerated in this Section 2.4 (the "**FCC Assumed Liabilities**").    The following Liabilities of Sellers (and only the following Liabilities) shall constitute the FCC Assumed Liabilities:

(a)    all Liabilities under any FCC Assumed Contracts and the Acquired OPEID Number;

(b)    certain Liabilities consisting of accounts payable to vendors and other operating expenses, in each case that were incurred in connection with goods purchased by, and services provided to, Sellers in connection with the FCC Business and the FCC Acquired Campuses identified on **Schedule 2.4(b)**;

(c)    all Liabilities arising out of the operation or ownership of the FCC Acquired Assets or the FCC Business by Buyer first arising during any period following the First Closing Date;

(d)    those specific Liabilities of Sellers (if any) identified on **Schedule 2.4(d)** attached hereto;

(e)    (i) the Transaction Taxes and (ii) all Tax liabilities relating to the FCC Acquired Assets or the FCC Business for a Tax period (or portion thereof) beginning on or after the Closing Date, but excluding all income Tax liabilities of Sellers for any Tax period;

(f)    accruals for wages, commissions, earned and unpaid vacation days, sick days and expense reimbursements of the Transferred Employees hired by the Buyer in connection with the First Closing Transactions that accrue commencing on the date of the First Closing and that accrue as a result of the Transition Services Agreement as well as all payroll Taxes related thereto; and

(g)    Assumed WARN Obligations related to Transferred Employees hired by the Buyers in connection with the First Closing Transactions.

2.5    <u>Assumption of Liabilities at the Second Closing</u>.    Upon the terms and subject to the conditions of this Agreement, Buyer shall, effective at the time of the Second Closing, assume and agree to discharge and perform when due, the Liabilities of Sellers (and only those Liabilities of Sellers) which are enumerated in this Section 2.5 (the "**Other Assumed Liabilities**").    The following Liabilities of Sellers (and only the following Liabilities) shall constitute the Other Assumed Liabilities:

(a)    all Liabilities under any Other Assumed Contracts or any FCC Assumed Contracts that cannot be conveyed at the First Closing;

(b)    certain Liabilities consisting of accounts payable to vendors and other operating expenses, in each case that were incurred in connection with goods purchased by, and services provided to, Sellers in the ordinary course of business, in connection

with the Other Acquired Assets incurred after the Petition Date or otherwise identified on **Schedule 2.5(b)**;

(c)    all Liabilities arising out of the operation or ownership of the Other Acquired Campuses or the Other Acquired Business by Buyer first arising during any period following the Second Closing Date and all liabilities and obligations prior to the Second Closing Date required in connection with any Educational Approval necessary for the operation of the Other Acquired Campuses after the Second Closing;

(d)    those specific Liabilities of Sellers (if any) identified on **Schedule 2.5(d)** attached hereto;

(e)    (i) the Transaction Taxes and (ii) all Tax liabilities relating to the Other Acquired Assets or any FCC Acquired Assets that are conveyed on the Second Closing for a Tax period (or portion thereof) beginning on or after the Petition Date, but excluding all income Tax liabilities of Sellers for any Tax period;

(f)    accruals for wages, commissions, earned and unpaid vacation days, sick days and expense reimbursements of the Transferred Employees hired by the Buyer in connection with the Second Closing Transactions that accrue commencing on the date of the Second Closing as well as all payroll Taxes related thereto; and

(g)    Assumed WARN Obligations related to Transferred Employees hired by Buyer in connection with the Second Closing Transactions.

2.6    Excluded Liabilities.  All Claims against Sellers, and all Liabilities of Sellers which are not specifically assumed by Buyer pursuant to Section 2.4 or Section 2.5 are collectively referred to herein as the "**Excluded Liabilities**." Buyer shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities including, without limitation, the following:

(a)    except as otherwise expressly provided in this Agreement with respect to Transaction Taxes, any and all Liabilities for Taxes of Sellers or any of their Affiliates or any shareholder or equity owner of Sellers or their Affiliates or for which such Seller or Affiliate may be liable for periods ending prior to the applicable Closing Date;

(b)    any and all Liabilities for indebtedness of Sellers with respect to borrowed money (other than obligations with respect to capitalized leases that are assumed by Buyer);

(c)    any litigation claim or assessment, breach of Contract (excluding Buyer's obligation to pay any amounts due and owing under any FCC Assumed Contracts or any applicable Cure Amounts with respect to any Other Assumed Contracts), tort, infringement, violation of Law of Sellers or any of their Affiliates arising from any facts, events or circumstances arising on or prior to the applicable Closing Date, in each case, of any kind or nature whatsoever and whether related to the Acquired Assets or the Business or otherwise and regardless of when commenced, except to the extent that any

of the foregoing relates to any of the liabilities or obligations expressly enumerated in Section 2.4 or 2.5;

(d)        any and all Liabilities (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the applicable Closing Date, (ii) with respect to periods prior to the applicable Closing Date and are or could be asserted as a claim in litigation or arbitration after the applicable Closing Date, (iii) that are associated with the Excluded OPEID Numbers, or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the applicable Closing , except to the extent that any of the foregoing relates to any of the liabilities or obligations expressly enumerated in Section 2.4 or 2.5;

(e)        any Liabilities of Sellers arising out of the ownership or operation of an Excluded Asset, including, for the avoidance of doubt, any Liability with respect to those Contracts, Permits and Educational Approvals which constitute Excluded Assets;

(f)        any Liabilities of Sellers arising under or relating to any notice and other requirements of WARN related to any of Sellers' employees (other than the Transferred Employees for the time period following the applicable Closing Date);

(g)        for periods ending prior to the applicable Closing Date, all Liabilities arising out of any environmental conditions at any Owned Real Property, the Acquired Assets or the Business or arising out of any other environmental matters relating to the Owned Real Property, including those matters arising under Environmental Laws or the release, use, storage or transportation of Hazardous Materials at or from any Owned Real Property;

(h)        all Liabilities arising in connection with the employment or termination of employment of any employee of Sellers (including the Transferred Employees) by Sellers, including, without limitation, any compensation, bonuses or commissions due to employees, any accrued vacation or paid time off, any workmen's compensation or OSHA claims, any employee grievances, or the sponsorship of, and all Liabilities attributable to the operation or funding of the Employee Benefit Plans, including with respect to any incurred but unpaid claims for benefits as of the applicable Closing Date;

(i)        any Liabilities of Sellers arising under or relating to any contract for employment for any current or former Employee, officer or director of any of the Sellers and any individual benefit obligations in connection with any such contract except to the extent such contract is an Assumed Contract;

(j)        any and all past, present, or future Liabilities of Sellers or individual participants arising in connection with any Employee Benefit Plan that is subject to Section 409A of the Code as a result of the imposition of any interest or an additional tax on any participant thereunder; and

(k)        in the event the Educational Approvals are not received to allow for the Second Closing, all Other Assumed Liabilities except the Liabilities related to the Second Closing FCC Assets acquired by the Buyer pursuant to the Sale Order.

2.7     <u>Assignment and Assumption of Contracts and Leased Real Property</u>.

(a)     <u>Assignment and Assumption at Closing</u>.

(i)     **Schedule 2.1(g)** and **Schedule 2.7(a)** set forth a list of all leases related to FCC Transferred Leased Real Property and other Contracts to which a Seller is a party and which Buyer has designated to be included in the FCC Acquired Assets (the "**FCC Assumed Contracts**") and **Schedule 2.2(g)** and **Schedule 2.7(b)** sets forth a list of all leases related to Other Transferred Leased Real Property and other Contracts to which a Seller is a party and which Buyer has designated to be included in the Other Acquired Assets (the "**Other Assumed Contracts**") or which constitute FCC Second Closing Assumed Contracts together with any estimated Cure Amounts for each Other Assumed Contract or FCC Second Closing Assumed Contract.  From and after the date hereof until five (5) Business Days prior to the Sale Hearing, Buyer shall be entitled to make such additions and deletions to **Schedules 2.2(g)** and **2.7(b)**, by delivery of written notice to Sellers.  Any such deleted Contract shall be deemed to no longer be an Other Assumed Contract or FCC Second Closing Assumed Contract (as applicable) and any such added Contract shall be deemed an Other Assumed Contract or FCC Second Closing Assumed Contract (as applicable).

(ii)     Sellers shall use commercially reasonable efforts to obtain the consents necessary to assign the FCC Acquired Contracts to the Buyer at the First Closing;

(iii)     Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of the Other Assumed Contracts and any FCC Second Closing Assumed Contracts.  Buyer shall, at or prior to Second Closing, comply with all requirements under Section 365 necessary to assign to Buyer the Assumed Contracts to be assumed and assigned at the Second Closing (including, without limitation, by providing "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code)).

(iv)     At the First Closing, Sellers shall, pursuant to the Assignment and Assumption Agreement(s), assign the FCC Assumed Contracts to the Buyer to the extent the appropriate consents to assignment of such Contracts have been received and Buyer shall assume and perform and discharge the Liabilities (if any) under such Contracts, pursuant to the Assignment and Assumption Agreement(s).

(v)     At the Second Closing, (x) Sellers shall, pursuant to the Sale Order and/or the Assignment and Assumption Agreement(s), assume and assign to Buyer each of the Other Assumed Contracts and each of the FCC Second Closing Assumed Contracts, in each case that are capable of being assumed and assigned and (y) Buyer shall promptly pay Cure Amounts (if any) in connection with such assumption and assignment (as agreed to among Buyer, Sellers and the Contract counterparty or as determined by the Bankruptcy Court) assume and perform and discharge the Liabilities (if any) under such Contracts, pursuant to the Assignment and Assumption Agreement(s).

(b)    Non-Assignment of Contracts and Permits.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Assumed Contract, Permit or Educational Approval, if notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code (if applicable), an attempt at assignment or transfer thereof, without the consent or approval of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "**Necessary Consent**"), would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder.  In such event, Sellers and Buyer will use commercially reasonable efforts to obtain the Necessary Consents with respect to any such Assumed Contract, Permit or Educational Approval or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code (if applicable), such Necessary Consent is not obtained, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Second Closing be delayed in respect of the Assumed Contracts, Permits or Educational Approvals.

## ARTICLE 3
## CONSIDERATION

3.1    Purchase Price.  In consideration of the sale of the Business and the Acquired Assets to Buyer, and upon the terms and subject to the conditions set forth herein, the purchase price (the "**Purchase Price**") for the Business and the Acquired Assets shall be:

(a)    at the First Closing: (i) $1,000,000 (the "**Cash Purchase Price**"), plus (ii) assumption of the FCC Assumed Liabilities, plus (iii) the funding of the Agreed Expenses plus (iv) in the event Buyer elects to close on the CA Campuses following the First Closing in accordance with Section 6.3(f), the funding of the CA Agreed Expenses plus (v) the funding of the BK Agreed Expenses plus (vi) the providing of Services (as defined in the Transition Services Agreement) under the Transition Services Agreement for no cost, plus (vii) the payment of $1,000,000 (the "**Lender Consent Fee**") to the Administrative Agent of Sellers' secured lenders who consent to the First Closing Transactions and Second Closing Transactions; and

(b)    at the Second Closing: (i) the assumption of the Liabilities associated with the Second Closing FCC Assets and (ii) if the Educational Approvals have been obtained to allow for the Second Closing, the assumption of the Other Assumed Liabilities.

3.2    Allocation of Purchase Price.

(a)    Within 120 days after the Second Closing Date, Buyer shall deliver to Sellers a statement (the "**Allocation Statement**") allocating, for tax purposes, the Purchase Price and any other items that are treated as additional purchase price for tax purposes among the Acquired Assets.  The Allocation Statement shall be subject to the

approval of Sellers, which approval shall not be unreasonably withheld or delayed.  The Allocation Statement shall be reasonable and prepared in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)     The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement after Sellers shall have approved it in writing, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby, jointly and severally, represent and warrant to Buyer as follows as of each of the First Closing and the Second Closing (except that as of the Second Closing the Sellers shall not be deemed to make any representations and warranties regarding the FCC Business or FCC Acquired Assets), subject to the Schedules to be delivered in accordance with Section 6.3(a):

4.1     Organization.  Each Seller is duly organized, validly existing and in good standing under the Laws of the State of its formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted (including the Business), and subject to Bankruptcy Court approval where applicable to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be party.  Each Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing would not have a Material Adverse Effect.

4.2     Authorization of Agreement.  Subject to the approval of the Bankruptcy Court and the receipt of the Educational Approvals as to the Second Closing Transactions:

(a)     Each Seller has, or at the time of execution will have, all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)     The execution and delivery of this Agreement and each Ancillary Agreement to which a Seller is or will become a party and the performance of a Seller's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary corporate action on the part of such Seller and no other proceedings (shareholder or otherwise) on the part of such Seller are or will be necessary to authorize such execution, delivery and performance; and

(c)     This Agreement and each Ancillary Agreement to which a Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by such Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which a Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

4.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on **Schedule 4.3(a)**, and as to the Second Closing Transactions subject to obtaining the approval of the Bankruptcy Court and the Educational Approvals, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement to which such Seller is or will become a party, the consummation of the transactions contemplated hereby and thereby, or compliance by such Seller with any of the provisions hereof and thereof do not, or will not, result in the creation of any Encumbrance upon the Acquired Assets and do not, or will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)     any Seller's organizational documents;

(ii)     subject to the entry of the Sale Order with respect to a Second Closing Transactions, any Order of any Governmental Authority applicable to a Seller or any of the properties or assets of a Seller as of the date hereof; or

(iii)     subject to the entry of the Sale Order with respect to a Second Closing Transactions, any applicable Law; provided, in the case of clauses (ii) and (iii), as would not (x) materially and adversely affect the ability of a Seller to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements on a timely basis or (y) otherwise have a Material Adverse Effect.

(b)     Subject to the entry of the Sale Order with respect to a Second Closing Transactions, no consent, waiver, approval, order, Permit or authorization of, or declaration, filing or registration with, or notification to, any Governmental Authority is required on the part of a Seller in connection with the execution, delivery and performance by a Seller of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by a Seller with any of the provisions hereof or thereof, the consummation by a Seller of the transactions contemplated hereby or thereby, or the assignment or conveyance by a Seller of the Acquired Assets, except (i) as set forth on **Schedule 4.3(b)** (such consent, waiver, approval, order, Permit or authorization of, or declaration, filing or registration with, or notification to any Governmental Authority or Educational Agency listed on **Schedule 4.3(b)** are referred to as "**Seller Regulatory Approvals**"), (ii)  where failure to obtain such consent, waiver, approval, order, Permit,

Educational Approval authorization or action, or to make such filing, declaration, registration or notification, would not prevent or materially delay the consummation by such Seller of the transactions contemplated by this Agreement and the Ancillary Agreements and would not have a Material Adverse Effect, or (iii) as may be necessary as a result of any facts or circumstances relating solely to Buyer or any of its Affiliates.

4.4     <u>Title to and Use of FCC Acquired Assets</u>.  Each of the Sellers owns, leases or has the legal right to use all the FCC Acquired Assets, and following the First Closing and receipt of the necessary consents from the Sellers' secured lenders, Buyer will be vested with good, valid, marketable and undivided title to or interest in the FCC Acquired Assets (other than the Second Closing FCC Assets) free and clear of all Claims and Encumbrances other than Assumed Liabilities and Permitted Encumbrances.  The Acquired Assets constitute all the properties and assets relating to, used or held for use in connection with the Business, other than the Excluded Assets.  There are no material assets or properties used primarily in the operation of the Business and owned by a third party that constitute Acquired Assets.

4.5     <u>Title to and Use of Other Acquired Assets</u>.  Each of the Sellers owns, leases or has the legal right to use all the Other Acquired Assets, and following the Second Closing, Buyer will be vested to the maximum extent permitted by law (including in connection with the Second Closing Transactions Sections 363 and 365 of the Bankruptcy Code) with good and valid title to the Other Acquired Assets and the Second Closing FCC Assets free and clear of all Liens, Claims, Interests and Encumbrances (other than any Assumed Liabilities and Permitted Encumbrances).

4.6     <u>FCC Contracts</u>.  **Schedule 4.6** sets forth a complete list, as of the date hereof, of all material Contracts to which a Seller is a party and that are used in or related to the FCC Business or the FCC Acquired Assets (the "**FCC Existing Contracts**"), including estimated Cure Amounts thereunder.

4.7     <u>Other Contracts</u>.  **Schedule 4.7** sets forth a complete list, as of the date hereof, of all material Contracts to which a Seller is a party and that are used in or related to the Other Acquired Business or the Other Acquired Assets (the "**Other Existing Contracts**"), including estimated Cure Amounts in connection therewith.

4.8     <u>Real Property</u>.

(a)     The Phoenix Owned Real Property is the only Owned Real Property of any Seller used in the Other Acquired Business.  No Seller owns any Owned Real Property used in the FCC Business.

(b)     **Schedule 2.1(g)** lists all real estate leased by a Seller as a lessee, sub-lessee, or assignee and covered by an FCC Assumed Contract (the "**FCC Transferred Leased Real Property**").

(c)     **Schedule 2.2(g)** lists all real estate leased by a Seller as a lessee, sub-lessee, or assignee and covered by an Other Assumed Contract (the "**Other Transferred Leased Real Property**").

4.9     Intellectual Property.

(a)     **Schedule 4.9(a)** lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets, including software, that are not registered but that are material to the operation of the Business.  Except as set forth on **Schedule 4.9(a)**, all required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing.

(b)     **Schedule 4.9(b)** lists all material Intellectual Property Agreements. Sellers have provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder.

(c)     The Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements are all of the Intellectual Property necessary to operate the Business as presently conducted.

4.10     Permits.  **Schedule 4.10(i)** sets forth a complete list, as of the date hereof, of all material Permits issued to Sellers for the operation of the Business.  **Schedule 4.10(ii)** sets forth a complete list, as of the date hereof, of all material Permits applied for by Sellers or the issuance of which to a Seller is pending.

4.11     Employee Benefit Plans.  **Schedule 4.11** sets forth a list of each written Employee Benefit Plan.  To the Knowledge of Sellers, neither Sellers nor any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last eighteen months or, in any way, directly or indirectly, has any Liability with respect to such a plan.  To the Knowledge of Sellers, all Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder.  Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which a Seller may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.  To the Knowledge of Sellers, all contributions (including all employer contributions and employee salary reduction contributions) required to have been made under any Employee Benefit Plan have been made by the due date thereof.

4.12     Labor Matters.  Except as set forth on **Schedule 4.12**, no Seller is a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization.

4.13     Environmental Matters.  Except as would not have a Material Adverse Effect,  the Business is being conducted in accordance with all applicable Laws, regulations, or other legal requirements which regulate the protection of the environment, pollution or human health and safety ("**Environmental Laws**") applicable to the Business.  No Seller has received written notice of any Claim relating to or arising under Environmental Laws with respect to the Acquired Assets, or the Business which has not been adequately addressed, nor, to the

Knowledge of Sellers, are any of the same being threatened in writing against a Seller or any real property owned, operated, or leased by a Seller. No Seller has received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree which have outstanding material requirements relating to or arising under Environmental Laws. To the Knowledge of Sellers, no Seller has released any Hazardous Material into the environment at, onto, or from any property owned or leased by a Seller which would result in a Material Adverse Effect. This Section 4.13 constitutes the sole and exclusive representation and warranty of Sellers regarding environmental and human health and safety matters and liabilities and obligations and compliance with Environmental Laws and no other representation contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made with respect thereto.

4.14    Insurance. Sellers maintain the insurance policies set forth on **Schedule 4.14**, which Schedule sets forth all insurance policies covering the property, assets, Employees and operations of the FCC Business and Other Acquired Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and Sellers have paid all premiums on such policies due and payable prior to the Execution Date. To the Knowledge of the Sellers, no Seller has done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.15    Good Faith Buyer. This Agreement was negotiated and entered into at arm's length and, to the Knowledge of Sellers, in good faith, and to the Knowledge of Sellers, there are no facts to support a finding that Buyer negotiated and entered into this Agreement other than in good faith as described in Section 363(m) of the Bankruptcy Code.

4.16    No Material Misstatements or Omissions. To the Knowledge of the Sellers, none of the representations made by Sellers in this Agreement, nor any certificate by Sellers pursuant to this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading.

4.17    No Brokers or Finders. Except as set forth on **Schedule 4.17**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Sellers in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which Buyer will be responsible.

4.18    Litigation; Proceedings. Except for the potential Bankruptcy Case to effect the Second Closing Transactions and any and all Actions arising therefrom or related thereto, and except as set forth in **Schedule 4.18**:

   (a)    There is no Action pending or, to the Knowledge of Sellers, threatened by or against a Seller that involves or relates to any of the transactions contemplated by this Agreement or affect any of the Acquired Assets or the Business.

   (b)    There is no Action relating to the ownership, occupancy, operation, use or maintenance of the Acquired Assets which is pending before any Governmental

Authority nor, to the Knowledge of the Sellers, is any such Action, suit, proceeding or claim threatened, except such actions, suits, proceedings or claims which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the business of the Sellers or the Acquired Assets.

(c)    Sellers have not received any notice of violation of the Code or any ordinance, regulation, law, or statute any Governmental Authority pertaining to the Acquired Assets or the Business or any portion thereof or any zoning ordinances, building codes or parking requirements that would constitute a Material Adverse Effect.

(d)    None of the material Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.19    Board Approval and Recommendations.    The Board of Directors (or similar governing body) of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement, a sale, assignment and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement (and, where applicable, under sections 105, 363 and 365 of the Bankruptcy Code) is in the best interests of each such Seller.

4.20    Compliance with Laws.    Except as set forth on **Schedule 4.20(i)** and as would not materially adversely affect the ability of Sellers to carry out their obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements, each Seller (a) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits, and (b) holds all material Permits, including Educational Laws and Educational Approvals addressed in Section 4.21.  Except as set forth on **Schedule 4.20(ii)**, no Seller has received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit.

4.21    Educational Law and Educational Approvals.

(a)    Set forth in **Schedule 4.21(a)** is a list of all Educational Approvals issued to Sellers relating to the FCC Acquired Campuses and Other Acquired Campuses (collectively "Acquired Campuses") since the Compliance Date, including the periods since the Compliance Date in which each such Educational Approval is or was in full force and effect and the period, if any, when each such Educational Approval was subject to any condition, limitation or restriction that reasonably would be expected to have a Seller Material Adverse Effect. Sellers have made available to Buyer complete and correct copies of all Educational Approvals in effect as of the date of this Agreement.

(b)    **Schedule 4.21(b)** lists each Student Financial Assistance Program for which funding is provided or has been provided since the Compliance Date to or on behalf of the students at each Acquired Campus.

(c)    Intentionally Omitted.

18

(d)      **Schedule 4.21(d)** lists the address of each Acquired Campus and each other campus or location at which each Acquired Campus offers or has offered fifty percent (50%) or more of an educational program since the Compliance Date.

(e)      Except as set forth in **Schedule 4.21(e)**, the Acquired Campuses are party to, and are in compliance in all material respects with, a valid and effective Program Participation Agreement with the DOE, and have a current and accurate Eligibility and Certification Approval Report issued by DOE that lists all the Acquired Campuses and all of the locations and  educational programs that are eligible to participate under the Title IV Programs.

(f)      Since the Compliance Date, each educational program offered by each Acquired Campus for which Title IV aid has been awarded is and has been an eligible program in material compliance with 34 CFR § 668.8, and the Acquired Campuses have measured the length of each such educational program in material compliance with all applicable Educational Agency requirements. The Acquired Campuses have awarded and disbursed Title IV Program funds to students enrolled in such educational programs in material compliance with the applicable DOE requirements.

(g)      Except as set forth in **Schedule 4.21(g)**, since the Compliance Date, the Sellers and the Acquired Campuses have materially complied with all applicable Educational Laws regarding the notification and approval of substantive changes in the Sellers or any Acquired Campus, including any addition of new education programs or changes in ownership or control.

(h)      **Schedule 4.21(h)** contains a list of all DOE program reviews, audits, DOE Office of Inspector General audits and investigations, and any non-routine reviews or audits by any other Educational Agency conducted at any Acquired Campus since the Compliance Date, and any Educational Claims asserted against an Acquired Campus or against Sellers arising out of actions at an Acquired Campus since the Compliance Date.

(i)      Except as set forth in **Schedule 4.21(i)**, there are no pending proceedings to revoke, suspend, materially limit restrict, or withdraw any material Educational Approval, and to Sellers' Knowledge, there are no facts, circumstances, or omissions concerning an Acquired Campus or against Sellers arising out of actions at an Acquired Campus that reasonably would be expected to result in such a proceeding.

(j)      Except as set forth in **Schedule 4.21(j)**, since the Compliance Date, neither an Acquired Campus nor any Person that exercises Substantial Control over an Acquired Campus, or any member of such Person's family (as the term "family" is defined in 34 C.F.R. § 600.21(f)), alone or together (i) owes a material liability for a Title IV Program violation, or (ii) exercises or exercised Substantial Control over another institution or third-party servicer (as that term is defined in 34 C.F.R. § 668.2) that owes a material liability for a violation of a Title IV Program requirement. Sellers do not (i) owe a material liability for a Title IV Program violation, or (ii) exercise, and have not exercised, Substantial Control over another institution or third-party servicer (as that term

is defined in 34 C.F.R. § 668.2) that owes a material liability for a violation of a Title IV Program requirement.

(k)      Except as set forth in **Schedule 4.21(k)**, neither Sellers nor any of their Affiliates that has the power, by contract or ownership interest, to direct or cause the direction of management of policies of Sellers, or any Person who exercises Substantial Control over Sellers, has filed for relief in bankruptcy or had entered against it an order for relief in bankruptcy.

(l)      Neither Sellers nor any of their Affiliates or principals of Sellers has pled guilty to, pled nolo contendere to, or been found guilty of, a crime involving the acquisition, use or expenditure of funds under the Title IV Programs or been judicially determined to have committed fraud involving funds under the Title IV Programs.

(m)      Except as set forth in **Schedule 4.21(m)**, sellers and the Acquired Campuses are, and since the Compliance Date, have been in material compliance with applicable Educational Laws concerning applications, filings, responses, submissions, reports and representations, including those filings related to substantive changes and the reporting of program placement, completion and exam passage rate information to ACICS and ABHES.

(n)      Sellers and the Acquired Campuses are, and since the Compliance Date have been, in material compliance with all applicable Educational Laws concerning satisfactory academic performance and verification of student eligibility for Title IV benefits.

(o)      Sellers and the Acquired Campuses are, and since the Compliance Date have been, in Material compliance with applicable Educational Laws concerning attendance and grade records.

(p)      Sellers and the Acquired Campuses are, and since the Compliance Date have been, in material compliance with the requirements at 34 CFR § 668.14(b)(22) regarding payment of commissions, bonuses or other payments. Further, all employees of the Acquired Campuses that have engaged in student recruiting have maintained any necessary approvals required by Educational Laws to conduct such activities.

(q)      Sellers and the Acquired Campuses are, and since the Compliance Date have been, in material compliance with applicable federal and state laws regarding misrepresentation, including 34 CFR § 668, Subpart F.

(r)      With respect to any location or facility that is being or has closed or which ceased operating educational programs since the Compliance Date, or any program that either or both has ceased offering since the Compliance Date, the Acquired Campuses have materially complied with Educational Laws related to the closure or cessation including teaching out the students from such location, facility or program.

(s)    Sellers and the Acquired Campuses have materially complied with applicable disclosure and reporting requirements related to gainful employment and consumer disclosures as required by 34 CFR § 668.6, and § 668, Subpart D.

(t)    For the fiscal years ended December 31, 2013, 2012 and 2011, no Acquired OPE ID has received greater than ninety (90) percent of its revenue from Title IV Programs as required by 34 CFR §§ 668.14 and 668.28.

4.22    <u>Affiliate Transactions</u>.    Except as set forth in **Schedule 4.22** and to the Knowledge of Sellers, there are no material written Contracts or material oral agreements between a Seller and any shareholder or Affiliate of a Seller which are necessary to conduct the Business after the applicable Closing in substantially the same manner as currently conducted by Sellers.

4.23    <u>Warranties Are Exclusive</u>.    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER ANY SELLER NOR ANY OTHER PERSON AUTHORIZED BY ANY SELLER MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE FCC ACQUIRED ASSETS AND OTHER ACQUIRED ASSETS), LIABILITIES (INCLUDING THE FCC ASSUMED LIABILITIES AND OTHER ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE 5
## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Sellers as follows:

5.1    <u>Corporate Organization</u>.    Buyer is duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and assets and to conduct its businesses in the manner in which its business is currently conducted.    Buyer is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of its business or otherwise conducts its business, except where the failure to so qualify or to so be in good standing would not have a Buyer Material Adverse Effect.

5.2    <u>Authorization and Validity</u>.

(a)    Buyer has, or at the time of Buyer's execution will have, all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which Buyer is or will become a party and to perform its obligations hereunder and thereunder;

21

(b)    The execution and delivery of this Agreement and each Ancillary Agreement to which Buyer is or will become a party and the performance of Buyer's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary action on the part of Buyer, and no other proceedings on the part of Buyer are or will be necessary to authorize such execution, delivery and performance; and

(c)    This Agreement and each Ancillary Agreement to which Buyer is or will become a party have been, or when executed will be, duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which Buyer is or will become a party constitutes, or will constitute, when executed and delivered, Buyer's valid and binding obligations, enforceable against Buyer in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    The execution, delivery and performance by Buyer of this Agreement and each Ancillary Agreement to which Buyer is or will become a party, the consummation by Buyer of the transactions contemplated hereby and thereby, or compliance by Buyer with any of the provisions hereof and thereof do not or will not (i) violate or conflict with any provision of the organizational documents of Buyer, (ii) violate any provision of applicable Law, or any Order applicable to Buyer or (iii) violate or result in a breach of or constitute (with or without notice or lapse of time, or both) an event of default or default under any Contract or permit to which Buyer is a party or by which Buyer is bound or to which any of Buyer's properties or assets are subject, in each case, other than any violation, conflict, breach, event of default or default that would not reasonably be expected to adversely affect Buyer's ability to perform its obligations under this Agreement on a timely basis.

(b)    No consent, waiver, approval, order, permit or authorization of, or declaration, filing or registration with, or notification to, any Person or Governmental Authority is required on the part of Buyer in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation by Buyer of the transactions contemplated hereby or thereby, or assumption by Buyer of the Assumed Liabilities, except (i) as set forth on **Schedule 5.3(b)** (such consent, waiver, approval, order, permit or authorization of, or declaration, filing or registration with, or notification to any Governmental Authority listed on **Schedule 5.3(b)** are referred to as "**Buyer Regulatory Approvals**," and together with the Seller Regulatory Approvals, the "**Regulatory Approvals**") or (ii) where failure to obtain such consent, waiver, approval, order, Permit, Educational Approval authorization or action, or to make such filing, declaration, registration or notification, would not prevent or materially delay the consummation by Buyer of the transactions contemplated

by this Agreement and the Ancillary Agreements. Neither Buyer nor any of its Affiliates is in violation of, or has violated, any applicable Law which has had or could reasonably be expected to have a Material Adverse Effect on Buyer's ability to receive the required Regulatory Approvals from any Educational Agency or to otherwise consummate the transactions contemplated by this Agreement.

5.4    Financing. Buyer currently has, and on the applicable Closing Date will have, sufficient immediately available funds in such amount as is required to pay the full Purchase Price and to make all other payments required by the terms hereof to consummate the transactions contemplated hereunder on the terms set forth herein and otherwise to perform all of Buyer's obligations under this Agreement.

5.5    No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Buyer in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which a Seller will be responsible.

5.6    Litigation.   There is no Action that is pending or, to Buyer's knowledge, threatened in any court, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, that would adversely affect Buyer's ability to perform its obligations under this Agreement on a timely basis.

5.7    Certain Compliance with Educational Law Matters.

(a)    Buyer neither (i) owes a material liability for a Title IV Program violation, nor (ii) exercises or exercised Substantial Control over another institution or third-party servicer (as that term is defined in 34 C.F.R. § 668.2) that owes a material liability for a violation of a Title IV Program requirement.

(b)    Neither Buyer nor any principals of Buyer has pled guilty to, pled nolo contendere to, or been found guilty of, a crime involving the acquisition, use or expenditure of funds under the Title IV Programs or been judicially determined to have committed fraud involving funds under the Title IV Programs.

(c)    Neither Buyer nor any principals of Buyer that has the power, by contract or ownership interest, to direct or cause the direction of management of policies of Buyer, or any Person who exercises Substantial Control over Buyer, has filed for relief in bankruptcy or had entered against it an order for relief in bankruptcy.

(d)    Neither Buyer nor any principals of Buyer has been debarred or suspended, or engaged in any activity that is cause for debarment or suspension, pursuant to the DOE regulations at 2 C.F.R. Part 3485.

5.8    No Other Representations and Warranties. Except for the representations and warranties contained in this ARTICLE 5, neither Buyer nor any other Person authorized by Buyer makes any other express or implied representation or warranty on behalf of Buyer.

# ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1    <u>Pre-Closing Covenants of Sellers</u>.  Sellers covenant to Buyer that, during the period from and including the Execution Date through and including the First Closing Date as to the FCC Acquired Assets or FCC Business and through and including the Second Closing Date as to the Other Acquired Assets or Other Acquired Business or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11:

(a)    <u>Cooperation</u>.  Sellers shall take, or cause to be taken, all reasonable actions and do, or cause to be done, all things reasonably necessary or proper, consistent with applicable Law, Educational Law, and any orders of the Bankruptcy Court (if applicable), to consummate the transactions contemplated by this Agreement.

(b)    <u>Access to Records and Properties</u>.  From the date of this Agreement through and including the applicable Closing Date, Sellers will permit Buyer and its Related Persons to have reasonable access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Sellers and the Business or the duties of any employee of Sellers, to all premises, properties, personnel, books, records (including financial, operational, and tax records), contracts, and documents of or pertaining to the Business, if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law.  Buyer will treat and hold as Confidential Information any information it receives from or on behalf of the Sellers or related to the Business in the course of the reviews contemplated by this Section 6.1(b), will not use or disclose to third parties any of the Confidential Information except in connection with this Agreement.  This obligation shall survive the termination of this Agreement.

(c)    <u>Conduct of Business Prior to Closing</u>. Except as expressly contemplated by this Agreement or disclosed on **Schedule 6.1(c)**, except to the extent expressly required under the Bankruptcy Code (if applicable) or other applicable Law or any ruling or order of the Bankruptcy Court (if applicable) and/or except to the extent waived by Buyer's prior written consent (such consent not to be unreasonably withheld, conditioned, delayed or denied), Sellers shall ensure that:

(i)    Sellers shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than in the Ordinary Course of Business or in connection with the First Closing;

(ii)    Sellers shall not, directly or indirectly, permit, offer, agree or commit to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Claim or Encumbrance, except for Permitted Encumbrances;

(iii)    Sellers shall use commercially reasonable efforts to maintain in full force and effect each material Permit and Educational Approval included in the Acquired Assets or related to the Business held by a Seller as of the Execution Date or

otherwise obtained by a Seller prior to the Closing, and shall use commercially reasonable efforts to comply with the terms of each such Permit or Educational Approval and not permit any such Permit or Educational Approval to terminate, expire or lapse, except as required to permit Buyer's acquisition of the Other Acquired Campuses; and

(iv)    From the date hereof until the Second Closing Date or the earlier termination of this Agreement, except as (A) set forth in the Transition Services Agreement, (B) contemplated by this Agreement, (C) consented to in writing by Buyer (such consent not to be unreasonably withheld, delayed or conditioned), (D) necessary to consummate the Second Closing Transactions pursuant to the Sale Order, (E) required by Law, or (F) contemplated by any First Day Motion, the Sellers shall use commercially reasonable efforts to conduct their respective businesses in the ordinary course of business (as is customary for companies facing financial distress or Chapter 11), and use all commercially reasonable efforts to (1) subject to the limited cash resources of Sellers, conduct the Business in the Ordinary Course of Business except as to the First Closing Transactions, (2) subject to the limited cash resources of Sellers, preserve the existing business organization and management of the Business intact in all material respects, (3) keep available the services of the current Employees who are expected to be Transferred Employees, (4) subject to the limited cash resources of Sellers, maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Employees and others having business dealings with the Business, (5) refrain from changing in any material respect any of its product or service prices or pricing policies (*e.g.*, discount policies) for any of its products or services, except as shall be necessary to meet competition or customer requirements, and (6) refrain from implementing any employee layoffs that would reasonably be expected to implicate the WARN Act with respect to Assumed WARN Obligations related to Transferred Employees hired by the Buyers in connection with the First Closing Transactions and the Second Closing Transactions, provided, however, that after execution of this Agreement, the Sellers will be permitted to give WARN Act notices to Transferred Employees who are intended to be Transferred Employees as of the Second Closing.  Notwithstanding the foregoing, other than for the budgeted items set forth on **Schedule 6.1(c)**, Sellers obligations hereunder shall be subject, in all respects, to (x) the Sellers fiduciary duties, (y) the limited cash resources of the Sellers and (z) the Sellers taking necessary steps to allow for an expeditious wind down of the Business in the event this Agreement is terminated.

(d)    Notice of Certain Events.  Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in Section 9.2 not to be fulfilled by the Termination Date.

(e)    Other Acquired Campuses.  Following the First Closing, any cash received by Sellers from students relating to the Other Acquired Campuses shall be used by Sellers to pay a portion of the Agreed Expenses.

(f)    CA Campuses.  In the event Buyer elects to close on the purchase of the CA Campuses following the First Closing pursuant to Section 6.3(f), any cash received

by Sellers from students relating to the CA Campuses shall be used by Sellers to pay a portion of the CA Agreed Expenses.

6.2     Pre-Closing Covenants of Buyer.   Buyer covenants to Sellers that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement in accordance with the provisions of ARTICLE 11:

(a)     Cooperation.  Buyer shall take, or cause to be taken, all reasonable actions and do, or cause to be done, all things reasonably necessary or proper, consistent with applicable Law and Educational Law, to consummate and make effective as soon as possible the transactions contemplated by this Agreement.

(b)     Adequate Assurance Regarding Assumed Contracts and Required Orders. If any of the transactions contemplated hereby are consummated through the commencement of a Bankruptcy Case, Buyer agrees that it will cooperate as reasonably requested by Sellers to assist in establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code with regard to the Assumed Contracts.  Further, if any of the transactions contemplated hereby are consummated through the commencement of a Bankruptcy Case, Buyer shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)     Financing.  Buyer shall ensure that, on the Second Closing Date, Buyer will have sufficient funds to pay in full all of the Cure Amounts with respect to the Assumed Contracts that are assumed and assigned to Buyer on such date. In addition, Buyer shall ensure that, on the applicable Closing Date, Buyer will have sufficient funds to pay in full the Purchase Price.

(d)     Permits.  Buyer shall use commercially reasonable efforts to obtain or consummate the transfer to Buyer of any Permit or Educational Approval required to own or operate the Acquired Assets under applicable Laws and Educational Laws.

(e)     Notice of Certain Events.  Buyer shall promptly notify Sellers of, and furnish Sellers any information Sellers may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in Section 9.1 not to be fulfilled by the Termination Date.

(f)     Headquarters Lease.  Buyer shall pay any and all costs or fees relating to the lease of that certain property located at 1000 Corporate Drive, Suite 500 Fort Lauderdale, FL 33334 which arise after the First Closing Date and prior to (i) the earlier of (i) the Second Closing Date or (ii) the termination of this Agreement.

(g)     Replacement of Letters of Credit.  On or before the First Closing Date, Buyer shall have obtained replacement letters of credit and/or provided cash collateral for the existing letters of credit at the FCC Transferred Leased Properties.

26

(h)    Intellectual Property License.  Buyer shall grant Sellers a limited license to use any Intellectual Property Assets Seller may require to ensure compliance with any of the Educational Laws related to the closure or cessation of operations, including teaching out the students from such location, facility or program.

(i)    Other Acquired Campuses.  Following the First Closing and subject to any cash received pursuant to Section 6.1(e), Buyer shall promptly pay directly all of the Agreed Expenses for the period from the First Closing Date through the earlier of (a) the termination of this Agreement solely relating to the Second Closing or (b) the Second Closing.

(j)    CA Campuses.  In the event Buyer elects to close on the purchase of the CA Campuses following the First Closing pursuant to Section 6.3(f), and subject to any cash received pursuant to Section 6.1(f), Buyer shall promptly pay directly all of the CA Agreed Expenses for the period from the First Closing Date through the earlier of (a) the termination of this Agreement solely relating to the closing on the purchase of the CA Campuses or (b) the closing on the purchase of the CA Campuses.

(k)    BK Filing.  Buyer shall promptly pay directly all of the BK Agreed Expenses for the period from the filing of the Bankruptcy Case (whether or not first filed as an involuntary and then converted to a voluntary chapter 11 under the Bankruptcy Code) through the earlier of (i) conversion of any of Sellers' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (ii) the Second Closing, or (iii) if the Second Closing has been terminated, upon the entry of a Sale Order pertaining to the purchase of the Second Closing FCC Assets (the "**BK Payment Period**").  Any BK Agreed Expenses that are paid in advance to a third party as a retainer and that are not actually incurred by such third party service provider, will be paid back to Buyer promptly following the BK Payment Period.  Nothing contained in this Agreement and the Ancillary Agreements or otherwise shall require Buyer to fund any BK Agreed Expenses over the amounts set forth in Schedule 2 hereto or preclude any objection by Buyer to any fees and expenses of any professionals identified on Schedule 2.

(l)    Phoenix Campus.  Buyer agrees to negotiate in good faith with Sellers' secured lenders to enter into a lease agreement with respect to the Phoenix Owned Real Property on terms satisfactory to Buyer.  In the event Buyer is unable to enter into such lease agreement, Buyer shall be entitled, by delivery of written notice to Sellers, to remove the Phoenix Campus from Schedule 1 as an Other Acquired Campus and all assets and liabilities of the Phoenix Campus shall be deemed "Excluded Assets" and "Excluded Liabilities" (as applicable) for all purposes hereunder.

6.3    Other Covenants of Sellers and Buyer.

(a)    Disclosure Schedules and Supplements.  From time to time prior to the applicable Closing Date, Sellers may supplement or amend the disclosure schedules (the "**Schedules**") to this Agreement with respect to any matter.  Each such supplement or amendment shall include reasonable supporting information, to the extent reasonably available to Sellers.  Unless Buyer delivers a notice of termination with respect to such

matter as contemplated by Section 11.1(d)(ii) (to the extent Buyer is entitled to deliver such notice pursuant to Section 11.1(d)(ii) based on a determination that the matters referenced in such supplement or amendment have resulted in a Material Adverse Effect), within three (3) Business Days of the receipt by Buyer of any such supplement or amendment to the Schedules pursuant to this Section 6.3(b), then Buyer will have automatically be deemed to have waived (i) any and all rights to terminate this Agreement pursuant to Section 11.1(d)(i) or 11.1(d)(ii) and (ii) the closing condition set forth in Section 9.2(a), in each case arising out of Buyer's receipt of such supplement.

(b)    <u>Personally Identifiable Information</u>.    Buyer shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Sellers in effect on the Execution Date prohibiting the transfer of personally identifiable information about individuals and, if applicable, otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c)    <u>Access to Records after Closing</u>.    From and after the applicable Closing Date, each party hereto shall provide the other parties hereto (and their respective representatives including, without limitation, any trustee or liquidating trustee appointed in the Bankruptcy Case) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the books and records acquired or retained pursuant to this Agreement so as to enable (i) Sellers to sell, transfer or dispose of any Excluded Asset and wind down the Sellers' estate pursuant to the Bankruptcy Code if necessary and/or (ii) Buyer and Sellers to prepare Tax, financial, audit or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions.    If any party desires to dispose of any such records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove such records to be disposed of at the removing party's expense.    The obligations of the Sellers under this Section 6.3 shall terminate upon the closing of the Bankruptcy Case in the event any of the transactions contemplated hereby are consummated through the commencement of a Bankruptcy Case; provided, however, that the Sellers shall have provided Buyer with any and all school records including financial records in the possession of the Sellers.

(d)    <u>Transfer of the FCC Federal Funds Accounts after Closing</u>.    From and after the FCC Closing Date and through the Second Closing Date, Sellers shall use their commercially reasonable efforts to transfer the Sellers' interests in the FCC Federal Funds Accounts to Buyer.

(e)    <u>Closing on CA Campuses</u>.    Prior to the First Closing, Buyer may elect to either (i) move the closing on the purchase of the CA Campuses to a date following the First Closing Date but prior to the termination of this Agreement or (ii) not close on the purchase of the CA Campuses at all.    Buyer shall provide prior written notice of such election to Sellers at least three (3) business days prior to the First Closing.    In the event Buyer elects to exercise its right under clause (i) above, Buyer and Sellers agree to work

in good faith to consummate the closing on the sale and purchase of the CA Campuses following such election.

6.4    Employment Covenants and Other Undertakings.

(a)    Employees.  Sellers shall, upon Buyer's request, permit Buyer access to any employee records that Buyer may reasonably request in order to facilitate Buyer's potential hiring of any or all of the Employees, including, but not limited to, job descriptions, time records, and payroll data. At least two weeks prior to each of the First Closing Date as to the FCC Business, and the Second Closing Date as to the Other Acquired Business, as applicable, Sellers shall permit Buyer, during business hours in a manner not to unreasonably disturb the Business, to solicit employment applications from and interview for potential employment any of Sellers' employees.  Sellers and Buyer agree that the Buyer may on or prior to the First Closing Date offer employment to take effect on or after the First Closing Date to certain of Sellers' employees identified by category on **Schedule 6.4(a)**.  Sellers and Buyer agree that Buyer may offer employment to any other of the Sellers' employees as of the Second Closing Date at the Buyer's discretion.    Nothing herein imposes any obligation on any employee to accept employment with Buyer, nor does it impose any obligation on the Buyer to retain any employee for any length of time.  Such offers of employment shall be on terms and conditions which are consistent with Buyer's policies and procedures.  Any Employees who accept such offer of employment by Buyer effective as of a Closing Date are referred to herein as "**Transferred Employees**."  Sellers shall deliver to Buyer on or before the applicable Closing Date all personnel files and employment records relating to the Transferred Employees to the extent permitted by Law (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as Sellers certifies in writing are exempt from such requirement).

(b)    Buyer Benefit Plans.  For purposes of any employee benefit plan maintained by Buyer for which a Transferred Employee becomes eligible to participate in accordance with such plans' governing plan terms, each such Transferred Employee shall receive service crediting for eligibility purposes for the period of continuous employment with Sellers that ends on the applicable Closing Date.

(c)    Forms W-2 and W-4.  Sellers and Buyer shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees.  Under this procedure, Sellers shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable Law concerning record retention and Buyer will obtain new IRS Forms W-4 with respect to each Transferred Employee.

(d)    Employee Communications.  Sellers shall provide Buyer with an advance opportunity to review, revise, and approve any intended communication regarding the First Closing Transactions or Second Closing Transactions with Sellers employees prior to distribution (which approval shall not be unreasonably withheld or delayed).

(e)     WARN Obligations.  Buyer shall be solely responsible for all obligations, if any, under the federal Worker Adjustment Retraining and Notification Act, and any similar state or local Laws (collectively, "**WARN**") related to any Transferred Employees after the applicable Closing Date.  Sellers shall be solely responsible for all obligations, if any, under WARN related to any employees of Sellers (other than the Transferred Employees following the applicable Closing Date).

(f)     COBRA Obligations.  Buyer shall be responsible for offering COBRA under its own group health plan with respect to (A) all former employees on COBRA as of the applicable Closing Date, (B) any Employees or their dependents who (1) participated in Sellers' group health plan on the day before the applicable Closing Date, and (2) are not Transferred Employees and (C) Transferred Employees and their eligible dependents who become covered by Buyer's group health plan after the applicable Closing Date and who then experience a later COBRA qualifying event.

(g)     No Third Party Beneficiaries. Without limiting the generality of Section 12.17, Sellers and Buyer acknowledge and agree that all provisions contained in this Section 6.4 are included for the sole benefit of Sellers and Buyer, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of Sellers, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Buyer or any of its Affiliates.

6.5     Approvals.

(a)     Each party hereto shall, as promptly as possible, use its commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities and Educational Agencies that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement.  Each party shall cooperate fully with the other parties in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The parties shall not willfully take any action that has, or is reasonably likely to have, the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of any party before any Governmental Authority or Educational Agency, or the staff or regulators of any Governmental Authority or Educational Agency, in connection with the transactions contemplated by this Agreement (but, for the avoidance of doubt, not including any interactions between Sellers and Governmental Authorities or Educational Agencies in the Ordinary Course of Business or any disclosure which is not permitted by Law) shall be disclosed to the other parties hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings,

arguments, and proposals.  Each party shall give notice to the other parties with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other parties with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(c)    Each party shall submit all applications and other required filings to each Educational Agency with respect to all Regulatory Approvals and Educational Approvals required to be obtained from any Educational Agency prior to the applicable Closing, including the pre-acquisition review applications to be filed with the DOE by the FCC Acquired Campuses under Seller's ownership before the First Closing and the additional location approvals to be filed by FCC Acquired Campuses under Buyer's ownership before the Second Closing; provided that no such applications or filings shall be submitted without the prior review and consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.  Each of Buyer and Sellers shall keep each other informed of their written and oral communications with any Educational Agency or Governmental Authority as promptly as practicable, including providing copies of any written communications delivered to or received from any Educational Agency or Governmental Authority and allowing the other parties the opportunity to take part in any meeting or substantive oral communication that is arranged or that otherwise arises with any Education Agency to discuss any Regulatory Approval.   Notwithstanding the previous sentence, if Buyer or Sellers, as the case may be, are unable to reach the other parties for any meeting or substantive oral communication, such party may take part in such meeting or oral communication and shall promptly report back to the other party in detail of such discussions.

## ARTICLE 7
## TAXES

7.1    <u>Taxes Related to Purchase of Acquired Assets</u>.

(a)    Buyer shall be responsible for paying in equal amounts any transfer, conveyance, recording and similar Taxes, including all such state and local Taxes, incurred in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, **"Transaction Taxes"**), that are imposed as a result of the sale, transfer, assignment and delivery of the Acquired Assets to the Buyer, regardless of whether a Governmental Authority seeks to collect such taxes from Seller or Buyer.  Notwithstanding the time period in Section 3.2 relating to the Allocation Statement, Buyer and Sellers shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and (b) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.  Buyer and Sellers shall cooperate in providing each other with any appropriate certification and other similar documentation relating to any exemption from Transaction Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.  Buyer shall also be responsible for (i) defending or pursuing any proceedings related to such Transaction Taxes and (ii) paying any expenses related thereto.  Buyer shall not be

responsible for income or franchise taxes of Sellers, if any, arising from the transactions contemplated hereby.

(b)    On or prior to the Closing Date, Sellers shall pay all sales Taxes, use Taxes, and other Taxes which are then due and owing by Sellers (and not any member or owner thereof) with respect to the Acquired Assets and the Business and attributable to Tax periods or portions thereof ending on or prior to the applicable Closing Date; provided, however, Sellers shall not be obligated to pay any such Tax that is disputed in good faith by Sellers, as long as appropriate reserves have been established in accordance with GAAP. All sales Taxes, use Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or attributable to, the period on or prior to the applicable Closing Date and become due on or after the applicable Closing Date shall be paid by Sellers. Subject to Section 7.1(a), all sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that both accrue and are due after the applicable Closing Date shall be paid by Buyer. Buyer and Sellers shall cooperate and prepare and file any and all required Tax Returns with respect to Taxes subject to this Section 7.1(b). For purposes of this Agreement, whenever it is necessary to determine the Liability for any such Taxes subject to this Section 7.1(b) for a taxable period that begins before the Closing Date and ends after the applicable Closing Date (a "**Straddle Period**"), the Taxes for the portion of the Straddle Period ending on and including, and for the portion of the Straddle Period beginning after, the applicable Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of calendar days during the Straddle Period before and including the applicable Closing Date, or the number of calendar days during the Straddle Period beginning the day after the applicable Closing Date, as applicable, and the denominator of which is the number of calendar days in the entire Straddle Period.

7.2    Waiver of Bulk Sales Laws. To the greatest extent permitted by applicable Law, Buyer and Sellers hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1    Certain Bankruptcy Matters. In the event any of the transactions contemplated hereby are accomplished through the commencement of a Bankruptcy Case, Sellers shall use all commercially reasonable efforts to:

(a)    file with the Bankruptcy Court, within three (3) Business Day after the Petition Date, the Sale Motion; and

(b)    within forty-five (45) days after filing of the Sale Motion, obtain entry by the Bankruptcy Court of the Sale Order.

8.2    Contracts.    In the event any of the transactions contemplated hereby are accomplished through the commencement of a Bankruptcy Case, Sellers shall serve on all non-Debtor counterparties to all of the Contracts on **Schedule 2.7(b)** a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than five (5) Business Days prior to the Sale Hearing.  In cases in which a Seller is unable to establish that a default exists, the relevant Cure Amount shall be set at $0.00.  Any such notice provided in accordance with this Section 8.2 shall be in form and substance reasonably acceptable to the Buyer.

8.3    Consultation with Buyer.    Except to the extent filings must be made on an emergency basis in the judgment of the Sellers, Sellers shall use commercially reasonable efforts to provide Buyer, at least two (2) days in advance of filing with the Bankruptcy Court, a draft of any motions, orders or other pleadings that Sellers propose to file with the Bankruptcy Court seeking approval of this Agreement, including the motion to approve the Sale Order.  Sellers shall reasonably cooperate with Buyer, and consider in good faith the views of Buyer, with respect to all such filings.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1    Conditions Precedent to Performance by Sellers.    The obligations of each Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the applicable Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c), Section 9.1(d) (if applicable), Section 9.1(e) and except as expressly provided therein) may be waived by Sellers, in their sole and absolute discretion:

(a)    Representations and Warranties of Buyer.    The representations and warranties of Buyer contained in ARTICLE 5 that are not qualified by materiality or Buyer Material Adverse Effect shall be true and correct in all material respects on and as of the applicable Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Buyer contained in ARTICLE 5 that are qualified by materiality or Buyer Material Adverse Effect shall be true and correct in all respects on and as of the applicable Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

(b)    Performance of the Obligations of Buyer.    Buyer shall have performed and complied in all material respects with all obligations required under this Agreement to be performed by Buyer on or before the applicable Closing Date (except with respect to obligations which Buyer is to perform as of the applicable Closing under this Agreement.

(c)    No Violation of Orders.    No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(d) <u>Bankruptcy Court Approval</u>. In the case of the Second Closing, the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay.

(e) <u>Regulatory Approvals and Educational Approvals</u>. All Regulatory Approvals and Educational Approvals shall have been received.

(f) <u>Consent of Sellers' Secured Lenders</u>. The Sellers shall have secured their secured lenders consent to the Closing, to the extent such consent is required.

(g) <u>First Closing</u>. In connection with the Second Closing, the First Closing shall have occurred in accordance with this Agreement.

(h) <u>No Examiner, Trustee, Conversion or Dismissal</u>. The Bankruptcy Court shall not have entered an order (i) appointing a trustee or an examiner with expanded powers, or (ii) dismissing any one of the Sellers' chapter 11 cases or converting any one of the Sellers' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

For avoidance of doubt, there shall be no conditions precedent to Sellers' obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

9.2 <u>Conditions Precedent to the Performance by Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the applicable Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c), Section 9.2(d) (if applicable) and Section 9.2(e), except as expressly provided therein) may be waived by Buyer, in its sole and absolute discretion:

(a) <u>Representations and Warranties of Sellers</u>. The representations and warranties of Sellers contained in ARTICLE 4 that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects on and as of the applicable Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Sellers contained in ARTICLE 4 that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects on and as of the applicable Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

(b) <u>Performance of the Obligations of Sellers</u>. Sellers shall have performed and complied in all material respects with all obligations required by Sellers under this Agreement that are to be performed by Sellers on or before the applicable Closing Date (except with respect to obligations which Sellers are to perform as of the applicable Closing under this Agreement).

(c) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

34

(d)     Bankruptcy Court Approval.  In the case of the Second Closing, the Sale Order shall have been entered by the Bankruptcy Court on or before the date that is 45 days after the Petition Date and shall not be subject to a stay.

(e)     No Examiner, Trustee, Conversion or Dismissal.  The Bankruptcy Court shall not have entered an order (i) appointing a trustee or an examiner with expanded powers, or (ii) dismissing any one of the Sellers' chapter 11 cases or converting any one of the Sellers' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

(f)     Consent of Sellers' Secured Lenders. The Sellers shall have secured their secured lenders consent to the Closing, to the extent such consent is required.

(g)     First Closing Approvals.  As a condition to the First Closing, all Buyer Regulatory Approvals and Educational Approvals relating to the First Closing as set forth in this Agreement and on **Schedule 5.3(b)** shall have been received; provided, however, that a response from the DOE to a request for Regulatory Approvals and Educational Approvals including the response to pre-acquisition review applications which requires as a condition for a Regulatory Approval or Educational Approval that Buyer post a letter of credit or imposes limitations on the schools such as the addition of new locations, new programs or the modification of existing programs shall not constitute a Buyer Regulatory Approval or Educational Approval in accordance with this Section 9.2(g).

(h)     Second Closing Approvals.  As a condition to the Second Closing, all Buyer Regulatory Approvals and Educational Approvals relating to the Second Closing as set forth in this Agreement and on **Schedule 5.3(b)** shall have been received; provided, however, that any such approvals shall be in form and substance satisfactory to Buyer in all respects.

(i)     First Closing.  In connection with the Second Closing, the First Closing shall have occurred in accordance with this Agreement.

For avoidance of doubt, there shall be no conditions precedent to Buyer's obligation to consummate the transactions contemplated by this Agreement (including any financing or due diligence condition), except for those conditions precedent specifically set forth in this Section 9.2.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1    Closing.

(a)     Upon the terms and subject to the conditions of this Agreement, the sale and purchase of the FCC Acquired Assets and the assumption of the FCC Assumed Liabilities contemplated by this Agreement (the "**First Closing Transactions**") shall take place at a closing (the "**First Closing**") to be held on a Business Day mutually acceptable to the parties (but as promptly as practicable) after the date on which all conditions to the obligations of the parties hereto set forth in ARTICLE 9 to consummate the transactions contemplated hereby are first satisfied and/or waived (the date the Closing occurs being

the "**First Closing Date**").  The First Closing shall occur on the First Closing Date in the offices of Greenberg Traurig, P.A., 401 East Las Olas Blvd., Suite 2000, Fort Lauderdale, FL 33301.  Upon consummation of the First Closing, the purchase and sale of the FCC Acquired Assets and the assumption of the FCC Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (New York time) on the First Closing Date.

(b)     Upon the terms and subject to the conditions of this Agreement, the sale and purchase of the Other Acquired Assets and the assumption of the Other Assumed Liabilities, and the sale and purchase of the Second Closing FCC Assets and the assumption of those FCC Assumed Liabilities that were not assumed at the First Closing, contemplated by this Agreement (the "**Second Closing Transactions**") shall take place at a closing (the "**Second Closing**" and together with the First Closing, a "**Closing**") to be held on a Business Day mutually acceptable to the parties (but as promptly as practicable) after the date on which all conditions to the obligations of the parties hereto set forth in ARTICLE 9 to consummate the transactions contemplated hereby are first satisfied and/or waived (the date the Closing occurs being the "**Second Closing Date**" and together with the First Closing Date, a "**Closing Date**").  The Second Closing shall occur on the Second Closing Date in the offices of Greenberg Traurig, P.A., 401 East Las Olas Blvd., Suite 2000, Fort Lauderdale, FL 33301.  Upon consummation of the Second Closing, the purchase and sale of the Other Acquired Assets and the assumption of the Other Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Second Closing Date.

10.2    Sellers' Deliveries.

(a)     At the First Closing:

(i)     Sellers shall deliver possession of the FCC Acquired Assets;

(ii)    The applicable Seller shall have executed and delivered to Buyer (A) each of the Bills of Sale, (B) the Assignment and Assumption Agreement, (C) each of the Trademark Assignment Agreements and (D) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance as may be reasonably requested by Buyer and required under applicable Law to convey valid, marketable title of the FCC Acquired Assets to Buyer;

(iii)   Sellers shall deliver an officer's certificate, duly executed by a senior officer of each of the Sellers, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form reasonably satisfactory to Buyer; and

(iv)    Each Seller shall deliver a non-foreign affidavit dated as of the First Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code.

(b)     At the Second Closing:

(i)     Sellers shall deliver possession of the Other Acquired Assets;

(ii)    The applicable Seller shall have executed and delivered to Buyer (A) each of the Bills of Sale, (B) the Assignment and Assumption Agreement, (C) each of the Trademark Assignment Agreements and (D) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance as may be reasonably requested by Buyer and required under applicable Law to convey valid, marketable title of the Other Acquired Assets to Buyer;

(iii)    Sellers shall deliver an officer's certificate, duly executed by a senior officer of each of the Sellers, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form reasonably satisfactory to Buyer;

(iv)    Sellers shall have executed and delivered the Transition Services Agreement; and

(v)    Each Seller shall deliver a non-foreign affidavit dated as of the Second Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code.

10.3    Buyer's Deliveries.

(a)    At the First Closing:

(i)    Buyer shall pay the Cash Purchase Price by wire transfer of immediately available funds to an account designated by Sellers prior to the Closing;

(ii)    Buyer shall pay the Professional Retainers by wire transfer of immediately available funds to the accounts designated by such professionals prior to Closing.

(iii)    Buyer shall pay the Lender Consent Fee by wire transfer of immediately available funds to an account designated by Bank of Montreal, a Canadian chartered bank, in its capacity as agent for the Sellers' secured lenders who consent to the First Closing Transactions and Second Closing Transactions.

(iv)    Buyer shall have executed and delivered to Sellers (A) the Assignment and Assumption Agreement and (B) each of the Trademark Assignment Agreements related to the FCC Acquired Assets;

(v)    Buyer shall have executed and delivered to Sellers the Transition Services Agreement; and

(vi)    Buyer shall deliver a certificate, duly executed by a senior officer of Buyer, certifying the matters set forth in Section 9.1(a) and Section 9.1(b) in form reasonably satisfactory to Sellers.

(b)    At the Second Closing:

(i)    Buyer shall have executed and delivered to Sellers (A) the Assignment and Assumption Agreement and (B) each of the Trademark Assignment Agreements related to the Other Acquired Assets; and

(ii)    Buyer shall deliver a certificate, duly executed by a senior officer of Buyer, certifying the matters set forth in Section 9.1(a) and Section 9.1(b) in form reasonably satisfactory to Sellers.

## ARTICLE 11
## TERMINATION

11.1    Termination.  This Agreement may be terminated only in accordance with this Section 11.1.  This Agreement may be, or, as applicable, shall be, terminated at any time before the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer; or

(b)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit a Closing; provided, that failure to obtain the required Regulatory Approvals and Educational Approvals for the Second Closing shall not impact the parties obligations as to the First Closing.

(c)    By either Sellers or Buyer if the First Closing shall not have occurred by August 24, 2014 (the "**Termination Date**");

(d)    by Buyer,

(i)    if Sellers shall have breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would result in the failure of a condition set forth in Section 9.2 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date;

(ii)    within three (3) Business Days of the receipt by Buyer of a supplement or amendment to the Schedules that results in a Material Adverse Effect in accordance with Section 6.3(b);

(iii)    if, prior to any Closing requiring the commencement of a Bankruptcy Case, the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(iv)    if one or more of the Sellers enter into a definitive agreement with any Person (other than Buyer or its Affiliates) with respect to (i) any Alternative Transaction except, subject to the terms of any Bid Procedures Order, in the event that the entering into such agreement relates to an Alternative Transaction with the Winning

Bidder (as defined in the Bid Procedures Order) and Buyer is the Second-Highest Bidder (as defined in the Bid Procedures Order), in which case, Buyer shall have the right to terminate this Agreement as set forth in the Bidding Procedures with regard to Second-Highest Bidder;

        (v)     if the Sale Order has not been entered on or before the date that is 45 days after the Petition Date.

        (e)     by Sellers if Buyer shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would result in the failure of a condition set forth in Section 9.1 and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date.

Each condition set forth in this Section 11.1 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The parties hereto acknowledge and agree that no notice of termination or extension of the Termination Date provided pursuant to this Section 11.1 shall become effective until five (5) days after the delivery of such notice to the other parties, and only if such notice shall not have been withdrawn during such five (5) day period or otherwise become invalid.

Notwithstanding anything to the contrary set forth herein, if (a) upon seven (7) days prior written notice from Buyer to Sellers, Buyer elects to terminate the Second Closing or (b) the Second Closing has not occurred within 60 days after the Petition Date, each of the Sellers and Buyer's obligations hereunder, solely relating to the Second Closing, shall become null and void and have no effect and no party hereto shall have any liability to the other parties hereto except nothing herein shall relieve either party from liability for any breach of this Agreement occurring prior to such termination. Furthermore, under no circumstances may Buyer terminate this Agreement as to the First Closing Transactions as a result of the Educational Approvals not being obtained to allow for the Second Closing or the Second Closing not occurring.

        11.2   <u>Effect of Termination</u>.  In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and no party hereto shall have any liability to the other parties hereto except (a) nothing herein shall relieve either party from liability for any breach of this Agreement occurring prior to such termination and (b) with respect to the provisions of ARTICLE 11 and ARTICLE 12 which shall expressly survive termination hereof.

        11.3   <u>Damages upon Termination.</u>

        (a)     If this Agreement remains in full force and effect as to the Second Closing Transactions and Sellers consummate an Alternative Transaction on or prior to the date that is four (4) months following the date of the termination of this Agreement, then at such time, Sellers will pay (or will cause to be paid) to Buyer (or its designee), from the proceeds of such Alternative Transaction, a payment of $150,000 (the "**Break Up Fee**")

and reimbursement of Transaction Expenses of up to $150,000.  The Break Up Fee and Transaction Expenses shall be paid by wire transfer of immediately available funds to an account designated by Buyer, and Buyer's right to receive the Break Up Fee under the circumstances described in this Section 11.3(a) shall be Buyer's sole and exclusive remedy following a termination of this Agreement; provided, however, that, notwithstanding anything to the contrary herein, if at the time of any such termination described in this Section 11.3 Buyer is also in material breach of  this Agreement such that any of the conditions set forth in Section 9.1(a) or Section 9.1(b) would not be satisfied, Buyer shall have no right to the Break Up Fee. Buyer acknowledges and agrees that payment of the Break Up Fee and reimbursement of its Transaction Expenses, in each case to the extent due and payable in accordance with the terms and conditions of this Agreement, shall be Buyer's sole and exclusive remedies against Sellers, any Affiliate or Representative of Sellers and each of their respective assets and properties following a termination of this Agreement.

(b)    Any such payments pursuant to Section 11.3(a) will be earned and payable by Sellers to Buyer (or its designee) immediately upon the consummation of the Alternative Transaction and without Bankruptcy Court review or further Bankruptcy Court order.  Buyer and Sellers agree that it would be impractical and extremely difficult to determine the extent of any damages to Buyer that might result from a termination of this Agreement by Sellers under such circumstances.  Therefore, the parties acknowledge and agree that any payment to Buyer made pursuant Section 11.3(a) will be paid as liquidated damages and the parties' good faith estimate of the actual potential damages to Buyer for any such termination.

(c)    Amounts required to be paid by the Sellers pursuant to this Section 11.3 shall constitute allowed superpriority administrative expenses under the Bankruptcy Code (which shall be an administrative expense claim of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code).


## ARTICLE 12
## MISCELLANEOUS

12.1    Survival.  No representations or warranties of Sellers or Buyer made in this Agreement shall survive the applicable Closing Date.  All covenants and agreements of Sellers and Buyer contained herein shall survive the applicable Closing in accordance with their terms. For the avoidance of doubt, and notwithstanding the preceding sentence, fraud committed by a party with respect to a representation and warranty made in this Agreement shall cause the representation and warranty to survive consummation of the transactions contemplated by this Agreement and shall continue in full force and effect without any time limitation, subject to the harmed party's right to seek all legal and equitable remedies arising solely out of such fraud.

12.2    Further Assurances.  At the request and the sole expense of the requesting party, Buyer or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered,

such documents as Buyer or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3    Successors and Assigns.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns and if applicable, any trustee appointed in the Bankruptcy Case or subsequent chapter 7 cases and Sellers, if the Bankruptcy Case is dismissed. Neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of Law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the parties hereto without the prior written consent of the other party or parties hereto (which consent may be granted, withheld, conditioned or delayed in such other party's sole and absolute discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect.

12.4    Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of  Florida (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Broward County, Florida.

12.5    Expenses.  Except as otherwise provided in this Agreement, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6    Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date (if any) this Agreement was last amended.

12.7    Notices.

(a)    All notices, requests, demands, consents, waivers and other communications required or permitted to be given under the terms of this Agreement

41

must be in writing and will be deemed to have been delivered: (i) upon receipt, if delivered personally; (ii) when sent, if sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); (iii) on the day of transmission, if sent via electronic transmission to the email address below (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); and (iv) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to Sellers:

Education Training Corporation
1000 Corporate Drive, Suite 500
Fort Lauderdale, FL 33334
Attention: Jeff Pierne
Email: jpierne@anthem.edu


With a copy (which shall not constitute notice) to:

Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Attention: Nancy Mitchell and Matthew Miller
Email: mitchelln@gtlaw.com and millerma@gtlaw.com
Facsimile: (212) 805-9203

If to Buyer:

IEC Corporation
16485 Laguna Canyon Rd Ste. 300
Irvine, CA 92618
Attention: Dr. Fardad Fateri
Email: FateriF@IECColleges.com

With a copy (which shall not constitute notice) to:

Ritzert & Leyton, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Attention: Peter Leyton
Email: pleyton@ritzert-leyton.com
Facsimile: (703) 934-9840

—and—

42

Cousins Chipman & Brown, LLP
1007 North Orange Street
Suite 1110
Wilmington, DE  19801
Attention:  Scott D. Cousins
Email: cousins@ccbllp.com
Facsimile: (302) 295-0199

(b)     Any party hereto may change its address, facsimile number or email address for the purpose of this Section 12.7 by giving the other parties written notice of its new address, facsimile number or email address in the manner set forth above. Written confirmation of receipt (i) given by the recipient of such notice, request, demand, consent, waiver or other communication, (ii) mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number or (iii) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

12.8     Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the party hereto waiving compliance.  Any waiver by any party hereto of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9     Sellers Disclosures.  After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case and other Persons bidding on assets of Sellers; provided, that nothing herein shall limit the Sellers' right to disclose such information to any Committee and its professionals.  Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction.

12.10     Entire Agreement.   This Agreement, together with the and the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), supersede all other prior oral or written agreements among the parties hereto solely, including the original Purchase Agreement, with respect to the matters contained herein and therein, and this

Agreement, together with the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, contain the entire understanding of the parties hereto solely with respect to the matters contained herein and therein.  For clarification purposes, the Recitals are part of this Agreement.

12.11    Headings.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party.  In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

12.13    Name Change.  As soon as practicable following the Closing, Sellers shall discontinue the use of its current name (and any other trade names currently utilized by Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Florida Career College" without the prior written consent of Buyer and if necessary, Sellers shall cause the name of Sellers in the caption of the Bankruptcy Case to be changed to the new names of Sellers as provided in the last sentence of this Section 12.13.  From and after the Closing, each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by Sellers in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder.  Sellers hereby irrevocably authorize Buyer to file, immediately following the Closing, the organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which such Seller is qualified to do business on Seller's behalf.

12.14    Payments and Revenues.  If after the Closing, either party shall receive any payment, revenue or other amount that belongs to the other party pursuant to this Agreement, such receiving party shall promptly remit or cause to be remitted the same to the other party.

12.15    Specific Performance.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at Law or in equity.

12.16    Waiver of Jury Trial.  **EACH PARTY HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS AGREEMENT.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-**

**LAW OR STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.**

12.17   <u>No Third Party Beneficiaries</u>.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

**IEC CORPORATION**

By: _____
Name:   FARDAD FATERI
Title:   President and CEO

**SELLERS:**

**FCC HOLDINGS, INC.**

By: _____
Name:   Jeffrey Pierne
Title:   Chief Financial Officer

**EDUCATION TRAINING CORPORATION**

By: _____
Name:   Jeffrey Pierne
Title:   Chief Financial Officer

**EDUTECH ACQUISITION CORPORATION**

By: _____
Name:   Jeffrey Pierne
Title:   Chief Financial Officer

**HIGH-TECH INSTITUTE HOLDINGS, INC.**

By: _____
Name:   Jeffrey Pierne
Title:   Chief Financial Officer

*[Signature Page to Amended and Restated Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER:**

**IEC CORPORATION**

By: _____
Name: _____
Title: _____


**SELLERS:**

**FCC HOLDINGS, INC.**

By: _____
Name:  Jeffrey Pierne
Title:    Chief Financial Officer

**EDUCATION TRAINING CORPORATION**

By: _____
Name:  Jeffrey Pierne
Title:    Chief Financial Officer


**EDUTECH ACQUISITION CORPORATION**

By: _____
Name:  Jeffrey Pierne
Title:    Chief Financial Officer

**HIGH-TECH INSTITUTE HOLDINGS, INC.**

By: _____
Name:  Jeffrey Pierne
Title:    Chief Financial Officer

*[Signature Page to Amended and Restated Asset Purchase Agreement]*

**HIGH-TECH INSTITUTE, INC.**

By: _____

Name:  Jeffrey Pierne

Title:   Chief Financial Officer

**Appendix A**

**DEFINED TERMS**

The following terms have the meanings set forth in the Preamble hereto or the Sections hereof set forth below:

| Definitions | Location |
|---|---|
| "Accounts Receivable" | Section 2.1 |
| "Agreement" | Preamble |
| "Allocation Statement" | Section 3.2(a) |
| "Bankruptcy Court" | Recitals |
| "BK Payment Period" | Section 6.2(k) |
| "Buyer" | Preamble |
| "Buyer Regulatory Approvals" | Section 5.3(b) |
| "Cash Purchase Price" | Section 3.1(a) |
| "Closing" | Section 10.1(b) |
| "Closing Date" | Section 10.1(b) |
| "Edutech" | Preamble |
| "Environmental Laws" | Section 4.13 |
| "ETC" | Preamble |
| "Excluded Assets" | Section 2.3 |
| "Execution Date" | Preamble |
| "Excluded Liabilities" | Section 2.6 |
| "FCC Accounts Receivable" | Section 2.1(a) |
| "FCC Acquired Assets" | Section 2.1 |
| "FCC Acquired Campuses" | Recitals |
| "FCC Assumed Contracts" | Section 2.7(a)(i) |
| "FCC Assumed Liabilities" | Section 2.4 |
| "FCC Business" | Recitals |
| "FCC Existing Contracts" | Section 4.6 |
| "FCC Holdings" | Preamble |
| "FCC Transferred Leased Real Property" | Section 4.8(b) |
| "First Closing" | Section 10.1(a) |
| "First Closing Date" | Section 10.1(a) |
| "First Closing Transactions" | Section 10.1(a) |
| "High-Tech" | Preamble |
| "High-Tech Holdings" | Preamble |
| "Lender Consent Fee" | Section 3.1(a) |
| "Necessary Consent" | Section 2.7(b) |
| "Original Purchase Agreement" | Recitals |
| "Other Accounts Receivable" | Section 2.2(a) |
| "Other Acquired Assets: | Section 2.2 |
| "Other Acquired Business" | Recitals |
| "Other Acquired Campuses" | Recitals |
| "Other Assumed Contracts" | Section 2.7(a)(i) |
| "Other Assumed Liabilities" | Section 2.5 |

A-1

| | |
|---|---|
| "Other Existing Contracts" | Section 2.7 |
| "Other Transferred Leased Real Property" | Section 4.8(c) |
| "Purchase Price" | Section 3.1 |
| "Regulatory Approvals" | Section 5.3(b) |
| "Schedules" | Section 6.3(a) |
| "Second Closing" | Section 10.1(b) |
| "Second Closing Date" | Section 10.1(b) |
| "Second Closing Transactions" | Section 10.1(b) |
| "Sellers" | Preamble |
| "Seller Regulatory Approvals" | Section 4.3(b) |
| "Straddle Period" | Section 7.1(b) |
| "Termination Date" | Section 11.1(c)(1) |
| "Transaction Taxes" | Section 7.1(a) |
| "Transferred Employees" | Section 6.4(a) |
| "WARN" | Section 6.4(e) |

"**Accrediting Body**" shall mean any non-Governmental Authority or non-governmental organization, including any institutional and specialized accrediting agency, that engages in the granting or withholding of accreditation of postsecondary schools or educational programs, including the Accrediting Council for Independent Career Schools (ACICS) and the Accrediting Bureau for Health Education Schools (ABHES).

"**Acquired Assets**" means the FCC Acquired Assets described in Section 2.1 and the Other Acquired Assets described in Section 2.2.

"**Acquired Business**" means the FCC Business described in the Recitals and Schedule 1 and the Other Acquired Business described in the Recitals and Schedule 1 .

"**Acquired Campuses**" means the FCC Acquired Campuses described in the Recitals and Schedule 1 and the Other Acquired Campuses described in the Recitals and Schedule 1.

"**Acquired OPEID Number**" means the six-digit Office of Post-Secondary Education Identification number 023058, and the eight-digit Office of Post-Secondary Education numbers assigned to the FCC Acquired Campuses, including its main campus and additional locations.

"**Action**" means any demand, claim, action, suit or proceeding, complaint, charge, hearing, grievance, arbitral action, litigation, inquiry, criminal prosecution or investigation by or threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or

cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreed Expenses**" shall mean the payment of the operating costs related to the Second Closing FCC Assets (including the FCC Second Closing Assumed Contracts) and the Other Acquired Campuses, less the amount of cash received by Sellers for students during such applicable period related to the Other Acquired Campuses; provided, that the Agreed Expenses for the first seven (7) days following the First Closing shall not exceed $565,000.

"**Alternative Transaction**" means any direct or indirect (through any Person) acquisition, divestiture, sale, business combination, restructuring or reorganization of or involving all or substantially all of the consolidated assets of Sellers or all or substantially all of the equity securities of Sellers, in either case, whether proposed to be effected pursuant to a merger, consolidation, share exchange, amalgamation or plan of reorganization, other than the First Closing Transaction, Second Closing Transaction or any other transaction with Buyer or any of its Affiliates.

"**Ancillary Agreement**" means any of the Bill of Sale, the Assignment and Assumption Agreement, Trademark Assignment Agreement, the Transition Services Agreement or such other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Acquired Assets to Buyer.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in substantially the form agreed to by Buyer and Sellers.

"**Assumed Contracts**" means the FCC Assumed Contracts set forth in Schedule 2.7(a) and the Other Assumed Contracts described in Schedule 2.7(b).

"**Assumed Liabilities**" means the FCC Assumed Liabilities and the Other Assumed Liabilities.

"**Bankruptcy Budget**" means the budget set forth on **Schedule 2**.

"**Bankruptcy Case**" means any voluntary petition for relief pursuant to the Bankruptcy Code.

"**Bankruptcy Code**" means the United States Code, 11 U.S.C. § 101-1532.

"**Bankruptcy Orders**" means the Bid Procedures Order and the Sale Order.

"**Bid Procedures Order**" means an order entered by the Bankruptcy Court granting the relief requested in the Sale Motion for the approval of the Bidding Procedures and authorization to pay the Break Up Fee and the Transaction Expenses in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement, which order shall be in form and substance satisfactory to Buyer in all respects.

"**Bill of Sale**" means each Bill of Sale in substantially the form agreed to by Buyer and Sellers.

"**BK Agreed Expenses**" shall mean the payment of the costs (accrued, whether or not when allowed) related to the Bankruptcy Budget, including the Professional Retainers.

"**Business**" means the FCC Business and the Other Acquired Business.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York are authorized by Law or other governmental action to close.

"**Buyer Material Adverse Effect**" means any circumstance, change or effect that would materially and adversely affect the ability of Buyer to carry out its obligations under this Agreement.  Notwithstanding anything to the contrary herein, a response from the DOE to a request for Regulatory Approval including the response to pre-acquisition review applications which requires as a condition for Regulatory Approval that Buyer post a letter of credit or imposes limitations on the schools such as the addition of new locations, new programs or the modification of existing programs shall be deemed to constitute a "Buyer Material Adverse Effect" (such event, a "DOE MAE").

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, instruments for the payment of money, certificates of deposit and other time deposits and letters of credit; provided, however, that the term "Cash" as used in this Agreement excludes all Prepaid Tuition Payments.

"**CA Agreed Expenses**" shall mean the payment of the operating costs related to the CA Campuses, less the amount of cash received by Sellers for students during such applicable period related to the CA Campuses.

"**CA Campuses**" shall mean those campuses designated with an "*" next to their name on **Schedule 1**.

"**Claim**" means any rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Compliance Date**" means July 1, 2012.

"**Confidential Information**" means any information, whether written or oral, concerning the Business that is not already generally available to the public (other than any such information that is generally available to the public as a result of a breach of any duty of confidentiality under this Agreement or otherwise).

"**Contract**" means any written agreement, contract, lease (including, without limitation, any real or personal property leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other written binding arrangement or written understanding, and any written amendments, modifications or supplements thereto.

"**Cure Amounts**" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assumed Contracts so that they may be sold and assigned to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, databases, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, student lists, prospect lists, curricula, databases and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), patient lists, patient files and electronic patient records for all active, inactive and prospective patients of the Business, personnel files and employment records relating to Transferred Employees (including, without limitation, applicable completed I-9 forms), supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Real Property, but excluding any materials exclusively related to any Excluded Assets.

"**DOE**" means the United States Department of Education.

"**DOE MAE**" has the meaning set forth in this Appendix A in the definition of "Buyer Material Adverse Effect."

"**Educational Agency**" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Approvals for private post-secondary schools in accordance with standards relating to the performance, operation, financial condition, or academic standards of such schools, including the Florida Commission on Independent Education, Accrediting Commission of Career Schools and Colleges, the Accrediting Council for Continuing Education and Training, the DOE and any student loan guaranty agency.

"**Educational Approval**" shall mean any license, permit, authorization, certification, accreditation, or similar approval, including a response to a pre-acquisition review application by the DOE, or any express exemption from approval, issued or required to be issued by an Educational Agency to an Acquired Campus, including any approvals (a) to operate and offer its educational programs in all jurisdictions in which it operates, including, as applicable, all jurisdictions where it offers educational programs online or through other distance education

delivery methods, (b) to participate in any Student Financial Assistance Program, or (c) for graduates to be eligible to obtain certification or state licensure, or to take any examinations to obtain such certification or state licensure, for any program for which an Acquired Campus has represented to students or prospective students in writing that such program will enable students to obtain such certification or licensure.

"**Educational Claims**" shall mean (i) any and all written claims or assertions of loss or liability by any Educational Agency against any Seller or an Acquired Campus relating to any violation by any Seller or an Acquired Campus, alleged or actual, of any applicable Educational Approval and (ii) any and all written claims by any Educational Agency against any Seller or an Acquired Campus seeking penalties or sanctions, resulting from any violation by any Seller or any Acquired Campus of any applicable Educational Law.

"**Educational Consent**" shall mean any consent, including any interim or temporary approval, that must be issued by or made with any Educational Agency in connection with the transactions contemplated by this Agreement, whether pre-Closing or post-Closing, pursuant to applicable Educational Law or as required by any Educational Agency in order to maintain or continue any Educational Approval held by an Acquired Campus.

"**Educational Law**" shall mean any statute, law, regulation, judgment, decree, injunction, ruling, rule, requirement, or binding standard issued, entered, administered or promulgated by any Educational Agency applicable to any Acquired Campus including without limitation the provisions of Title IV of the HEA and its implementing regulations and regulations issued or administered by an Educational Agency.

"**Employee Benefit Plans**" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business or the Acquired Assets), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Sellers or any ERISA Affiliate and that covers any current or former employee, director, manager, member, officer or consultant of Sellers (or their dependents, spouses or beneficiaries).

"**Employees**" means all individuals employed by Sellers in connection with the Business and the Acquired Assets as of the Execution Date.

"**Encumbrances**" means any security interest, lien, pledge, hypothecation, mortgage, charge, option, right of first refusal, easement, restrictive covenant, encumbrance or other similar restriction.

"**Environmental Laws**" means all federal, state, local and foreign laws, statutes and regulations relating to pollution or the environment, including, without limitation, those relating to Releases or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, transport or handling of Hazardous Materials as in effect as of the Closing Date.

"**Environmental Liabilities and Obligations**" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or hazardous waste; (ii) the Release of Hazardous Materials or waste; (iii) any other Pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is treated as a single employer with Sellers under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Excluded OPEID Numbers**" means the following six-digit Office of Post-Secondary Education Identification numbers: (i) 030764, (ii) 010851, (iii) 022392, (iv) 008441 and (v) 022631.

"**FCC Federal Funds Accounts**" means any and all bank accounts related to the FCC Campuses where the Pell grant and direct loan funds flow to from the government when they are drawn down by the school for disbursement to the students through the operating account of the institution.

"**FCC Second Closing Assumed Contract**" means any Contract or unexpired lease which would otherwise constitute an FCC Acquired Asset that cannot be assumed or assigned to Buyer without consent of the counterparty; provided, that a Contract shall cease to be an FCC Second Closing Assumed Contract at such time as consent to assumption or assignment has been obtained from such counterparty.

"**First Day Motion**" means any motion listed on **Schedule A** attached hereto.

"**GAAP**" means the United States' generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any foreign or United States federal, national, supranational, state, provincial, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality, but excluding any Educational Agency.

"**Hazardous Materials**" means any (a) chemical, material or substance defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "acutely hazardous waste", "radioactive waste", "biohazardous waste", "pollutant", "toxic pollutant", "contaminant", "restricted hazardous waste", "infectious waste", "toxic substances" or any other term or expression intended to define, list, regulate or classify substances by reason of properties harmful to health, safety or the indoor or outdoor

environment (including harmful properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "TCLP toxicity" or "EP toxicity" or words of similar import) as defined in, the subject of, or that could give rise to Liability under, any Environmental Law, (b) oil, petroleum, petroleum fraction, or petroleum additive (including methyl tertiary butyl ether), (c) flammable substances or explosives, (d) radioactive materials, (e) asbestos or asbestos-containing materials, (f) urea formaldehyde foam insulation, (g) polychlorinated biphenyls, and (h) lead-based paint, including, in each case, any mixture or solution thereof.

"**HEA**" shall mean the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq., as amended, or any successor statute thereto.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Real Property.

"**Intellectual Property**" means all intellectual property used in, held for use in, or related to the Acquired Campuses or the Business, including, without limitation, (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) internet addresses, uniform resource locaters, domain names, websites and web pages, and (h) any and all other intellectual property and proprietary rights of Sellers used in, held for use in, or related to the Acquired Campuses or the Business.

"**Intellectual Property License**" means (i) any Contract that contains any grant by Sellers to any third Person of any right to use, publish, perform or exploit any of the Intellectual Property, and (ii) any Contract (other than a Contract concerning the licensing of generally commercially available software, including "shrink-wrap" and "click-wrap" licenses) that contains any grant by any third Person to Sellers of any right to use, publish, perform or exploit any intellectual property of such third Person concerning or relating to the Intellectual Property.

"**Inventories**" or "**Inventory**" means all inventory of any kind or nature used in, held for use in, or related to the Acquired Campuses or the Business (other than PP&E), whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same.

"**Key Executives**" mean Jeff Pierne, Dean Bartness and Sean Harding.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the actual knowledge of the Key Executives.

"**Law**" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order (including, without limitation, the Bankruptcy Orders), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority, but excluding any Educational Law.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"**Liability**" means any debt, loss, liability, claim, damage, expense, fine, cost, deficiency or obligation, of any nature, whether known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Material Adverse Effect**" means any change, event, or circumstance, or series of changes, events or circumstances that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on the assets, liabilities or results of operations or the financial condition of the Business, taken as a whole; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a "Material Adverse Effect": (a) events, circumstances, changes or effects that generally affect the industry in which the Business operates, other than as may materially disproportionately impact the Business (but then only to the extent of such materially disproportionate impact); (b) general economic or political conditions or events, circumstances, changes or effects affecting the economy or securities markets generally; (c) changes arising from the consummation of the transactions contemplated by, or the announcement of the execution of or existence of, this Agreement, including (i) any actions of competitors, (ii) any actions taken by or losses of employees, (iii) any delays or cancellations of orders for products or services or (iv) any litigation; (d) any reduction in the prices of services or products offered by the Business (or the margins of the Business) in response to the reduction in prices of comparable services or products offered by a competitor, or the seasonality of the Business; (e) any circumstance, change or effect that results from any action taken pursuant to, in accordance with or as permitted by this Agreement or at the request of Buyer; (f) conditions caused by acts of terrorism or war (whether or not declared) or any natural or man-made disaster, weather phenomenon or acts of God, or the seasonality of the Business; (g) the fact that Sellers filed as a

debtor pursuant to the Bankruptcy Code; or (h) the effect of any changes in applicable Laws, regulations or accounting rules, including GAAP, or the interpretation or enforcement thereof.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"**Ordinary Course of Business**" means the conduct by Sellers of the Business in substantially the same manner as conducted as of the date of this Agreement and consistent with Seller's past practices.

"**Other Acquired Campuses**" means those Acquired Campuses set forth on Schedule 1 under the heading "Other Acquired Campuses."

"**Owned Real Property**" means the real property in which a Seller has fee title (or equivalent) together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"**Permits**" means all material approvals, permits, certificates of occupancy or other certificates, concessions, authorizations, grants, easements, variances, exemptions, consents, orders, franchise, filings, authorizations and licenses used in the operation of the Business or the Acquired Assets, other than Educational Approvals.  The term "Permits" does not include any Contract or Contracts, whether an Assumed Contract or not, with any entity or Governmental Authority to provide items or services, including, by way of example only, Contracts with third-party payors, agents of third-party payors, insurers, supplier number agreements, or participation agreements.

"**Permitted Encumbrances**" means: (a) statutory liens for current Taxes not yet due or delinquent (or which may be paid without interest or penalties) or the validity or amount of which is being contested in good faith by appropriate proceedings which suspend the collection thereof without penalty, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of Sellers or the validity or amount of which is being contested in good faith by appropriate proceedings, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of the Acquired Assets, (d) all covenants, conditions, restrictions, easements, charges, rights-of-way, other Encumbrances and other similar matters of record set forth in any state, local or municipal franchise under which the Business is conducted as to which no material violation or encroachment exists or, if such violation or encroachment exists, as to which do not materially impair the use or occupancy of the Real Property, (e) matters which would be disclosed by an accurate survey or inspection of the Real Property which do not materially impair the occupancy or current use of such Real Property which they encumber, and (f) all other Encumbrances that would not individually or in

the aggregate reasonably be expected to materially impair the ability to use or occupy an Acquired Asset or the marketability of title to such Acquired Asset.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**Petition Date**" means the date of the filing of the Bankruptcy Case.

"**Phoenix Owned Real Property**" means that certain real property located at 1515 E. Indian School Rd., Phoenix, AZ 85014.

"**PP&E**" means all equipment, machinery, industrial and motor vehicles, fixtures, furniture and other tangible property, including all such property that is damaged and all attachments, appliances, fittings, gas and oil burners, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, in each case, which is used in, held for use in, or related to the Acquired Campuses or the Business.

"**Prepaid Tuition Payments**" means all deposits, advance payments, and any other tuition payments, drawdowns or funds being held by Sellers that are unearned as of the Closing Date.

"**Professional Retainers**" means the amounts designated as "Professional Retainers" on the Bankruptcy Budget.

"**Records**" means the corporate minute books (including, without limitation, stock certificates and corporate seal), Tax records, work papers and other files, documents, instruments, papers, books, reports and records (including all Records in electronic format) of the Sellers.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"**Release**" means any spilling, emitting, discharging, leaking, pumping, pouring, dumping, injecting, depositing, disposing, dispersing, leaching or migrating of any Hazardous Material into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata).

"**Remedial Action**" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor

environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Motion**" means a motion or motions seeking the Bankruptcy Court's approval of the Sale Order in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement and the Transition Services Agreement.

"**Sale Order**" means an order issued by the Bankruptcy Court approving this Agreement and the transactions contemplated hereby and the Transition Services Agreement (which order shall be in form and substance satisfactory to Buyer in all respects) ordering, among other things, that (i) such sale shall be, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Liens other than Permitted Liens and Assumed Liabilities; (ii) all agreements, contracts, and leasehold interests required to be assumed by Sellers and assigned to Buyer are so assumed and assigned free and clear of all Liens and Excluded Liabilities other than Permitted Liens and Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code; (iii) Buyer has purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code; (iv) Sellers are authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Acquired Assets to Buyer; and (v) approving Sellers' entry into the Intellectual Property Licenses.

"**Second Closing FCC Assets**" means all FCC Acquired Assets to the extent the Sellers were unable to transfer title to such FCC Acquired Assets at the First Closing but to which Sellers can transfer title under the Sale Order.

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software, in each case, which is used in, held for use in, or related to the Acquired Campuses or the Business.

"**Student Financial Assistance Program**" shall mean any government-sponsored student financial assistance program pursuant to which student financial assistance, grants or loans are provided to students of the Acquired Campuses, including Title IV Programs and student financial assistance programs sponsored by the VA.

"**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of Contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Trademark Assignment Agreement**" means each Trademark Assignment Agreement in substantially the form agreed to by Buyer and Sellers.

"**Transaction Expenses**" means the reasonable and documented fees, costs, expenses, disbursements and charges of Buyer paid or payable to third parties (that are not Affiliates of Buyer) incurred in connection with the diligence, negotiation, preparation or implementation (including legal, accounting, restructuring, business strategy, advisory and consulting services) of this Agreement or any of the transactions contemplated herein, which shall include but is not limited to, the reasonable and documented fees, costs and expenses of the advisors, agents and Representatives of Buyer (that are not Affiliates of Buyer) (including, for the avoidance of doubt, the reasonable and documented fees, costs and expenses of each of Ritzert & Leyton, P.C., Cousins Chipman & Brown, LLP, Akerman LLP and Shraiberg, Ferrara & Landau, P.A.).

"**Transition Services Agreement**" means the Transition Services Agreement in substantially the form agreed to by Buyer and Sellers pursuant to which the Buyer and Sellers will address, among other things, the operation of the Other Acquired Assets during the period from the First Closing to the Second Closing, the transition of the Transferred Employees and any Assumed Contracts or Permits that are not subject to assignment.

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

**Schedule 1**

**Post-Secondary Institution Campus Locations**

**Florida Career College Campuses**

Black Canyon Campus (OPEID #023058)
Boynton Campus (OPEID #023058)
Brandon Campus (OPEID #023058)
Clearwater Campus (OPEID #023058)
Hialeah Core Campus (OPEID #023058)
Houston Campus (OPEID #023058)
Jacksonville Campus (OPEID #023058)
Kendall Core Campus (OPEID #023058)
Lauderdale Core Campus (OPEID #023058)
Margate Core Campus (OPEID #023058)
Miami Campus (OPEID #023058)
Orlando East Campus (OPEID #023058)
Pines Core Campus (OPEID #023058)
West Palm Beach Campus (OPEID #023058)
Anaheim (USC) Campus (No OPEID)*
Mount Clair (USC) Campus (No OPEID)*
Riverside (USC) Campus (No OPEID)*
San Diego (USC) Campus (No OPEID)*
San Marcos (USC) (No OPEID)*

**Other Acquired Campuses**

Beaverton Campus (OPEID #022392)
Bryman Campus (OPEID #030764)
Las Vegas Campus (OPEID #030764)
Memphis Campus (OPEID #030764)
Morrison Campus (OPEID #008441)
Nashville Campus (OPEID #022631)
Orlando West Campus (OPEID #030764)
Phoenix Campus (OPEID #022631)
Sacramento Campus (OPEID #022631)

**Schedule 2**

Bankruptcy Budget

Bankruptcy Retainers and Fees

| | |
|---|---|
| FTI Consulting - Professional Retainer | $300,000 |
| Greenberg Traurig - Professional Retainer | $300,000 |
| Unsecured Creditor Committee | $100,000 |
| Claims Agent | $100,000 |
| US Trustee | $30,000 |
| Total Bankruptcy Fees | $830,000 |