THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FCC Holdings, Inc., *et al.*,[1] | Case No. 14-11987 (CSS) |
| Debtors. | (Jointly Administered) |

## FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF ORDERLY LIQUIDATION OF FCC HOLDINGS, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dennis A. Meloro (DE Bar No. 4435)
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
melorod@gtlaw.com

Nancy A. Mitchell (*pro hac vice*)
Maria J. DiConza (*pro hac vice*)
Matthew L. Hinker (DE Bar No. 5348)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
mitchelln@gtlaw.com
diconzam@gtlaw.com
hinkerm@gtlaw.com

Counsel for the Debtors and Debtors-in-Possession

Dated: January 28, 2015

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FCC Holdings, Inc. (6928); Education Training Corporation (1478); High-Tech Institute Holdings, Inc. (4628); EduTech Acquisition Corporation (8490); High-Tech Institute, Inc. (3099); and Florida Career College, Inc. The Debtors' business address is 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334.

**PLEASE REVIEW THIS DOCUMENT FOR IMPORTANT INFORMATION REGARDING:**

* **Description of the Debtors, their Estates, and Background of the Chapter 11 Cases**
* **Classification and Treatment of Claims and Equity Interests**
* **Distributions to Holders of Allowed Claims**
* **Implementation and Execution of the Plan**
* **Treatment of Contracts and Leases and Procedures to Assert Rejection Claims**

**IMPORTANT DATES:**

* **Date to Determine Record Holders of Claims and Equity Interests: January 29, 2015**
* **Deadline to Submit Ballots: March 11, 2015 at 5:00 p.m. (ET)**
* **Deadline to Object to Plan Confirmation: March 11, 2015 at 5:00 p.m. (ET)**
* **Hearing on Plan Confirmation: March 18, 2014 at 10:00 a.m. (ET)**
* **Deadline to Assert Administrative Expense Claims: Forty-five (45) business days after the Effective Date**
* **Deadline to Submit Rejection Claims arising from the entry of the Confirmation Order: Thirty (30) days after the Effective Date**

## 1.    INTRODUCTION

   **1.1    Purpose of the Disclosure Statement.**  This disclosure statement (including all exhibits hereto, as may be amended, supplemented, or modified, the "**Disclosure Statement**") is being provided by the Debtors to the U.S. Trustee and to Holders of Claims pursuant to section 1125(b) of title 11 of the United States Code for the purpose of soliciting acceptances of the *Joint Plan of Orderly Liquidation of FCC Holdings, Inc. and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, dated as of [_____], 2015 (including all exhibits thereto, as may be amended, supplemented, or modified, the "**Plan**").  The Plan has been filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan.  A copy of the Plan is attached hereto as **Exhibit 1**.  All capitalized terms used within this Disclosure Statement which are not defined herein shall have the meanings set forth in the Plan.

   THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(c) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON ITS ACCURACY.

   NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.   THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION, OR

INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL, AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS, IF ANY.  IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

IF A HOLDER OF A CLAIM WISHES TO CHALLENGE THE ALLOWANCE OR DISALLOWANCE OF A CLAIM FOR VOTING PURPOSES UNDER THE TABULATION RULES SET FORTH IN THE SOLICITATION ORDER, SUCH ENTITY MUST FILE A MOTION, PURSUANT TO BANKRUPTCY RULE 3018(a), FOR AN ORDER TEMPORARILY ALLOWING SUCH CLAIM IN A DIFFERENT AMOUNT OR CLASSIFICATION FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN AND SERVE SUCH MOTION ON THE UNDERSIGNED COUNSEL TO THE DEBTORS SO THAT IT IS RECEIVED NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON FEBRUARY 25, 2015**.  TO THE EXTENT NOT CONSENSUALLY RESOLVED, SUCH MOTIONS SHALL BE HEARD AT SUCH TIME AS THE BANKRUPTCY COURT MAKES AVAILABLE PRIOR TO THE CONFIRMATION HEARING.  UNLESS THE BANKRUPTCY COURT ORDERS OTHERWISE, SUCH CLAIM WILL NOT BE COUNTED FOR VOTING PURPOSES IN EXCESS OF THE AMOUNT DETERMINED IN ACCORDANCE WITH THE TABULATION RULES.

**THE DEBTORS, THE AGENT AND THE COMMITTEE RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL VOTING CLASSES VOTE TO ACCEPT THE PLAN.**

### 1.2     Confirmation of the Plan.

**1.2.1    Requirements.**  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.

**1.2.2    Confirmation Hearing.**  To confirm the Plan, the Bankruptcy Court must hold the Confirmation Hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.  The Bankruptcy Court has set **March 18, 2015, at 10:00 a.m. (Eastern Time)**, for the Confirmation Hearing.

2

**1.2.3   Objections to Confirmation of the Plan.**    Objections, if any, to Confirmation of the Plan, including any supporting memoranda, must (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received on or before **March 11, 2015, at 5:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**") by the following parties: (i) the Debtors, FCC Holdings, Inc., 1000 Corporate Dr. #500, Fort Lauderdale, FL 33334 (Attn: Sean Harding), and (ii) the Debtors' counsel, (a) Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801 (Attn: Dennis Meloro, Esq.), email: melorod@gtlaw.com; and (b) Greenberg Traurig, LLP, The Metlife Building, 200 Park Avenue, 38th Floor, New York, NY 10166 (Attn: Maria J. DiConza, Esq. and Matthew L. Hinker, Esq.), email: hinkerm@gtlaw.com; (iii) counsel to the Agent, (a) Chapman and Cutler, LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn: Stephen R. Tetro II, Esq.); email: stetro@chapman.com; and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, DE 19801 (Attn: Michael R. Nestor, Esq.); (iv) The Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Benjamin Hackman, Esq.); and (v) counsel to the Official Committee of Unsecured Creditors, (a) Otterbourg P.C., 230 Park Avenue, New York, NY 10169 (Attn: David M. Posner, Esq. and Gianfranco Finizio, Esq.), email: dposner@otterbourg.com; and (b) Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801 (Attn: Matthew P. Ward, Esq. and Ericka F. Johnson, Esq.), email: maward@wcsr.com.  **IF AN OBJECTION IS NOT TIMELY FILED, SERVED, AND RECEIVED AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN AND MAY NOT BE HEARD AT THE HEARING.**.

**1.2.4   Effect of Confirmation.**   Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation will authorize and effect the Distribution of the Liquidating Trust Assets by the Liquidating Trust to Holders of Allowed Claims and the dissolution of the Debtors.  Confirmation serves to make the Plan binding upon the Debtors, all Creditors, Holders of Equity Interests, and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

**1.3   Voting on the Plan.**

**1.3.1   Impaired Claims or Equity Interests.**   Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims and Equity Interests in Classes Impaired by the Plan and receiving a payment or distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.  The Holders of Claims in Classes 2 and 4 and Equity Interests in Class 5 are not expected to receive any payment or distribution or retain any property pursuant to the Plan, are deemed to reject the Plan, and do not have the right to vote.  The Holders of Claims in Classes 1A, 1B and 3 are Impaired by the Plan and have the right to vote on the Plan.

**1.3.2   Eligibility to Vote on the Plan.**   Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 1A, 1B and 3 may vote on the Plan unless

expressly prohibited from voting under the terms of the Solicitation Order or any other Order of the Bankruptcy Court.

   **1.3.3** <u>**Voting Procedure and Ballot Deadline**</u>.  To ensure your vote is counted you must (i) complete the Ballot in accordance with the instructions set forth therein, (ii) indicate your decision either to accept or reject the Plan in the boxes indicated in the Ballot, and (iii) sign and return the Ballot to the address set forth on the Ballot.  <u>ABSENT PRIOR CONSENT OF THE DEBTORS, BALLOTS SENT BY FACSIMILE OR ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED</u>.

   Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan <u>must actually be received by the Balloting/Claims Agent on or before</u>  **March 11, 2015 at 5:00 p.m. (Eastern Time)**.

   **1.3.4** <u>**Acceptance of the Plan**</u>.  For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.  In any case, at least one impaired Class of Claims, excluding the votes of insiders, must actually vote to accept the Plan.  <u>YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT TO FCC HOLDINGS, INC. BALLOT PROCESSING CENTER, C/O KCC, 2335 ALASKA AVENUE, EL SEGUNDO, CA 90245.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND ENSURE THAT THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF CREDITOR IS CORRECTLY IDENTIFIED IN THE BALLOT</u>.

**2.** **THE DEBTORS AND KEY EVENTS LEADING**
  **TO THE FILING OF THE CHAPTER 11 CASES**

  **2.1** <u>**Description of Debtors**</u>.

   Prior to the Petition Date, the Debtors operated three sets of schools under the name "Anthem Education" – 14 Florida Career College schools (the **"FCC Schools"**); 22 Anthem Education schools (**"Anthem Schools"**); and 5 US Colleges (the **"US Colleges"**)[1] – on over 40 campuses, as well as "Anthem Online," its online course offerings. Headquartered in Ft. Lauderdale, Florida, the Debtors provided quality post-secondary education in fourteen states. Proprietary post-secondary education plays an important role in making education accessible to a variety of students that might otherwise not have the opportunity to obtain a quality education, including low-income students who cannot afford traditional college, students who are academically unprepared for traditional college, working students, and students who are single or stay-at-home parents. Proprietary post-secondary schools generally offer flexible schedules, online course offerings, and qualified faculty that are paid to teach courses rather than to conduct research. Throughout their history, the Debtors were successful in providing education to many students and particularly to these non-traditional students.

---

[1] The US Colleges are the only campuses that did not derive revenue under Title IV.

The Debtors' programs provided career-focused degrees and diplomas that provided graduates with the ability to seek or improve their employment opportunities in the healthcare, technology, trades, business and legal industries, by teaching students specific skills that are sought by employers. As a result, students were prepared for the workplace right out of school or gained additional expertise to help them progress in their current occupations. The programs offered by the Debtors included the following: dental assistant; healthcare management; medical assistant technician; medical billing and coding; pharmacy technician; nursing; surgical technology; accounting; business management; healthcare management; masters of business administration; cosmetology; skin and nail care specialist; criminal justice; paralegal; computer & network technician; information technology; massage therapy; heating ventilation & air conditioning (**"HVAC"**); and veterinary technology.

## 2.2     Debtors' Business Model

The Debtors' business model was based on earning revenue from tuition paid by students for their educational programs and relying on advertising and referrals to introduce new students to the Company. The Debtors' expenses generally consisted of employee salaries, costs of instruction, advertising costs, facility costs, capital expenditures, and general overhead and administrative costs.

## 2.3     Prepetition Capital Structure

Prior to the Petition Date, FCC Holdings, Inc. (**"FCC"**), as borrower (the **"Borrower"**), Education Training Corporation (**"ETC"**), EduTech Acquisition Corporation (**"EduTech"**), High-Tech Institute Holdings, Inc. (**"High-Tech Holdings"**), and High-Tech Institute, Inc. (**"High-Tech"**), as guarantors (collectively, the **"Guarantors"**), Bank of Montreal, as administrative Agent (**"BMO"** or the **"Agent"**) and the other lenders party thereto from time to time (the **"Lenders"**) were party to that certain Credit Agreement, dated as of November 2, 2012, as amended by that First Amendment to Credit Agreement, dated as of January 31, 2012, that certain Second Amendment to Credit Agreement, dated as of June 14, 2013, that certain Third Amendment to Credit Agreement, dated as of April 4, 2013, and as amended and restated by that certain Amended and Restated Credit Agreement dated as of April 29, 2014 (the **"Amended and Restated Credit Agreement,"** and, together with the other Loan Documents as defined therein, the **"Pre-Petition Loan Documents"**).

As of the Petition Date, the Debtors' outstanding obligations under the Pre-Petition Loan Documents and other loan documents were approximately $49,000,000, plus interest and fees, including the following principal amounts:

| | |
|---|---|
| Tranche A Loans: | $18,578,846 |
| Tranche B Loans: | $29,056,430 |
| Existing Letters of Credit: | $ 1,390,122 |

Pursuant to the Pre-Petition Loan Documents, and as security for the payment and performance of the Debtors' obligations thereunder and under all other loan documents, the Debtors granted the Agent, for the benefit of the Lenders, a first priority security interest in substantially all assets of the Debtors and the proceeds thereof.

5

The Tranche A lenders are Abrams Capital Partners I, LP, Abrams Capital Partners II, LP, Whitecrest Partners, LP, Great Hollow International, L.P., Riva Capital Partners, LP, GCP Anthem, LLC, and Education Lender, LLC (collectively, the **"Tranche A Lenders"**). The Tranche B lenders are Bank of Montreal, Synovus Bank, BancAlliance Inc., Community & Southern Bank, C1 Bank, and Congressional Bank (collectively, the **"Tranche B Lenders"** or the "**Consenting Last Out Lenders**"). Under the waterfall established pursuant to the Pre-Petition Loan Documents, the first $10 million in loan proceeds would go to repay the Tranche A loans, the second $15 million would go to repay the Tranche B loans, the third $5 million would go to repay the Tranche A loans, the remainder would go to repay the Tranche B loans, and the remainder after that would go to repay the Tranche A loans.

Pursuant to that certain Assignment Agreement, dated as of August 21, 2014 (the "**Assignment Agreement**") among the Consenting Last Out Lenders and the Tranche A Lenders, with the exception of Education Lender, LLC (the "**Assigning First Out Lenders**"), the Assigning First Out Lenders irrevocably sold, assigned, transferred and otherwise conveyed to BMO for the ratable benefit of the Consenting Last Out Lenders, all of each such Assigning First Out Lender's right, title and interest, in and to and under (i) that certain Agreement Among Lenders (the "**AAL**") dated as of April 29, 2014, by and between BMO, the Consenting Last Out Lenders, the Assigning First Out Lenders and certain other parties, including, without limitation, all rights to receive and have applied payment, repayment, and prepayment of Obligations (as defined in the Amended and Restated Credit Agreement) by the Debtors and all proceeds of collateral received by BMO under and pursuant to Section 6 of the AAL, and (ii) fees and payments to the "Consenting Lenders" under that certain Consent under Amended and Restated Credit Agreement dated as of August 21, 2014 (the "**Consent**"), among the Debtors, the Consenting Lenders (as defined therein) and BMO, including, in particular, but without limitation, the fees contemplated by Section 3.6 of the Consent.

The Debtors also have unsecured debt in the approximate amount of $15,000,000, consisting largely of advertisers, landlords, book vendors, supplies venders, and information technology service vendors.

### 2.4    Regulatory Overview.

The Debtors operated in a highly-regulated industry, subject to oversight by the U.S. Department of Education (**"DOE"**) as well as state regulatory agencies and national accrediting bodies. As proprietary post-secondary institutions, the Debtors relied on funding from the DOE pursuant to Title IV ("**Title IV**") of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 et seq.

The federal government provides financial support for students attending post-secondary educational institutions in the United States through the federal student aid programs (**"FSA Programs"**) administered by the DOE under the Higher Education Act, 20 U.S.C. §§ 1001 *et seq.* ("**HEA**"). The DOE promulgates regulations under the HEA and enforces the regulatory and statutory provisions governing the administration of FSA funds to students through post-secondary institutions. Post-secondary institutions must apply to and receive certification from

6

the DOE to be eligible to participate in the FSA Programs. Once an institution has been approved, or "certified," by the DOE to participate in the FSA Programs, it is given an identification number known as an OPEID (**"OPEID"**) and may disburse FSA funds to eligible students enrolled in and attending an approved program at the institution, whether at the main campus or any approved additional location of that main campus. Many students rely heavily on these funds to finance their education. A single OPEID number covers the main campus and each of its additional locations. These campuses are collectively referred to as the "institution."

Nearly 90% of the Debtors' revenue came from Title IV funding from the DOE. The remainder of the Debtors' revenues came primarily from cash payments by students, payments by employers, loans from private sources and loans and grants from other federal agencies.

### 2.5    Impact of Regulatory Scheme on Sale of Debtors' Assets.

The Debtors' dependence on Title IV revenues limited the options the Debtors had to find additional investment and/or transaction partners when the Debtors experienced financial distress. This is primarily due to the fact that the filing of a chapter 11 proceeding immediately, and permanently, terminates an institution's eligibility to participate in the FSA programs. As a result, the Debtors could not pursue a traditional 363 sale or reorganization within the context of chapter 11.

In addition, the universe of potential buyers for a distressed post-secondary education business is extremely limited. If a buyer is interested in purchasing an institution and also wants to acquire the associated OPEID number, the buyer must assume known and unknown liabilities associated with the OPEID number (which may cover more than one campus) in order for that location to continue to be eligible to participate in the FSA Programs. As a result, the universe of buyers without their own OPEID number willing to purchase campuses that are in financial difficulty is extremely limited, as assumption of the OPEID number may bring un-quantified risk and a distressed seller cannot provide meaningful indemnity. Even strategic buyers, those with their own OPEID number, find distressed purchases difficult in this industry because the post performance of the acquired institution(s) may be ascribed to the buyer's existing business.

Selling a distressed post-secondary education provider is further complicated by the fact that the industry has been subject to increased regulatory scrutiny and litigation in recent years from a variety of sources, including the DOE, the Consumer Financial Protection Bureau, State Attorneys General, members of Congress and its committees, and private litigants. To participate in the FSA Programs, an institution must be (1) legally authorized by a state to provide post-secondary education programs in that state and (2) accredited by an accrediting agency recognized by DOE as a reliable authority on institutional quality and integrity. As a result, institutions are subject to extensive regulation and review by these agencies, which cover virtually all phases of the institution's operations.

In addition to various approvals by the DOE, states and each school's accreditation body, an entity operating a proprietary post-secondary education business interested in acquiring the Debtors' business would have been required to furnish two years of audited financial statements to the DOE. This further limits the universe of buyers as potentially interested parties not

7

already operating a proprietary post-secondary education business with two years of audited financial statements must provide the DOE with a letter of credit in an amount determined by the DOE in its sole discretion. It is customary for the DOE to require a letter of credit in the amount of twenty-five percent (25%) of the company's Title IV funding for the most recently completed fiscal year. Therefore, any potentially interested party not already operating a proprietary post-secondary education business with two years of audited financial statements would have been required to provide the DOE with a letter of credit in the amount of approximately $45 million, given that the Debtors received approximately $180 million in Title IV funding in their most recently completed fiscal year.

The extensive regulatory environment in which the Debtors operated, detailed more fully in the First Day Declaration, effectively limited the universe of potential buyers for the Debtors' business to strategic buyers willing to take on the risk of certain liabilities to their existing business or financial buyers already comfortable with the proprietary post-secondary education business. Due to the regulatory requirements and unmitigated risks related to the acquisition of an existing OPEID number, many buyers were either disinterested or unable to efficiently and effectively propose and execute any transaction to acquire the a distressed post-secondary education business.

### 2.6    Events Leading to the Filing of the Chapter 11 Cases.

The Debtors experienced a number of issues which precipitated these Chapter 11 Cases, including:
- financial problems related to the Debtors' acquisition of Anthem Education in 2012;
- difficulties related to the integration of the Anthem Education software systems and the FCC software systems which required significant expenditures of both time and money to address;
- difficulties in reconciling the Debtors' Title IV funding with the DOE, which ultimately caused the Debtors to stop drawing Title IV funding for a period of time;
- severely constrained liquidity due primarily to the Debtors' inability to draw Title IV funding;
- an unexpected erosion in new student enrollments and a higher-than-expected student drop-out rate; and
- financial strain due to many of the Debtors' vendors requiring cash-on-delivery payment and/or payment of all outstanding invoices.

Faced with a multitude of liquidity and regulatory issues, the Debtors attempted to address their operating and regulatory issues, restructure their debt and secure additional investment. The Debtors also restructured their management team during that same period. As a result of the foregoing issues, however, the Debtors defaulted under their loan documents on or around July 1, 2014.

### 2.7    The Debtors' Efforts to Restructure and Pre-Petition Sale

The Debtors retained FTI as consultants in April 2014 and restructured their debt and brought in additional capital that same month. They also made a number of changes in their

8

management team, with Chief Operating Officer Neal Yawn resigning on April 4, 2014, CEO David Knobel being removed by the Company's Board of Directors on April 29, 2014, and Mark Young, Senior Vice President of Student Operations, resigning in early June, 2014. Upon the removal of Mr. Knobel, Sean Harding was installed as interim Chief Executive Officer.

Ultimately, the Debtors reconciled their Title IV funding and repaid the DOE approximately $17 million, as of June 2014, which was significantly higher than the originally estimated $9 million deficiency at the time of the April 2014 recapitalization. Further, the amount of cash needed to resolve the Debtor's financial problems, combined with a continuing decline in the student population, drained the Debtors' resources such that they no longer believed they had a viable long-term business model without significant investment that was not available.

Once the Debtors realized that their long-term business model was not sustainable without significant additional capital, the Debtors moved quickly to identify transaction options that would allow the students to continue their educational opportunities, protect employee jobs, address DOE liabilities, and provide on-going business opportunities for vendors and suppliers. The timing of these efforts were driven by the determination that the Debtors' liquidity would be fully used up in late August 2014 even with certain additional funds the Equity Holders had agreed to invest to allow for pursuit of a transaction.

The Debtors considered a number of options including a sale of the entire business; a sale of portions of the business; and Teach-Out arrangements. A **"Teach-Out"** arrangement is one where another school either selects students that they will accept to transfer to the new school, or where a new school agrees to take all of the students for a particular program. With respect to those campuses for which the Debtors were unable to procure a purchaser, the Debtors sought Teach-Out arrangements for its students, so that they could continue their education with as little disruption as possible. As of the Petition Date, the Debtors executed approximately 15-20 Teach-Out agreements – covering approximately 1,100 students – in order to provide their students with a convenient option for completing their education.

Given the regulatory overlay described above – most particularly the DOE's onerous change-in-control provisions that would require an entity not already in the education business to post a letter of credit in the amount of 25% of the Title IV funding – the universe of possible purchasers was extremely limited, and restricted to only to others already in the industry. Against the backdrop of those restrictions, in the early Summer of 2014, the Debtors began marketing their business to others in the industry, based largely on the contacts of the Debtors' equity holders (who have extensive experience and contacts in the proprietary post-secondary education industry), as well as contacts provided by the leading investment bank in the industry. As a result of those efforts, the Debtors spoke with approximately 7-10 potential purchasers, signed approximately 5-7 confidentiality agreements, and had approximately 30 unique visitors to its data room.

Ultimately, these efforts resulted in the Amended and Restated Asset Purchase Agreement by and between the Debtors and IEC Corporation ("**IEC**") or its Designee (the **"Purchase Agreement"**). The transaction contemplated two components: (1) the sale of certain campuses that, due to regulatory issues, was substantially consummated pre-petition, although

certain aspects of the sale (such as assumption and assignment of leases), were contemplated to be concluded post-petition (the **"Step 1 Transactions"**), and (2) a post-petition private sale of certain other campuses (the **"Step 2 Transactions,"** and together with the Step 1 Transactions, the **"Transaction"**). The Step 1 Transactions involved the pre-petition sale of 14 FCC Schools to IEC with the post-petition assumption of certain contracts and leases. The Step 2 Transactions involved the sale of 5 US Colleges campuses to IEC, and subject to obtaining the required regulatory approvals, the sale of 9 Anthem Education campuses to IEC. The consideration for the Transaction was $1,000,000 in cash, a $1,000,000 lender consent fee, and the assumption of certain liabilities and funding of certain expenses that enabled the Debtors to (a) keep certain parts of their businesses running (and therefore students educated) through the conclusion of the Transaction and (b) have the opportunity to conclude and implement "Teach-Out" arrangements that allowed students in campuses that are not being sold to conclude their education.

Separate and apart from the Transaction with IEC, the Debtors consummated another prepetition transaction with Premier Education Group, L.P. (**"Premier"**), for the sale of three campuses located in New Jersey (OPEID #010851). That sale closed on August 22, 2014. As with the Step 1 Transaction, the sale to Premier also involved the sale of an OPEID number, such that applicable federal law prohibited this sale from being conducted in a bankruptcy case. Upon closing of that sale, approximately 700 students were able to continue their educations and the majority of the faculty and staff will receive employment.

The Lenders consented to the sale to the Premier transaction as well, in exchange for a $150,000 consent fee. Premier also assumed High-Tech Institute's liabilities under OPEID number 010851, as well as any bulk sales law and WARN act obligations that High-Tech Institute may have had.

## 3.    THE CHAPTER 11 CASES

**3.1    Commencement of the Chapter 11 Cases.**  On August 25, 2014, the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code and continued in the management and possession of their business and property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**3.2    First Day Relief.**  Concurrent with the filing of their chapter 11 petitions, the Debtors filed several "first-day" applications and motions (collectively, the "**First Day Pleadings**") with the Bankruptcy Court.  The First Day Pleadings, as set forth more fully therein, were intended to minimize the adverse effects of the Chapter 11 Cases on the Debtors and were necessary to enable them to operate effectively as chapter 11 debtors in possession.  Pursuant to the First Day Pleadings, the Debtors sought and obtained the approval of the Bankruptcy Court to, among other things:  (i) jointly administer the Chapter 11 Cases for procedural purposes only [D.I. 5, 32, 103, and 247]; (ii) establish, initially on an interim and thereafter on a final basis, adequate assurance procedures with respect to their utility providers [D.I. 7, 39, and 162]; (iii) pay certain prepetition taxes, including trust fund and personal liability taxes [D.I. 11 and 37]; (iv) maintain prepetition insurance policies and pay or honor prepetition obligations related thereto [D.I. 12 and 36]; (v) credit certain excess funds to students' accounts [D.I. 16, 34 and 156]; (vi) pay certain prepetition wages, salaries, commissions, and other accrued compensation

10

and continue certain employee benefits and programs [D.I. 10 and 33]; (vii) reject certain unexpired leases nunc pro tunc as of the Petition Date [D.I. 8 and 181]; and (viii) continue using their prepetition centralized cash management system and bank accounts and business forms [D.I. 5, 47, and 155]. For additional information with respect to the First Day Pleadings and related relief sought by the Debtors at the beginning of the Chapter 11 Cases, please consult the *Declaration of Sean Harding in Support of Debtors' Chapter 11 Petitions and Requests for First Day Relief* [D.I. 13].

### 3.3    Use of Cash Collateral.

On the Petition Date, the Debtors filed, along with the other First Day Pleadings, the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2* [D.I. 14] (the "**Cash Collateral Motion**"). The Bankruptcy Court approved the relief requested in the Cash Collateral Motion on an interim basis on August 28, 2014 [D.I. 46], on September 22, 2014 [D.I. 164], on October 23, 3014 [D.I. 252] and on November 14, 2014 [D.I. 275] (the "**Interim Orders**"). On December 19, 2014 [D.I. 308], the Court approved the relief on a Final Basis (the "**Final Cash Collateral Order**"). The Interim Orders and the Final Order authorized the Debtors' limited use of cash collateral on the terms set forth therein (i) to pay certain costs and expenses of administration of the Chapter 11 Cases, (ii) to operate the Other Acquired Campuses (as such term is defined in the Interim Orders), and (iii) to satisfy the other costs and expenses provided for in the budgets associated therewith. In addition, the Final Cash Collateral Order increased the amount of the Carve-Out (as defined in the Final Cash Collateral Order) by an additional $67,000 with cash from certain of the Debtors' bank accounts.

### 3.4    Retention of Professionals.
The Debtors retained the following professionals in the Chapter 11 Cases: (i) Greenberg Traurig, LLP as bankruptcy counsel [D.I. 230]; and (ii) FTI Consulting, Inc. to provide the Debtors a Chief Restructuring Officer, and Interim Chief Executive Officer and Additional Personnel [D.I. 158].

### 3.5    Appointment of Committee and Retention of Committee Professionals.
On September 5, 2014, the U.S. Trustee appointed the Committee [D.I. 68]. The Committee retained Otterbourg P.C. [D.I. 246] and Womble Carlyle Sandridge & Rice, LLP [D.I. 245] as bankruptcy counsel.

### 3.6    Schedules.
On October 1, 2014, the Debtors filed their Schedules [D.I. 194–202].

### 3.7    Sale of Assets and Settlement Agreement with IEC.

On September 22, 2014, the Bankruptcy Court entered an Order [D.I. 166] (the "**Sale Order**") approving the Purchase Agreement by and between the Debtors and IEC Corporation. The Sale Order only approved the post-petition transactions and the assignment of executory contracts and unexpired leases in connection with such transactions; it did not approve the Step 1 Transactions or the transaction with Premier. As described in more detail in the Sale Motion, because the Debtors did not receive the requisite response from the DOE by August 29, 2014, the Debtors were forced to close down the Anthem Schools. For more information regarding the Sale, please consult, as applicable, the Sale Motion [D.I. 27] and the Sale Order [D.I. 166].

11

The Plan also embodies a Settlement Agreement entered into as of December [19], 2014 by and between the Debtors, the Agent on behalf of the Lenders, IEC and the Committee (the "**Settlement Agreement**") over the resolution of the cases. In particular, the Debtors, the Agent on behalf of the Lenders, IEC and the Committee have agreed to the releases of claims and other liabilities set forth in the Plan and in the Final Cash Collateral Order. Further, the Debtors, the Agent on behalf of the Lenders, IEC and the Committee have agreed that (i) IEC will fund $100,000 to a liquidating trust (the "Liquidating Trust"), and (ii) IEC will acquire any and all potential preference actions against non-insiders under section 544 and 547 of the Bankruptcy Code, and shall covenant not to pursue such actions. A copy of the Settlement Agreement is attached hereto as **Exhibit 2**.

     **3.8**    **Retention and Enforcement and Release of Causes of Action.** Except as otherwise provided in the Plan, or in any document, instrument, release or other agreement entered into in connection with the Plan, on the Effective Date, the Debtors will transfer to the Liquidating Trust all of their rights, title, and interest in all of the Liquidating Trust Assets. In connection therewith, the Liquidating Trustee shall, among other things, pursue the Causes of Action transferred to and retained by the Liquidating Trust. For the avoidance of doubt, and as set forth in the Plan, the Settlement Agreement and this Disclosure Statement, the Causes of Action transferred to and retained by the Liquidating Trust shall not include (a) preference actions against non-insiders under Sections 544 and 547 of the Bankruptcy Code, which preference actions were acquired by IEC in connection with the Sale Transaction; (b) causes of action or claims against BMO or any Tranche B Lenders (or any or any of their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors) in any capacity, or any Tranche A Lenders (or any or any of their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors) in their capacity as lenders under the Amended and Restated Credit Agreement and the other Pre-Petition Loan Documents, which causes of action were released pursuant to the Final Cash Collateral Order; and (c) causes of action against IEC in connection with the Sale Transaction. In determining which Causes of Action would not be transferred to the Liquidating Trust, the Debtors, the Committee, IEC and the Agent on behalf of the Lenders engaged in good faith and arm's length negotiations concerning the ultimate resolution of these cases. As part of such negotiations, the Committee and the Debtors concluded that BMO had valid, enforceable, first priority liens and claims on substantially all of the assets of the Debtors pre-petition and, by virtue of the Final Cash Collateral Order, post-petition. The Committee also concluded by virtue of its investigation that any causes of action or claims against BMO or IEC in connection with their prepetition conduct was remote and would likely result in costly and uncertain litigation. The Committee, BMO, IEC and the Debtors also reviewed the extent of potential non-insider preference actions and concluded that when factoring in possible applicable defenses and costs of collection on a contingency fee basis and the usual recovery that can be achieved as a result thereof, that such recoveries may not be substantial. Moreover, any such recoveries would predominantly inure to the benefit of BMO by virtue of their deficiency claim, which claim makes them the largest unsecured creditor. As a result of those and other efforts, the parties agreed that the releases of claims and other liabilities set forth in the Plan, the Final Cash Collateral Order and the Settlement Agreement were appropriate, fair, equitable and reasonable in exchange for, among other things: (x) the Causes of Action that would be transferred to the Liquidating Trust, which

12

causes of action include, but are not limited to (i) preference actions against insiders of any of the Debtors under Sections 544 and 547 of the Bankruptcy Code; and (ii) any and all potential causes of action against the Tranche A Lenders that are insiders of any of the Debtors arising wholly from any acts or omissions of any Tranche A Lender as an insider, equity holder, officer or director or in any other capacity other than as a lender; and (y) IEC's funding of the Liquidating Trust in the amount of $100,000, which funding shall not be repaid to IEC in any type of waterfall.  The Debtors, the Committee, IEC and the Agent believe that the retention, enforcement and release of the Causes of Action set forth in the Plan, the Settlement Agreement and this Disclosure Statement are in the best interest of the Debtors, the Estates and Holders of Claims.

4.    **SUMMARY OF THE PLAN**

    4.1    **Classification of Claims and Equity Interests under the Plan.**

        4.1.1    **Classification.**

Claims against the Debtors, other than Administrative Claims and Priority Tax Claims are classified for all purposes (unless otherwise specified), including voting and Distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1A | Lender Secured Claims | Impaired | Yes |
| 1B | First Out Lender Secured Claims | Impaired | Yes |
| 2 | Other Secured Claims | Impaired | No (deemed to reject) |
| 3 | Other Priority Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | No (deemed to reject) |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

        4.1.2    **Substantive Consolidation of Debtors of Purposes of Voting, Confirmation and Distribution.**

The Plan provides for substantive consolidation of the Estates, for purposes of voting, confirmation, and making Distributions to the Holders of Lender Secured Claims and the Holders of First Out Lender Secured Claims under the Plan.  Voting on the Plan shall be counted on a consolidated basis.  On the Effective Date, and solely for purposes of voting, confirmation and making Distributions to the Holders of Claims under the Plan (a) all guarantees of any Debtor of the payment, performance or collection of another Debtor with respect to Claims against such Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees or other obligations by a Debtor with respect to Claims against one or more of the other Debtors shall be treated as a single obligation in the consolidated cases.  On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all General Unsecured Claims based upon guaranties of collection, payment or performance made by a Debtor as to the obligation of another Debtor shall be

13

released and of no further force and effect.  Except as set forth in the Plan, such substantive consolidation shall not affect (a) the legal and corporate structure of the Debtors, or (b) any obligations under any leases or contracts assumed through the Plan or otherwise after the Petition Date.

Here, substantive consolidation is warranted because prior to the Petition Date, all of the Debtors operated under consolidated books and records, such that their creditors regarded them as one legal entity.  Furthermore, because BMO holds a lien on all of the assets of each of the Debtors, and the combined remaining assets of all of the Debtors is substantially less than the amount owed to BMO, substantive consolidation is warranted in that attempting to separate the Debtors would be an unnecessary cost to the Debtors' estates with no corresponding benefit.

Notwithstanding the substantive consolidation of the Estates for the purposes set forth herein, each Debtor shall pay all U.S. Trustee Fee Claims on all disbursements, including any Distributions or disbursements made as a result of the Plan, until the entry of a final decree in these Chapter 11 Cases, dismissal of these Chapter 11 Cases, or conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

## 4.2    Treatment of Claims and Equity Interests.

**4.2.1    General.**  Pursuant to Section 1122 of the Bankruptcy Code, a Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of the Class and is classified in a different class to the extent that the Claim or Equity Interest qualifies within the description of that different Class.  A Claim or Equity Interest is placed in a particular Class for the purposes of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

### 4.2.2    Unclassified Claims.

(a)    **Administrative Claims**

In full satisfaction, and settlement of and in exchange for each Allowed Administrative Claim, except to the extent that any Holder of an Allowed Administrative Claim has received payment prior to the Effective Date, agrees with the Debtors or the Liquidating Trustee, as applicable, to different treatment or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Claim (including the Lenders' Superpriority Claims (as defined in the Cash Collateral Orders) shall receive payment in full, in Cash, on the later of (i) the Effective Date if due on or before that date and unpaid on the Effective Date, (ii) as soon as practicable after the date upon which such Administrative Claim becomes an Allowed Claim, or (iii) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Liquidating Trustee.

14

(b)    **Professional Fee Claims**

Any Professional seeking an award by the Bankruptcy Court of an Allowed Professional Fee Claim on account of Professional Fees incurred from the Petition Date through and including the Effective Date (i) shall, no later than thirty (30) days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date, which application shall comply with the *Administrative Order Establishing Procedures for Final, Interim, and Monthly Compensation and Reimbursement of Expenses of Professionals Retained in These Chapter 11 Cases and Reimbursement of Expenses of Committee Members Appointed in These Chapter 11 Cases* [Docket No. 308], and (ii) shall receive, as soon as reasonably practicable after such Claim is Allowed, in full settlement and satisfaction of, and in exchange for, such Allowed Professional Fee Claims, Cash in the amount of the Allowed Professional Fee Claims; provided, that to the extent the Allowed Professional Fee Claims for any Professional exceed the amount for such Professional provided for in the Carve-Out set forth in the Cash Collateral Order, such Professional shall receive its Pro Rata Share of any Liquidating Trust Assets available for Distribution after payment of all Allowed Administrative Claims and any Distributions to the Holders of Class 1A Claims, Holders of Class 1B Claims and Holders of Class 3 Claims.

(c)    **Priority Tax Claims**

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date or unless otherwise agreed to by the Liquidating Trustee and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall in exchange for such Allowed Priority Tax Claim:  (a) regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan; (ii) over a period ending not later than 5 years after the date of the order for relief under Section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan; (b) such other treatment in accordance with 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed between the Holder of such Allowed Priority Tax Claim and the Liquidating Trustee.

(d)    **U.S. Trustee Fee Claims**

The Debtors or the Liquidating Trustee, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  The U.S. Trustee shall not be required to file any proof(s) of claim regarding quarterly fees.

### 4.2.3    Impaired/Voting Classes of Claims against and Equity Interests in the Debtors.

(a)    **Lender Secured Claims (collectively, "Class 1A Claims").**

Classification:    Class 1A Claims consist of all Lender Secured Claims against the respective Debtors, other than First Out Lender Secured Claims.

Treatment:  Except to the extent that a Holder of an Allowed Class 1A Claim agrees to a less favorable treatment in exchange for each Class 1A Claim, a Holder of an Allowed Class 1A Claim shall receive (a) its Pro Rata Share of all Restricted Cash remaining in the Debtors' bank accounts as of the Effective Date and (b) a first priority lien on and secured claim against Liquidating Trust Assets that are Pre-Petition Collateral or proceeds thereof or, solely to the extent of any post-petition diminution in value of the Pre-Petition Collateral, Post-Petition Collateral.  To the extent the Allowed Class 1A Claims exceed the amount of Restricted Cash and any Pre-Petition Collateral or Post-Petition Collateral, such Class 1A Claims shall be treated as Class 4 Claims for purposes of treatment and Distribution.

Voting:  Class 1A Claims are Impaired by the Plan.  Each Holder of an Allowed Class 1A Claim is entitled to vote to accept or reject the Plan.

(b)    **First Out Lender Secured Claims (collectively, "Class 1B Claims").**

Classification:  Class 1B Claims consist of all First Out Lender Secured Claims against the respective Debtors.

Treatment:  Except to the extent that a Holder of an Allowed Class 1B Claim agrees to a less favorable treatment in exchange for each Class 1B Claim, a Holder of an Allowed Class 1B Claim shall receive (a) its Pro Rata Share of all Restricted Cash remaining in the Debtors' bank accounts as of the Effective Date and (b) a first priority lien on and secured claim against Liquidating Trust Assets that are Pre-Petition Collateral or proceeds thereof, or, solely to the extent of any post-petition diminution in value of the Pre-Petition Collateral, Post-Petition Collateral.  To the extent the Allowed Class 1B Claims exceed the amount of Restricted Cash and any Pre-Petition Collateral or Post-Petition Collateral, such Class 1B Claims shall be treated as Class 4 Claims for purposes of treatment and Distribution.  Any Distribution to a Holder of an Allowed Class 1B Claim shall be made in accordance with the terms of the Assignment Agreement.

Voting:  Class 1B Claims are Impaired by the Plan.  Each Holder of an Allowed Class 1B Claim is entitled to vote to accept or reject the Plan.

(c)    **Other Priority Claims (collectively, "Class 3 Claims").**

Classification:  Class 3 Claims consist of all Other Priority Claims against the Debtors.

Treatment:  Except to the extent that an Allowed Other Priority Claim has been paid prior to the Effective Date or unless otherwise agreed to by the Liquidating Trustee and the Holder of an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive either (i) full payment on account of such Allowed Other Priority Claim on the later of the Effective Date or on such date such Other Priority Claim is Allowed, or (ii) such other treatment as may be agreed between the Holder of such Allowed Other Priority Tax Claim and the Liquidating Trustee.

Voting:  The Holders of Class 3 Claims are Impaired by the Plan.  Each Holder of an Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

**4.2.4        Impaired/Non-Voting Classes of Claims against and Equity Interests in the Debtors.**

(a)    **Other Secured Claims (collectively, "Class 2 Claims").**

Classification:  Class 2 Claims consist of all Other Secured Claims against the Debtors.

Treatment:   To the extent of the Debtors' right, title or interest to the Assets securing such Other Secured Claims, a Holder of an Allowed Class 2 Claim shall receive such right, title and interest in exchange for each Class 2 Claim.

Voting:   The Holders of Class 2 Claims are deemed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

(c)    **General Unsecured Claims (collectively, "Class 4 Claims").**

Classification:   Class 4 Claims consist of all General Unsecured Claims against the Debtors.

Treatment:   Except to the extent that a Holder of an Allowed Class 4 Claim agrees to a less favorable treatment in exchange for each Class 4 Claim, a Holder of an Allowed Class 4 Claim shall receive its Pro Rata Share of any remaining Liquidating Trust Assets after providing for the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Professional Fee Claims.  For the avoidance of doubt, Allowed Class 4 Claims shall include for Distribution purposes, all Class 1A Claims and Class 1B Claims Allowed in excess of the Restricted Cash, any Pre-Petition Collateral and any Post-Petition Collateral.

Voting:   The Holders of Class 4 Claims are deemed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

(d)    **Equity Interests (collectively, "Class 5 Equity Interests").**

Classification:   Class 5 Equity Interests consist of all Equity Interests in the Debtors which after giving effect to substantive consolidation as provided in the Plan will include only the Equity Interests in FCC Holdings, Inc.

Treatment:  Class 5 Equity Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

17

**Voting**:  The Holders of Class 5 Equity Interests are deemed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

(e)    **Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing herein shall affect the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**4.3**    **Acceptance or Rejection of the Plan.**

**4.3.1    Impaired Classes of Claims and Equity Interests Entitled to Vote.** Only Holders of Allowed Claims in each Impaired Class of Claims receiving a Distribution under the Plan are entitled to vote as a Class to accept or reject the Plan.  Accordingly, only the votes of Holders of Class 1A Claims, Holders of Class 1B Claims and Holders of Class 3 Claims shall be solicited with respect to the Plan.

**4.3.2    Acceptance by an Impaired Class.**  In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims or Equity Interests in such Class that have timely and properly voted to accept or reject the Plan.

**4.3.3    Presumed Rejection by Impaired Class.**  Holders of Class 2 Claims, Holders of Class 4 Claims and Holders of Class 5 Equity Interests are Impaired under the Plan. Under Section 1126(g) of the Bankruptcy Code, Holders of such Impaired Claims and Equity Interests are conclusively presumed to have rejected the Plan, and the votes of Holders of such Impaired Claims and Equity Interests shall not be solicited.

**4.3.4    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

**4.3.5    Elimination of Vacant Classes.**  Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

### 4.4    The Liquidating Trust.

#### 4.4.1    Sources of Consideration for Plan Distributions

The Debtors' Cash and the other Liquidating Trust Assets shall be used to fund the Distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims provided herein.

#### 4.4.2    The Liquidating Trust

On or prior to the Effective Date, the Debtors, on their own behalf and on their Estates' behalf and on behalf of the Holders of Claims and Equity Interests that are to be satisfied with post-Effective Date Distributions from the Liquidating Trust Assets, will execute the Liquidating Trust Agreement and will take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Liquidating Trust all of their rights, title, and interests in all of the Liquidating Trust Assets.

The FCC Liquidating Trust shall be established solely for the purpose of holding and administering the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Accordingly, the Liquidating Trustee shall hold the Liquidating Trust Assets pursuant to the terms of the Plan and the Liquidating Trust Agreement by engaging in the following activities: (a) pursuing the Causes of Action retained by the Liquidating Trust; (b) making all required Distributions to the beneficiaries as provided for under the Liquidating Trust Agreement; and (c) taking other actions as may be necessary to effectuate any of the foregoing. The Liquidating Trust will not hold itself out as an investment company and will not conduct a trade or business. At no time shall the Liquidating Trust control or operate the business of the Debtors or any assets of the Debtors other than the Liquidating Trust Assets.

Notwithstanding anything to the contrary in the Plan, any disclosure or examination of any Privileged Documents shall be limited to the Liquidating Trustee and the attorneys that the Liquidating Trustee has retained on behalf of the Liquidating Trust for the purpose of pursuing Causes of Action or claims not released by the Debtors, those attorneys' administrative support personnel, and any consulting, non-testifying experts retained by the Liquidating Trustee on behalf of the Liquidating Trust for the purpose of assisting the Liquidating Trust in pursuing such Causes of Action or claims. The Liquidating Trustee may not disclose any of the Privileged Documents (or the contents of the Privileged Documents), or otherwise take any actions that may constitute a waiver of the attorney-client privilege, work product privilege, common interest privilege, or any other applicable privileges with respect to the Privileged Documents, without giving three (3) Business Days' notice to the applicable affected party and an opportunity to object. Nothing in the Plan shall constitute a waiver of any privilege claims over any of the documents, including the Privileged Documents that are produced to or received by the Liquidating Trust or Liquidating Trustee. For the avoidance of doubt, the Liquidating Trust is a successor-in-interest to the Debtors, and thus, the transfer of the Privileged Documents as provided herein does not impair or waive any privilege.

19

### 4.4.3    Liquidating Trust Board.

The Liquidating Trust will be governed by the Liquidating Trust Board, which shall initially consist of three voting members designated by the Creditors' Committee and BMO, in consultation with the Debtors.

### 4.4.4    Appointment and Termination of the Liquidating Trustee

The Liquidating Trustee shall be jointly selected by the Debtors and the Creditors' Committee by no later than ten (10) days prior to the Plan Voting Deadline.  The Debtors shall File and serve a notice identifying the person or entity selected as Liquidating Trustee on the parties entitled to vote on the Plan and parties that have requested notice pursuant to Bankruptcy Rule 2002 no later than seven (7) days prior to the Plan Voting Deadline.  The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be effective on the Effective Date.

In accordance with the Liquidating Trust Agreement, the Liquidating Trust shall continue for a term terminating on the earlier to occur of (a) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (b) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets or retained Causes of Action are not likely to yield sufficient additional proceeds to justify further pursuit, (c) the date on which the Liquidating Trust Board directs the Trustee to terminate the Trust (which date shall be at least thirty (30) days after such direction has been provided by the Liquidating Trust Board to the Trustee) or (d) all Distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust Board may not terminate the Liquidating Trustee for any reason without approval by the Bankruptcy Court.  The Liquidating Trust Board may bring a motion on proper notice to the Liquidating Trustee and its counsel for removal of the Liquidating Trustee for, among other reasons: (1) fraud, gross negligence, or willful misconduct in connection with the affairs of the Liquidating Trust, (2) for such physical or mental disability as substantially prevents the Liquidating Trustee from performing the duties of Liquidating Trustee in accordance with the Plan or the Liquidating Trust Agreement, or (3) for cause, which shall include a breach of fiduciary duty or an unresolved conflict of interest.

### 4.4.5    Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a), with no objective to continue or engage in the conduct of a trade or business.  In the

event the Liquidating Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.7701-4(d), the parties to the Liquidating Trust Agreement intend that the Liquidating Trustee take such action as it shall deem appropriate to have the Liquidating Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a publicly traded partnership under Code Section 7704), including, if necessary, creating or converting it into a Delaware limited liability partnership or limited liability company.

For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer by each Debtor of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the beneficiaries in full satisfaction of the beneficiaries' claims against the Debtors and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Distribution Reserve Account (as defined in the Liquidating Trust Agreement), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets in exchange for such beneficiaries interest in the Liquidating Trust Assets. Accordingly, the Liquidating Trust beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, provincial, territorial and local income tax purposes

The Liquidating Trust shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to each holder in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes.

The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Liquidating Trust Assets and shall pay any federal, state and local income taxes attributable to the Liquidating Trust Assets, based on the items of income, deduction, credit or loss allocable thereto.

The Liquidating Trust may request an expedited determination of Taxes of the Debtors or of the Liquidating Trust, including the Distribution Reserve Account, under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trustee shall be responsible for filing all federal, state, local and foreign tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing

authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

### 4.4.6          Responsibilities of Liquidating Trustee

The responsibilities of the Liquidating Trustee, which shall be discharged in accordance with the terms of the Plan and the Liquidating Trust Agreement, shall include, but not shall not be limited to, the following:

(a)     Administering, liquidating, and monetizing the Liquidating Trust Assets;

(b)     Establishing a Bar Date and objecting to and resolving Disputed Claims;

(c)     Investigating, pursuing, litigating, settling, or abandoning any Causes of Action which constitute Liquidating Trust Assets;

(d)     Making Distributions in accordance with the terms of the Plan and the Liquidating Trust Agreement;

(e)     Preparing and filing post-Effective Date operating reports;

(f)     Filing appropriate tax returns in the exercise of its fiduciary obligations;

(g)     Retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations; and

(h)     Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust.

To the extent necessary or appropriate, the Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which a Debtor is a party, consistent with Section 1123(b)(3)(B) of the Bankruptcy Code and Section 303 of Delaware General Corporation Law.

### 4.4.7          Cost and Expenses of Liquidating Trustee

To the extent the Liquidating Trust Funding is insufficient to pay the expenses of the Liquidating Trust and the Liquidating Trustee, then such expenses shall be reimbursed from the first dollars out of any proceeds that come into the Liquidating Trust above the amount of the Trust Funding and before any Distribution to the beneficiaries of the Liquidating Trust; provided, however, the Liquidating Trust expenses shall be subject to the procedures and review set forth in the Liquidating Trust Agreement.

### 4.4.8          Bonding of Liquidating Trustee

The Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his, her, or its sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidating Trust.

FTL 109906775v9

### 4.4.9             Fiduciary Duties of the Liquidating Trustee

Pursuant to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of the beneficiaries of the Liquidating Trust.

### 4.4.10           Dissolution of the Liquidating Trust

The Liquidating Trust shall continue for a term terminating on the earlier to occur of (a) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (b) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets or retained Causes of Action are not likely to yield sufficient additional proceeds to justify further pursuit, or (c) all distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  If at any time the Liquidating Trustee determines, in reliance upon such Professionals as the Liquidating Trustee may retain and in consultation with the Liquidating Trust Board, that the expense of administering the Liquidating Trust so as to make a final distribution to the beneficiaries is likely to exceed the value of the Liquidating Trust Assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (x) reserve any amount necessary to dissolve the Liquidating Trust, (y) donate any balance to a charitable organization described in section 501(c)(3) of the Code; provided that the Liquidating Trustee, members of the Liquidating Trustee Board and/or any Debtor may not have any ties or connections to such charitable organization, and (z) dissolve the Liquidating Trust.  Notwithstanding the foregoing, after the termination of the Liquidating Trust, the Liquidating Trustee shall have the power to exercise all the powers, authorities and discretions herein conferred solely for the purpose of winding up the affairs of the Liquidating Trust.  The Liquidating Trustee shall retain the books, records and files that shall have been delivered to or created by the Liquidating Trustee.  At the Liquidating Trustee's discretion, all of such records and documents may be destroyed at any time after two (2) years from the date of termination of the Liquidating Trust.

### 4.4.11           Liability, Indemnification of the Liquidating Trust Protected Parties

The Liquidating Trust Protected Parties shall not be liable for any act or omission of any other Liquidating Trust Protected Parties or the member, designee, agent, or representative of such Liquidating Trust Protected Parties, nor shall such Liquidating Trust Protected Parties be liable for any act or omission taken or not taken in their capacity as Liquidating Trust Parties other than for specific acts or omissions resulting from such Liquidating Trust Protected Parties' willful misconduct, gross negligence or fraud.  The Liquidating Trustee may, in connection with the performance of his, her, or its functions, and in his, her, or its sole and absolute discretion,

23

consult with his, her, or its attorneys, accountants, financial advisors, and agents. Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with his, her, or its attorneys, accountants, financial advisors, and agents, and his, her, or its determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or the Liquidating Trust Protected Parties, unless such determination is based on willful misconduct, gross negligence or fraud. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Protected Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses), which such Liquidating Trust Protected Parties may incur or to which such Liquidating Trust Protected Parties may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Liquidating Trust Protected Parties arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that such indemnification shall be limited to the Liquidating Trust Assets and provided further that no such indemnification will be made to such Liquidating Trust Protected Parties for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

### 4.4.12 Full and Final Satisfaction Against Liquidating Trust

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidating Trust Agreement. All payments and all Distributions made by the Liquidating Trustee under the Plan shall be in exchange for all Claims or Equity Interests against the Liquidating Trust.

### 4.5 Means for Implementation of the Plan.

#### 4.5.1 Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, the Debtors, or any other Entity or Person or further Order of the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

#### 4.5.2 Dissolution and Boards of the Debtors and Officers

As of the Effective Date, the existing boards of directors and/or boards of managers of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and any all remaining officers,

24

managers or directors of each Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders or members of such Debtor, or the officers and directors of such Debtor.

On the Effective Date, the Professionals retained by the Debtors shall be deemed to have completed their services unless they are expressly retained by the Liquidating Trustee, but they shall be able to file final applications for reasonable compensation and reimbursement of expenses through the Effective Date as provided for in the Plan.

### 4.5.3        Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any further Bankruptcy Court Order, approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 4.5.4        Preservation of Rights of Action

Other than Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order (including, for the avoidance of doubt, any claims or Causes of Action released pursuant to Article XI hereof), the Debtors reserve and, as of the Effective Date, assign to the Liquidating Trust, any and all Causes of Action, including without limitation any actions specifically enumerated in the Plan Supplement.  On and after the Effective Date, the Liquidating Trustee may pursue such Causes of Action in accordance with the Liquidating Trust Agreement.

Subject in all respects to Article XI of the Plan, the Debtors shall not release any Avoidance Actions, and the Liquidating Trustee shall be authorized and empowered to enforce any such Avoidance Actions on and after the Effective Date in accordance with the terms of the Plan and the Liquidating Trust Agreement; provided that, for the avoidance of doubt, Purchaser acquired any and all potential preference actions pursuant to Section 544 and 547 of the Bankruptcy Code against non-insiders of the Debtors and has covenanted not to pursue such actions.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors reserve the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. Except as otherwise provided by the Liquidating Trust Agreement, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall retain and shall have,

25

including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court to the fullest extent permitted by Section 1123 of the Bankruptcy Code and all other applicable law. Notwithstanding anything contained herein to the contrary, the settlement of Claims and Causes of Action which are expressly to be settled by confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

### 4.5.5    Closing of Debtors' Cases

For the avoidance of doubt, the closing of such case shall not have any effect, in any manner, on the Causes of Action that the Liquidating Trustee may assert in accordance with the Plan and the Liquidating Trust Agreement. The jointly administered case of FCC Holdings, Inc., identified as Case No. 14-11987 (CSS) (the "Main Case") shall remain open and subject to the provisions of Section 6.5 of the Plan. Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Main Case, when all Assets contributed to the Liquidating Trust in accordance with Section 5.02 above and the Liquidating Trust Agreement have been liquidated and converted into Cash (other than those assets previously abandoned by the Debtors or abandoned by the Liquidating Trust), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Main Case in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms of Section 5.10 of the Plan.

### 4.5.6    Cancellation of Existing Agreements and Existing Stock and/or Membership Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, membership interests, instruments, warrants, certificates, and other documents evidencing any Claims or Equity Interests shall be canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be terminated.

### 4.5.7    Operations of the Debtors Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### 4.5.8    Dissolution

On the Effective Date, and without the need for any further order of the Bankruptcy Court, action or formality which might otherwise be required under applicable non-bankruptcy laws, the Debtors shall be deemed dissolved without the need for any filings with the Secretary

of State or other governmental official in each Debtors' respective state of incorporation or formation.

### 4.5.9        Dissolution of the Creditors' Committee

On the Effective Date the Creditors' Committee shall be deemed dissolved and subject to Section 11.04 of the Plan, its members shall be deemed released of their duties, responsibilities and obligations, provided, however, that the Creditors' Committee shall remain in existence with respect to (a) any Professional Fee Claims; and (b) any appeals of the Confirmation Order.

### 4.6        Treatment of Executory Contracts and Unexpired Leases

### 4.6.1        Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under Bankruptcy Code Section 365 rejecting all prepetition executory contracts and unexpired leases to which the Debtor is a party, to the extent that such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtor, (b) previously shall have expired or terminated pursuant to its own terms before the Petition Date or (c) is the subject of a pending motion to assume or reject on the Confirmation Date.

### 4.6.2        Asset Purchase Agreement; Designated Contracts

The Debtors' rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any Cure obligations assumed by the Purchaser in accordance with the Asset Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases.

### 4.7        Provisions Governing Distributions

### 4.7.1        Calculation of Amounts to be Distributed

Each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Liquidating Trustee, on behalf of the Debtors or the Liquidating Trust, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VIII. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

### 4.7.2 Delivery of Distributions and Undeliverable or Unclaimed Distributions

*(a) Record Date for Distribution*

On the Distribution Record Date, the Claims Register shall be closed and the Debtors or the Liquidating Trustee or any other party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

*(b) Delivery of Distributions in General*

1.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the Liquidating Trustee's reasonable discretion, be deemed to have been made by the Liquidating Trustee on the Effective Date, unless the Liquidating Trustee and the applicable Holder of such Claim agree otherwise.

2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Liquidating Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

3.    Distributions

On and after the Effective Date, the Liquidating Trustee shall make the Distributions required to be made on account of Allowed Claims under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Liquidating Trustee in the Distribution Reserve Account and distributed on the next Distribution Date that occurs after such Claim Allowed in accordance with the Plan and the Liquidating Trust Agreement. In accordance the Plan, no interest shall accrue or be paid on the unpaid amount of any Distribution paid pursuant to the Plan.

*(c) Minimum; De Minimus Distributions*

Notwithstanding any other provision of the Plan to the contrary (including the treatment of any Claims or Classes), (a) the Liquidating Trustee shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of

28

such fraction to the nearest whole dollar (up or down), with half dollars being rounded down, and (b) the Liquidating Trustee shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $5,000, in which case such Distributions shall be deferred to the next Distribution date, (ii) if the amount to be distributed to that Holder on the particular Distribution date is less than $25.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) the amount of the final Distribution to any such Holder is less than $25.00, in which case such Distribution shall revert to the Liquidating Trust for distribution on account of other Allowed Claims.

### (d) Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest; provided, however, such Distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of four (4) months from the date the initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### (e) Charitable Contributions

After the final Distributions have been made in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of remaining Cash is less than $5,000, the Liquidating Trustee may donate such amount to one or more charities or philanthropic endeavors as chosen by the Liquidating Trustee, in consultation with the Liquidating Trust Board; provided that such philanthropic endeavors shall be non-profit, and provided further that such charities or philanthropic endeavors shall not have any connection to the Liquidating Trustee, the Debtors or the Liquidating Trust Board.

### (f) Manner of Payment Pursuant to the Plan

Cash payments under the Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Debtors or the Liquidating Trustee, as applicable, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Debtors or the Liquidating Trustee, as applicable. Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Debtors or the Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks issued by the Liquidating Trustee shall be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check shall be made directly to the Liquidating Trustee.

### 4.7.3        Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Debtors, or the Liquidating Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Debtors and the Liquidating Trustee are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Plan and Liquidating Trust Agreement shall be subject to any such withholding and reporting requirements. Each Creditor is required to provide the Liquidating Trustee with an executed Form W-9 or similar tax form as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9 or similar form within 90 days of written request, said Creditor shall be deemed to have forfeited their Distribution.

### 4.7.4        Claims Paid or Payable to Third Parties

*(a) Claims Paid by Third Parties; Recourse to Collateral*

The Debtors or the Liquidating Trustee, as applicable, shall be authorized to reduce in whole or in part a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or, as applicable, the Liquidating Trust, including on account of recourse to collateral held by third parties that secure such Claim. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment, in whole or in part, from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the Debtor or the Liquidating Trustee, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

*(b) Claims Payable by Insurance, Third Parties; Recourse to Collateral*

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or  more of the

Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding the foregoing, Section 8.05(b) of the Plan does not apply with regard to the Lender Secured Claim.

*(c) Applicability of Insurance Policies*

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and consummation of the Plan shall not limit or affect the rights of any third-party beneficiary of any of the Debtor's insurance policies with respect to such policies, including the D&O Policy, and the rights of the Debtors under any such insurance policies shall vest in Liquidating Trustee as of the Effective Date.

### 4.8    **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Equity Interests**

#### 4.8.1        **Resolution of Disputed Claims**

*(a) Allowance of Claims and Equity Interests*

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

*(b) Prosecution of Objections to Claims or Equity Interests*

Subject in all respects the provisions hereof, other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and on or after the Effective Date, the Liquidating Trustee shall have the authority to File objections to Claims or Equity Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all Claims or Equity Interests, regardless of whether such Claims or Equity Interests are in a Class or otherwise. For the avoidance of doubt, the U.S. Trustee's right to object to Claims, including Professional Fee Claims and Claims asserted under Section 503(b)(3) and (b)(4) is reserved.

Subject to the foregoing sentence, from and after the Effective Date, the Liquidating Trustee (a) may settle or compromise any Disputed Claim in accordance with the Liquidating Trust Agreement and (b) shall succeed to the Debtors' rights with respect to any objections Filed

31

by the Debtors that remain pending as of the Effective Date. From and after the Effective Date, the Liquidating Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

##### (c) Claims Estimation

On and after the Effective Date, the Liquidating Trustee, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including Section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Debtors or the Liquidating Trustee, as applicable, may elect to pursue additional objections to the ultimate Distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidating Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim.  Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

##### (d) Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtors or the Liquidating Trustee (or the Notice and Claims Agent at, as applicable, the Debtors' or the Liquidating Trustee's direction), and any Claim that has been amended may be adjusted thereon by, as applicable, the Debtors or the Liquidating Trustee without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.8.2        Distribution Reserve Account

Distributions of Liquidating Trust Assets with respect to Disputed Claims shall be deposited into the Distribution Reserve Account in accordance with the terms of the Plan and the Liquidating Trust Agreement.  The amount deposited shall be determined by the Liquidating Trustee in consultation with the Liquidating Trust Board.  The Liquidating Trustee may, in consultation with the Liquidating Trust Board, invest any Cash that is withheld in the Distribution Reserve Account in accordance the Liquidating Trust Agreement.  Notwithstanding any such investment and the addition to Liquidating Trust Assets of any income earned in respect thereof, in the event such Claim ultimately becomes an Allowed Claim, nothing in the Plan or Liquidating Trust Agreement shall be deemed to entitle the holder of a Disputed Claim to postpetition or post-Effective Date interest on such Claim.

### 4.8.3        Distributions After Allowance

On the next Distribution Date after the date when the order or judgment of the Bankruptcy Court allowing all or part of a Disputed Claim becomes a Final Order, the Liquidating Trustee, or such other disbursing agent, will (1) distribute to the holder of such Claim any property in the Distribution Reserve Account that would have been distributed to such beneficiary on the Distribution Dates on which distributions previously were made to beneficiaries if the Claim in issue had been an Allowed Claim (in whole or in part, as applicable) on such earlier Distribution Dates; and (2) distribute any remaining property held in the Distribution Reserve Account on  account of any resolved Disputed Claim in accordance with the Plan and the Trust Agreement.

After a Final Order has been entered, or other final resolution has been reached with respect to all Disputed Claims, any remaining property held in the Distribution Reserve Account will be distributed in accordance with the Plan and the Trust Agreement.

### 4.8.4        Disallowance of Claims

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtors or the Liquidating Trustee (or the Notice and Claims Agent at, as applicable, the Debtors' or the Liquidating Trustee's direction), and any Claim that has been amended may be adjusted thereon by, as applicable, the Debtors or the Liquidating Trustee without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.8.5        Amendments

After the Administrative Claims Bar Date and the Bar Date, as applicable, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that, even with such Bankruptcy Court authorization, a Claim may be amended by the Holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

### 4.8.6        No Interest

Unless otherwise specifically provided for in the Plan, by applicable law, or agreed-to by, as applicable, the Debtors or the Liquidating Trustee, interest shall not accrue or be paid on any Claim, and no Holder of any Claim shall be entitled to interest accruing on and after the Petition Date on account of any Claim. Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final Distribution paid on account of such Claim occurs after the Effective Date.  Notwithstanding the foregoing, if Holders of Allowed General Unsecured Claims receive a distribution of 100%, they shall be paid interest from the Petition Date until the date their Allowed General Unsecured Claims are paid in full at the federal judgment interest rate that was in effect on the Petition Date, which interest rate is 0.15 percent (0.15%).

### 4.9     Retention of Jurisdiction

### 4.9.1        Retention of Jurisdiction

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising under the Bankruptcy Code or arising in or related to these Chapter 11 Cases and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with Section 1334(b) of Title 28 of the United States Code), including, among other things, jurisdiction to:

(a)        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Equity Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

(b)        hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; provided, however, that the payment of the fees and expenses of the Professionals of the Reorganized Debtors and the Creditors' Committee incurred from and after the Effective Date shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)        hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)    effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

(e)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, these Chapter 11 Cases, any litigation rights or the Plan;

(f)    enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)    hear and determine any and all disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(h)    consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)    enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)    hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the schedules to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the schedules to the Plan, the Disclosure Statement, or the Confirmation Order;

(l)    enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with these Chapter 11 Cases;

(m)    except as otherwise limited herein, recover all assets of the Debtors and property of the Estate, wherever located;

(n)    hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharges;

(p)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(q)      enter a final decree closing these Chapter 11 Cases.

### 4.9.2       Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to these Chapter 11 Cases, including the matters set forth in Section 11.01 of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### 4.10      Settlement, Releases, Injunctions and Exculpations

### 4.10.1       Debtors Will Not Receive Discharge

**Notwithstanding anything to the contrary therein, the Debtors shall not receive a discharge under the Plan.**

### 4.10.2       Releases by Debtors

**ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, EACH DEBTOR ON BEHALF OF ITSELF, ITS ESTATE, AND THE LIQUIDATING TRUST (SUCH THAT THE LIQUIDATING TRUST WILL NOT HOLD ANY CLAIMS OR CAUSES OF ACTION RELEASED PURSUANT TO THIS ARTICLE 11.02), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO EACH OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY EACH DEBTOR AND ITS ESTATE) AND THEIR RESPECTIVE PROPERTY FROM:**

**(A)      ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE ASSET PURCHASE AGREEMENTS, CREDIT AGREEMENT AND ANY ANCILLARY LOAN DOCUMENTS ENTERED INTO AT ANY TIME IN CONNECTION WITH THE CREDIT AGREEMENT (INCLUDING ANY ASPECT OF THE RELATIONSHIP BETWEEN BMO, AS ADMINISTRATIVE AGENT AND AS A LENDER UNDER THE CREDIT AGREEMENT, THE OTHER LENDERS**

36

UNDER THE CREDIT AGREEMENT, AS LENDERS, AND THE DEBTORS, AS BORROWERS AND GUARANTORS, ANY ACTS OR OMISSIONS BY BMO OR THE LENDERS UNDER THE CREDIT AGREEMENT IN CONNECTION THEREWITH, OR ANY LOANS OR ADVANCES MADE PURSUANT TO, CLAIMS, LIABILITIES OR OBLIGATIONS UNDER (OR THE NATURE OR CHARACTERIZATION THEREOF), THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS OR THE LIQUIDATING TRUST WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE IS NOT INTENDED TO AND SHALL NOT RELEASE, AFFECT OR IMPAIR ANY CLAIMS, SUITS, JUDGMENTS, DAMAGES, RIGHTS, CAUSES OF ACTION AGAINST OR OBLIGATIONS OR LIABILITIES OF ANY FIRST OUT LENDERS THAT ARE INSIDERS OF ANY OF THE DEBTORS ARISING WHOLLY FROM ANY ACTS OR OMISSIONS OF ANY FIRST OUT LENDER AS AN INSIDER, EQUITYHOLDER, OFFICER OR DIRECTOR OR IN ANY OTHER CAPACITY OTHER THAN AS A LENDER UNDER THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS); PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF ANY DEBTOR OR THEIR RESPECTIVE CHAPTER 11 ESTATES AGAINST A RELEASED PARTY ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN;

(B)    ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO PAYMENTS RECEIVED FROM ANY DEBTOR OR ANY OTHER PARTY BY ANY OF THE PURCHASER, BMO OR ANY LENDERS PARTY TO THE CREDIT AGREEMENT FROM TIME TO TIME (INCLUDING THE FIRST OUT LENDERS AND THE CONSENTING LAST OUT LENDERS) UNDER, PURSUANT TO OR IN CONNECTION WITH THE CREDIT AGREEMENT, INCLUDING ANY CONSENT FEES; AND

(C)    ANY AND ALL AVOIDANCE ACTIONS AGAINST ANY OF THE PURCHASER, BMO AND ANY LENDERS PARTY TO THE CREDIT AGREEMENT FROM TIME TO TIME, INCLUDING THE FIRST OUT LENDERS AND THE CONSENTING LAST OUT LENDERS; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE IS NOT INTENDED TO AND SHALL NOT RELEASE, AFFECT OR IMPAIR ANY CLAIMS, SUITS, JUDGMENTS, DAMAGES, RIGHTS,

37

CAUSES OF ACTION AGAINST OR OBLIGATIONS OR LIABILITIES OF ANY FIRST OUT LENDERS THAT ARE INSIDERS OF ANY OF THE DEBTORS ARISING WHOLLY FROM ANY ACTS OR OMISSIONS OF ANY FIRST OUT LENDER AS AN INSIDER, EQUITYHOLDER, OFFICER OR DIRECTOR OR IN ANY OTHER CAPACITY OTHER THAN AS A LENDER UNDER THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, _AND_, _FURTHER_, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

### 4.10.3    Third Party Release

ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM:

(A)    ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE ASSET PURCHASE AGREEMENT, THE CREDIT AGREEMENT AND ANY ANCILLARY LOAN DOCUMENTS ENTERED INTO AT ANY TIME IN CONNECTION WITH THE CREDIT AGREEMENT (INCLUDING ANY ASPECT OF THE RELATIONSHIP BETWEEN BMO, AS ADMINISTRATIVE AGENT AND AS A LENDER UNDER THE CREDIT AGREEMENT, THE OTHER LENDERS UNDER THE CREDIT AGREEMENT, AS LENDERS, AND THE DEBTORS, AS BORROWERS AND GUARANTORS, ANY ACTS OR OMISSIONS BY BMO OR THE LENDERS UNDER THE CREDIT AGREEMENT IN CONNECTION THEREWITH, OR ANY LOANS OR ADVANCES MADE PURSUANT TO, CLAIMS, LIABILITIES OR

OBLIGATIONS THEREUNDER (OR THE NATURE OR CHARACTERIZATION THEREOF); PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE IS NOT INTENDED TO AND SHALL NOT RELEASE, AFFECT OR IMPAIR ANY CLAIMS, SUITS, JUDGMENTS, DAMAGES, RIGHTS, CAUSES OF ACTION AGAINST OR OBLIGATIONS OR LIABILITIES OF ANY FIRST OUT LENDERS ARISING WHOLLY FROM ANY ACTS OR OMISSIONS OF ANY FIRST OUT LENDER THAT IS AN INSIDER OF ANY OF THE DEBTORS AS AN INSIDER, EQUITYHOLDER, OFFICER OR DIRECTOR OR IN ANY OTHER CAPACITY OTHER THAN AS A LENDER UNDER THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS), THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT, THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT AFFECT ANY PROOFS OF CLAIM FILED OR CLAIMS OTHERWISE ALLOWED AGAINST THE DEBTORS OR CLAIMS OR CAUSES OF ACTION PENDING AGAINST A RELEASED PARTY IN A COMPLAINT OR PLEADING FILED AS OF THE PETITION DATE IN A COURT OR ARBITRATION PANEL OF COMPETENT JURISDICTION; AND PROVIDED, FURTHER, HOWEVER, THAT, THE THIRD PARTY RELEASE SHALL PRECLUDE A RELEASING PARTY FROM AMENDING OR MODIFYING SUCH COMPLAINT OR PLEADING TO ASSERT CLAIMS OR CAUSES OF ACTION AGAINST A RELEASED PARTY THAT WAS NOT OTHERWISE A PARTY TO SUCH PROCEEDING AS OF THE PETITION DATE;

(B)    ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO PAYMENTS RECEIVED FROM ANY DEBTOR OR ANY OTHER PARTY BY ANY OF THE PURCHASER, BMO OR ANY LENDERS PARTY TO THE CREDIT AGREEMENT FROM TIME TO TIME (INCLUDING THE FIRST OUT LENDERS AND THE CONSENTING LAST OUT LENDERS) UNDER, PURSUANT TO OR IN CONNECTION WITH THE CREDIT AGREEMENT, INCLUDING ANY CONSENT FEES; AND

(C)    ANY AND ALL AVOIDANCE ACTIONS AGAINST ANY OF THE PURCHASER, BMO AND ANY LENDERS PARTY TO THE CREDIT AGREEMENT FROM TIME TO TIME, INCLUDING THE FIRST OUT LENDERS AND THE CONSENTING LAST OUT LENDERS; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE IS NOT INTENDED TO AND SHALL NOT RELEASE, AFFECT OR IMPAIR ANY CLAIMS, SUITS, JUDGMENTS, DAMAGES, RIGHTS,

CAUSES OF ACTION AGAINST OR OBLIGATIONS OR LIABILITIES OF ANY FIRST OUT LENDERS THAT ARE INSIDERS OF ANY OF THE DEBTORS ARISING WHOLLY FROM ANY ACTS OR OMISSIONS OF ANY FIRST OUT LENDER AS AN INSIDER, EQUITYHOLDER, OFFICER OR DIRECTOR OR IN ANY OTHER CAPACITY OTHER THAN AS A LENDER UNDER THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

### 4.10.4    Exculpation

The Exculpated Parties shall neither have, nor incur any liability, to any holder of a claim or an equity interest, the Debtors, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, negotiation, or implementation of the Sale Transaction, including the implementation of the Sale Transaction, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct; provided further, however, that the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law; provided further, that the foregoing exculpation shall not be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order.

### 4.10.5    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO SECTION 11.02 OR SECTION 11.03 HEREOF; (3) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.04 HEREOF (BUT ONLY TO THE EXTENT OF THE

40

EXCULPATION PROVIDED IN SECTION 11.04); OR (4) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED, INCLUDING THE LIQUIDATING TRUST AND THE LIQUIDATING TRUST ASSETS) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF (UNLESS PREVIOUSLY ASSERTED) OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR SUBROGATION PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED

41

**CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

### 4.10.6    Setoffs

Except as otherwise provided in the Plan, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Equity Interest on account of any Proof of Claim or other pleading Filed with respect thereto prior to the Confirmation Hearing and the Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Distribution is made on account of such Allowed Claim or Equity Interest), any claims, rights, and Causes of Action of any nature that the Debtors' Estates may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), including any rights under Section 502(d) of the Bankruptcy Code, provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such claims, rights, and Causes of Action that the Debtors' Estates may possess against such Holder, provided, further, that the Holder of a Claim or Equity Interest may contest such set off by the Debtors or the Liquidating Trustee, as applicable, in the Bankruptcy Court or any other court of competent jurisdiction. In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors' Estates unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff; provided that nothing in the Plan shall prejudice or be deemed to have prejudiced the Debtors' or the Liquidating Trustee's right to assert that any Holder's setoff rights were required to have been asserted by motion or pleading filed with the Bankruptcy Court prior to the Effective Date.

### 4.10.7    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in these Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

### 4.11    Conditions Precedent to Confirmation and Consummation of the Plan

#### 4.11.1    Conditions to Confirmation

The following conditions precedent to the occurrence of the Confirmation Date must be satisfied unless any such condition shall have been waived by the Debtors in accordance with Section 12.03 of the Plan:

> (a)    the Confirmation Order shall have been entered in form and substance satisfactory to the Debtors and the Creditors' Committee;

> (b)    the Liquidating Trustee shall have been appointed and the Liquidating Trust Agreement shall have been executed and become effective; and

> (c)    the Bankruptcy Court finds that adequate information and sufficient notice of the Disclosure Statement, the Plan and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan has been given to all relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).

#### 4.11.2    Notice of Occurrence of the Effective Date

The Debtors or Liquidating Trustee shall File a notice of the occurrence of the Effective Date within five (5) business days thereafter; provided, however, that failure to timely File such notice shall not effect the occurrence of the Effective Date.

#### 4.11.3    Waiver of Conditions

Each of the conditions set forth in this Article XI may be waived in whole or in part by the Debtors and the Creditors' Committee without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

#### 4.11.4    Consequences of Non-Occurrence of Effective Date

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Equity Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) to the extent permitted under the Bankruptcy Code, the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of one forty-five (45) days after the date the Confirmation Order is vacated.

### 4.11.5    Substantial Consummation

Substantial Consummation of the Plan shall be deemed to occur on the Effective Date.

### 4.12    Miscellaneous Provisions

#### 4.12.1    Administrative Claims Bar Date

All Administrative Claims (other than as set forth herein) must be made by application Filed with the Bankruptcy Court and served on counsel for the Debtors or Liquidating Trustee no later than forty-five (45) days after the Effective Date or their Administrative Claims shall be forever barred.  In the event that the Liquidating Trustee objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing no application seeking payment of an Administrative Claim need be Filed with respect to Cure owing under an Executory Contract or Unexpired Lease if the amount of Cure is fixed or proposed to be fixed by order of the Bankruptcy Court pursuant to a motion to assume and fix the amount of Cure Filed by the Debtors and a timely objection asserting an increased amount of Cure Filed by the non-Debtor counterparty to the subject contract or lease; provided further, however, that post-petition statutory tax claims shall not be subject to the Administrative Claims Bar Date.

With respect to Administrative Claims, the last day for Filing an objection to any Administrative Claim will be the later of (a) 180 days after the Effective Date, (b) 90 days after the filing of such Administrative Claim, or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

#### 4.12.2    Professional Fee Claims

(a)  All final requests for payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on the Debtors, their counsel, the Liquidating Trustee, its counsel, counsel to the Creditors' Committee, the U.S. Trustee and other necessary parties-in-interest no later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be Filed and served on the Debtors, their counsel, Liquidating Trustee, its counsel, counsel to the Creditors' Committee and the requesting Professional or other Entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(b)  The Liquidating Trustee may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to them after the Effective Date.

#### 4.12.3    Modifications and Amendments

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as

44

appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, but only until the Effective Date and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII hereof.

Notwithstanding anything herein to the contrary, any modification, alteration, or amendment to the Plan suggested or filed by the Debtors that would affect in any material way the economic or any other terms of the Asset Purchase Agreement, may become effective only with the prior written consent of the Purchaser and the Creditors' Committee.

After the Effective Date, the Liquidating Trustee can modify the Plan only in accordance with Section 1127 of the Bankruptcy Code and applicable law.

### 4.12.4      Continuing Exclusivity and Solicitation Period

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to Section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

### 4.12.5      Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 4.12.6      Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Entity, including, but not limited to, the Liquidating Trustee and all other parties-in-interest in these Chapter 11 Cases such as Holders of Claims and Equity Interests.

### 4.12.7      Revocation, Withdrawal or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of (x) any Claims against, or any Equity Interests in, the Debtors, or (y) any Avoidance Actions, Litigation Rights or other claims by or against the Debtors, the Creditors' Committee or any Entity, (ii) prejudice in any manner the rights of the Debtors, the Creditors' Committee, or any Entity in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors, the Creditors' Committee, or any other Entity.

### 4.12.8      Notices

Any notice, request, or demand required or permitted to be made or provided under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:
> Greenberg Traurig LLP
> Attn:  Nancy A. Mitchell, Esq.
>        Matthew L. Hinker, Esq.
> 200 Park Avenue
> New York, New York 10166
> Tel:  (212) 801-9200
> Fax:  (212) 801-6400
> Email: hinkerm@gtlaw.com

If to the Creditors' Committee:
> Otterbourg P.C.
> Attn:   David M. Posner, Esq.
> 230 Park Ave.
> New York, NY 10169
> Tel: (212) 661-9100
> Fax:  (212) 682-6104
> Email: dposner@otterbourg.com

> -and-

Womble Carlyle Sandridge & Rice LLP
Attn: Matthew P. Ward, Esq.
222 Delaware Ave., Suite 1501
Wilmington, DE 19801
Tel: (302) 252-4320
Fax: (302) 252-4330
Email: maward@wcsr.com

### 4.12.9    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

### 4.12.10    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtor; in each case without giving effect to the principles of conflicts of law thereof.

### 4.12.11    Exhibits

All exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims or Equity Interests may also obtain a copy of any exhibit upon written request to the Debtors in accordance with Section 12.11 of the Plan.  To the extent any exhibit is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit portion of the Plan shall control.

### 4.12.12    Conflicts

To the extent any provision of the Disclosure Statement or any instrument, document or agreement executed in connection with the Plan or any exhibits, schedules, appendices, supplements or amendments to the foregoing conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.  To the extent of any inconsistency between the Plan and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

### 4.12.13    Exemption

Under Section 1145 of the Bankruptcy Code, the issuance of the beneficial interests in Liquidating Trust under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities and

47

Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Liquidating Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

### 4.12.14    Substitution of the Liquidating Trust for the Debtors

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party in lieu of the Debtors in all pending matters including but not limited to (i) motions, contested matters and adversary proceeding pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums or administrative proceedings outside of the Bankruptcy Court without the need or requirement for the Liquidating Trustee to file motions or substitutions of parties and counsel.

## 5.    RISK FACTORS AND LIQUIDATION ANALYSIS

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

**5.1    Certain Bankruptcy Considerations.**  Even if an Impaired Class votes to accept the Plan, and with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may exercise substantial discretion and may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

**5.2    Claims and Asset Value Estimation.**  There can be no assurance that the estimated amount of Claims set forth in the Plan is correct.  Additionally, there can be no assurance that the Debtors' estimate of the value of the Assets is correct.  Any increase in the amount of Claims or decrease in the value of the Assets versus the Debtors' estimates of each could result in decreased recoveries to Creditors.  The actual allowed amounts of Claims may differ from the Debtors' estimates.  Any value given as to the Claims against and the Assets of the Debtors and the Estates is based upon an estimation of such value only and no formal appraisal of either has been done in connection with this Disclosure Statement.

Distributions to Creditors holding Allowed Class 2, 4 and 5 Claims are almost entirely dependent on the successful prosecution of the Causes of Action transferred to the Liquidating Trust.  There is no other source of payment for Distributions to such Creditors.  The value of the Causes of Action is speculative and there is no assurance that such Liquidating Trust Assets will generate any proceeds for Distribution to the Holders of Class 2, 4 and 5 Claims.  Under the Plan and Settlement Agreement, IEC has agreed to provide the Liquidating Trust Funding to pay expenses related to the administration of the Liquidation Trust, which expenses include the fees and expenses of the Liquidating Trustee and its professionals.  To the extent the Liquidating Trust Funding is insufficient to pay the expenses of the Liquidating Trust and the Liquidating

Trustee, then such expenses shall be payable before any Distributions to Holders of Allowed Class 2, 4 and 5 Claims.

The Debtors, however, believe that the same factors described herein are present in and significantly greater to Creditors in a Chapter 7 case.

### 5.3     Liquidation Analysis.

In the event that the Plan is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidated the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Attached hereto as **Exhibit 3** is a Liquidation Analysis that provides a reasonable estimate of the recoveries for creditors in a liquidation under the proposed Plan.  In the event of a liquidation under chapter 7, the liquidation analysis would be similar to what is provided on **Exhibit 3**, except that (i) IEC would be under no obligation to contribute the additional $100,000 to fund the Liquidating Trust that it has agreed to contribute in connection with the Plan, (ii) chapter 11 professional fees would be paid pari passu with other chapter 11 administrative claims, and (iii) the Debtors believe that in a liquidation under chapter 7, additional administrative expenses involved with the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' estates, thereby reducing the assets available to for distribution to creditors.  Accordingly, the Debtors believe that a chapter 7 liquidation is a less attractive alternative for Holders of Claims against or Equity Interests in the Debtors than the Plan because of the greater return anticipated by the Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated.

## 6.     TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States ("**U.S.**") federal income tax consequences of the Plan to certain Holders of Claims.  The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury regulations promulgated thereunder (the "**Regulations**"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service ("**IRS**") as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.  The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  This summary does not generally address state, local, or non-U.S. tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers,

broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).  Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN MAY BE UNCERTAIN DUE TO THE LACK OF DIRECTLY APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW.  NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE  IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED WITH RESPECT THERETO.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.   THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE  TAX CODE; (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN; AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### 6.1    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

6.1.1   Sale of the Debtors' Assets.  The sales of substantially all of the Debtors' Assets (each, a "Sale" and collectively, the "Sales") in the Chapter 11 Cases are a taxable transaction.  Thus, the Debtors must recognize any gain or loss realized on the Sales.  To determine the amount of gain or loss realized on any Sale, the total consideration (net of selling expenses) received in such Sale must be allocated among the Assets sold in accordance with their relative fair market values.  The gain or loss realized with respect to each asset is then determined separately by subtracting the selling Debtors' tax basis in such asset from the amount of consideration received for such asset.  To the extent that the Debtors recognize a net gain from the Sale, such gain may be offset either by (i) net operating losses ("NOLs") that accrue during the taxable year of the Sale, (ii) the Debtors' existing NOLs from prior taxable years, or (iii) capital loss carryforwards from prior years. The Debtors' ability to use certain losses (including loss carryforwards) to offset taxable gains and income may be subject to certain limitations under

the Tax Code.  Accordingly, the amount of gain or loss arising from the Sales may be subject to adjustment in subsequent years in the event contingent payments are made in connection with any Sale.

      **6.1.2**   Cancellation of Indebtedness and Reduction of Tax Attributes.  As a result of the consummation of the Plan, certain indebtedness of the Debtors will be deemed to be discharged for U.S. federal income tax purposes.  Generally, gross income includes the amount of any such cancellation of indebtedness ("**COD**") income.  The amount of the COD income generally equals the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction).  Because the Debtors are in a chapter 11 bankruptcy proceeding, however, the Debtors will not be required to recognize COD income.  Instead, the Debtors will be required to reduce certain tax attributes to the extent of unrecognized COD income.  The order and manner prescribed for the reduction of the Debtors' tax attributes is set forth in section 108(b)(2) of the Tax Code.  The tax attributes of the Debtors subject to reduction include NOLs, NOL carryforwards, capital losses and loss carryovers, certain tax credits, and, subject to certain limitations, the income tax basis of Debtors' property (including stock of subsidiaries).

      **6.2**    **FEDERAL INCOME TAXATION OF THE LIQUIDATION TRUST**

Upon the occurrence of the Effective Date, the Debtors' Assets will be transferred to the Liquidating Trust to be established pursuant to the Plan.  The tax treatment of the Liquidating Trust is discussed in section 4.4.5 herein.

      LIQUIDATING TRUST BENEFICIARIES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPROPRIATE FEDERAL INCOME TAX REPORTING OF ALLOCATIONS FROM THE LIQUIDATING TRUSTS.

      **6.3**    **FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

      **6.3.1**  **In General.**  The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors, including, but not limited to: (i) whether the Holder's Claim (or a portion thereof) constitutes a Claim for principal or interest; (ii) the origin of the Holder's Claim; (iii) the type of consideration received by the Holder in exchange for the Claim; (iv) whether the Holder is a resident of the U.S. for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (v) whether the Holder reports income on an accrual or cash basis method; (vi) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Holder's Claim; and (vii) whether the Holder received Distributions under the Plan in more than one taxable year.

      Generally, a Holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for the Holder's Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim, including, in the case of the Liquidating Trust Beneficiaries, the fair market value of each

51

Liquidating Trust Beneficiary's proportionate share of the Assets transferred to the Liquidation Trust on the behalf of and for the benefit of such Holder (to the extent that such cash or other property is not allocable to any portion of the Claim representing accrued but unpaid interest (see discussion below)).  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost therefore.  The holding period of a Liquidating Trust Beneficiary in its proportionate share of the Assets held by the Liquidating Trust will begin on the day following the deemed Distribution of Assets to the Holder.

The character of any recognized gain or loss (*i.e.*, as ordinary income or as short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of the Claim's acquisition, the Holder's holding period of the Claim, and the extent to which the Holder of the Claim previously claimed a deduction for the worthlessness of all or a portion of the Claim.  If the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as capital gain or loss and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.  There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers.

HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS AND RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

> **6.3.2    Allocation of Consideration to Accrued Interest.**    A portion of the consideration received by a Holder of a Claim in satisfaction of that Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest. If any portion of the Distribution is required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the Holder has previously reported such interest as income.  A Holder will generally recognize a loss to the extent that any accrued interest was previously included in the Holder's gross income and is not paid in full.

Pursuant to the Plan, all Distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for U.S. federal income tax purposes, and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

In the event that a portion of the consideration received by a Holder of a Claim represents accrued but unpaid interest, only the balance of the Distribution would be considered received by the Holder in respect of the principal amount of the Claim.  Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Holder with respect to the Claim.  If any such loss were a capital loss, it would not offset any amount of the Distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the Distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

      **6.3.3**   **Market Discount.** A Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the Holder.

      **6.3.4**   **Information Reporting and Backup Withholding.** The Debtors and the Liquidating Trustee, as well as their respective paying agents, may be obligated to furnish information to the IRS regarding the consideration paid to Holders (other than corporations and other exempt Holders of Claims) pursuant to the Plan.

      A Holder of an Allowed Claim may be subject to backup withholding with respect to any "reportable" payments received pursuant to the Plan unless (i) such Holder falls within certain exempt categories and, when required, demonstrates its eligibility for such exemption or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding, and otherwise complies with the applicable requirements of the backup withholding rules. A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS. Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the IRS.

### 6.4   RESERVATION OF RIGHTS

      The foregoing discussion is subject to change (possibly substantially) based on subsequent changes to the Plan or subsequent events. The Debtors and their advisors reserve the right to modify, revise, or supplement this discussion and other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

      **THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL, AND FOREIGN TAX LAWS. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors, the Agent and the Committee believe that Confirmation and consummation of the Plan are preferable to all other alternative restructuring options.  Consequently, the Debtors urge all Holders of Claims in voting classes to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED by the Voting Agent on or before 5:00 p.m. (prevailing Eastern Time) on the Voting Deadline.

FCC Holdings, Inc.,
and its affiliated Debtors

*/s/ Sean Harding*
By: Sean Harding
Chief Restructuring Officer

*/s/ Dennis A. Meloro*
Dennis A. Meloro  (DE Bar No. 4435)
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware  19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360

-and-

Nancy A. Mitchell
Maria J. DiConza
Matthew L. Hinker
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400

Counsel for the Debtors and Debtors-in-Possession

DATED:  January 28, 2015